UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                           CASE NO. 8:16-cr-517-T-33AEP

RICHMOND JOSEPH MCDONALD

**SENTENCING MEMORANDUM**

The United States files this sentencing memorandum requesting a

Guidelines sentence for Defendant Richmond Joseph McDonald.  In support

thereof, the United States states as follows:

**I.      Background**

**A.      Offense Conduct**

On November 30, 2016, the defendant was arrested on a criminal

complaint for enticement of a minor, in violation of 18 U.S.C. §§ 2422(b) and

2, for persuading, inducing, enticing, and coercing a seven-year-old female

child victim to engage in sexual activity with the defendant and the

defendant's wife, Shauna Boselli ("Boselli").  Docs. 1, 7.  The complaint

alleged that in July 2016, the defendant, along with Boselli, allowed Jamie

Esposito ("Esposito"), a man that they had met online, to travel to Tampa

with his seven-year-old child for the purpose of engaging in sexual activity

with the defendant and Boselli.  Prior to arriving in Tampa, Esposito

communicated with the defendant and Boselli via text message, Skype, and

Kik.  The defendant and Esposito discussed the fact that the child victim

1

would "be shy at first" but "will gravitate/copy" Boselli.  The defendant and Boselli created a video for the child victim and sent the video to Esposito.  In the video, Boselli waved to the camera and said, "hi, I can't wait to meet you."  The defendant and Boselli then turned to each other and kissed. Esposito responded that the child victim loved the video and sent a picture of the child victim holding a child's toy.

On or about July 19, 2016, Esposito and the child victim arrived in Tampa and met the defendant and Boselli at the zoo.  After spending time at the zoo and taking the child victim for ice cream, the defendant and Boselli led Esposito and the child victim their home in Tampa.  While at the house, Boselli entertained the child victim, while nude, by playing in the backyard and inside a child-like tent in the living room.  The defendant performed oral sex on the child victim while Esposito watched.

Two days later, on July 21, 2016, the defendant and Boselli went to Esposito's hotel and met with Esposito again for the purpose of engaging in sex acts with the child victim.  The defendant and Boselli went swimming with the child victim in the hotel pool before they led the child victim back to the hotel room.  Once they arrived back in the hotel room, the defendant, Boselli, and the child victim, removed all of their clothing and engaged in multiple sex acts.  While in the hotel room, Boselli performed oral sex on the child victim and vaginally penetrated the child victim with an object.  Boselli showed the child victim how she performs fellatio and both she and the child

2

victim performed fellatio on the defendant while Esposito watched.  During this sexual encounter at the hotel, the defendant ejaculated on to the child victim.

Esposito preserved this abuse by photographing the child victim engaged in sexually explicit conduct with the defendant and Boselli.[1]  The defendant is captured on video and in photographs allowing the child victim to perform fellatio on him.  Throughout every video and image, the defendant's demeanor is calm, relaxed, and he appears to be enjoying himself.  At no point does the defendant appear to be in distress, nor does he appear remorseful for the sexual acts he or Boselli is committing against the child victim.

On November 29, 2016, Homeland Security Investigations ("HSI") Orlando executed a federal search warrant at Esposito's residence.  During the execution of the search warrant, Esposito admitted that he had met the defendant and Boselli on Motherless.com, communicated with them via Kik, Skype, and text message, and travelled to Tampa in July 2016 so that the defendant and Boselli could engage in sexual activity with the child victim. On November 30, 2016, HSI agents executed a federal search warrant at the defendant's residence in Tampa and arrested the defendant and Boselli.

A forensic analysis of the defendant's Gateway desktop revealed that the defendant was in possession of 1,335 child-pornographic images.  Eighty-

---

[1] The specific details of the content of the images and videos depicting the defendant engaged in sexual activity with the child victim are attached as an Addendum to the PSR in paragraph 4 of the United States' letter of objections to the initial PSR, dated September 13, 2017.  *See* Doc. 106 at 27-29.

six of the child-pornographic images were sadistic, showing vaginal

penetration and/or bondage of prepubescent children.  Additionally, the

defendant received, via the Internet, several child-pornographic images and

videos of the child victim from Esposito.  Some of the images found on the

defendant's Gateway desktop were of the child victim.

A forensic analysis of the defendant's Asus Nexus Tablet revealed that

the defendant was in possession of approximately 30 child-pornographic

images, 30 child-erotica images, 90 child-anime images, two child-

pornographic videos, and four child-erotica videos.  Some of the child-

pornographic images were of a prepubescent female being sexually molested

by an adult male.  There were also images of a naked prepubescent female that

had been tied/bound by pink and/or purple rope, and in some images,

wearing a toy pig nose or handcuffs.

A forensic analysis of the defendant's LG cellular telephone revealed

that the defendant was in possession of approximately 15 child-pornographic

images and approximately 10 child-erotica images.

### B.    Procedural History

On December 1, 2016, the defendant appeared for his initial appearance

and requested release on bond.  Doc. 4.  Following a December 7, 2016,

detention hearing, United States Magistrate Judge Thomas B. McCoun, III,

found that "the defendant is a danger of similar criminal conduct involving

minors should he be released."  Doc. 12 at 2.  The court found that the

4

defendant cannot overcome the presumption as provided by 18 U.S.C. § 3142(e). *Id.* Specifically, the court reasoned that "the defendant would clearly again engage in such sordid activity, if given the opportunity…the defendant appears [to be] a predator likely to engage in sexual abuse of children if given the chance." Doc. 12 at 2.

On December 6, 2016, a federal grand jury returned a three-count Indictment charging the defendant with one count of enticement of a minor, in violation of 18 U.S.C. §§ 2422(b) and 2; one count of receipt of child pornography, in violation of 18 U.S.C. § 2252(a)(2); and one count of possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B). Doc. 8.

On May 2, 2017, a federal grand jury returned a four-count Superseding Indictment charging the defendant with one count of enticement of a minor, in violation of 18 U.S.C. §§ 2422(b) and 2; one count of production of child pornography, in violation of 18 U.S.C. § 2251(a), (e), and 2; one count of receipt of child pornography, in violation of 18 U.S.C. § 2252(a)(2); and one count of possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B).

On July 20, 2017, pursuant to a written plea agreement, the defendant pleaded guilty to one count of enticement of a minor, in violation of 18 U.S.C. § 2422(b), which carries a mandatory minimum term of imprisonment of 10 years up to life imprisonment and a term of supervised release of five years up

to life.  Doc. 60.  This Court adjudicated the defendant guilty on July 20,

2017.  Doc. 65.  The defendant's sentencing is scheduled for November 3,

2017.  Doc. 87.

## II.  <u>Presentence Investigation Report</u>

On October 27, 2017, probation issued its Final Presentence

Investigation Report (PSR) as to the defendant.  Doc. 106.  Pursuant to the

PSR, the defendant's applicable Guidelines range for the underlying offense is

life; he has a criminal history category of I; and the applicable period of

supervised release is five years to life.  Defense counsel has set forth factual

and legal objections to the information stated in the PSR.[2]

## III.  <u>Argument for Life Imprisonment</u>

The facts of this case and the defendant's conduct are utterly repulsive

and demand a Guidelines sentence.  A sentence of life imprisonment is

necessary due to the history and characteristics of the defendant, and for both

deterrence of these crimes and for the protection of the public against the

defendant.  *See* 18 U.S.C. § 3553(a).  The United States recognizes that a

sentencing court may not presume that a sentence within the advisory

guideline range is reasonable; however, the Guidelines remain a significant

and pivotal component of the sentencing process.  The Court "must first

---

[2] The United States' response to the defendant's objections to the PSR is outlined in the Addendum to the PSR.  *See* Doc. 106 at 34-37.

calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the former with reference to the latter." *Nelson v. United States*, 129 S. Ct. 890, 891-92 (2009).  Section 3553(a)(1) provides that, in determining a sentence, courts must consider the nature and circumstances of the offense, as well as the history and characteristics of the defendant.  Additional factors outlined in § 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense; to promote respect for the law; to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed education or vocational training, medical care, or other corrective treatment in the most effective manner.  18 U.S.C. § 3553(a)(2).  A consideration of these factors warrants a sentence of life imprisonment.

### A.   Nature and Circumstances of the Offense.

The nature and circumstances of the offense are despicable.  The defendant accessed a website known by law-enforcement officers to be used by individuals who are interested in and in engage in sexually explicit activities with children.  The defendant met co-conspirator Esposito on the website and voluntarily agreed to sexually abuse a seven-year-old child over a two-day period.  The defendant was clear that he intended to sexually abuse the child victim on multiple occasions if provided with the opportunity.  In his Kik

communications to Esposito, the defendant stated that he was "so excited" and that he wanted to be the child victim's "uncle or God father so to speak." PSR ¶¶ 50, 58.

In a proffer with federal agents, Esposito provided a thorough and detailed account of the two-day abuse. Esposito advised that the defendant and Boselli bought the child victim a stuffed panda bear from the gift shop at the zoo. Esposito stated that the defendant also bought the child victim ice cream from the ice cream shop after they had left the zoo, and continued to give the child victim gifts while at the defendant's home.

Esposito recounted the events of July 19, 2017, and stated that the Boselli and the child victim were playing in the backyard and then came inside to take a shower. After their shower, Boselli and the child victim came out into the living room. The child victim was wearing a towel with a hood.[3] Boselli and the child victim then went inside a tent that was in the living room. Boselli instigated a game of wrestling in the nude with the child victim, at which point the defendant began to undress. The defendant entered the tent and joined Boselli and the child victim. Esposito witnessed the defendant become completely nude while in the tent and develop an erection, which the defendant showed to the child victim. The defendant began to digitally stimulate the Boselli's vaginal area and told the child victim that the same type

---

[3] This is another gift that the defendant and Boselli gave to the child victim.

of sensation could happen to her.  The defendant led Boselli and the child victim, by the hand, into the bedroom where he performed oral sex on the child victim.

Esposito stated that while in the hotel room, on July 21, 2017, McDonald performed oral sex on the child victim.  Esposito stated that McDonald did not initially realize that Esposito had been videotaping and photographing the sexual encounter.  At some point, however, McDonald became aware of the videos and photographs and stated that it was okay for Esposito to continue.  McDonald requested that Esposito send him a copy of the videos and photographs.  Esposito recalled that McDonald had used a vibrator on the child victim but Esposito stopped the activity because McDonald was becoming too "aggressive."  After the sexual abuse, all four of them went to a restaurant to eat lunch.  The defendant told Esposito that he wanted to see the child victim regularly and was willing to travel to Orlando to visit.

In this case, the nature and circumstances of the offense are egregious and weigh heavily against the defendant.  While the defendant has only pleaded guilty to one count of child enticement, the defendant also received and was in possession of over 1300 child-pornographic images and videos that were sadistic, showing vaginal penetration and/or bondage of prepubescent children.  The pervasiveness of the defendant's activities and the fact that the sexual activity carried on for a period of two days, clearly demonstrate that the

defendant did not have a solitary lapse in judgment. The nature and circumstances of the offense dictate the need for a lifetime of incarceration of the defendant.

### B.   History and Characteristics of the Defendant

The defendant is a violent, sadistic, sexually deviant child predator. The defendant began his pattern of preying upon children at the age of 21 years old.[4] In 1999, the defendant was charged in Baldwin County, Georgia, for sexually molesting his then girlfriend's 12-year-old cousin. While pending the resolution to that case, the defendant physically and sexually abused other young women as outlined below. The defendant is precisely the kind of individual for which Congress "directed the Commission to ensure lengthy incarceration"—offenders who engage in a pattern of activity involving the sexual abuse or exploitation of minors. USSG § 4B1.5 app. notes.

1.   **The Defendant's Past Victims.**

a.   *E.S., 12-year-old female child victim*

On or about June 13, 1998, in Baldwin County, Georgia, the defendant fondled the breast and vaginal area of E.S. with the intent to arouse his sexual desires.[5] PSR ¶ 107. *See* Exhibit A. The defendant placed his hands on the back of E.S.'s head and forced E.S.'s face towards his genital area. PSR ¶ 107.

---

[4] The defendant committed this offense at 39 years old and is currently 40 years old.

[5] *State of Georgia v. Richmond McDonald*, in the Superior Court of Baldwin County, Georgia, case number #41514-D.

The defendant was charged in a two-count indictment on April 20, 1999.  PSR
¶ 107.  The defendant pleaded not guilty and proceeded to trial.  Testimony at
trial revealed that at the time of the offense the defendant was dating L.S.  E.S.
is the cousin of L.S.  The defendant met E.S. when she came to Milledgeville,
Georgia, to attend L.S.'s college graduation.  E.S. spent the night at the
defendant's apartment with her cousin.  During that time, the defendant
reached under E.S.'s shirt and fondled her breasts.  The defendant then pulled
E.S.'s shorts back and touched her vaginal area.  The defendant showed E.S.
his erect penis and placed his hand on the back of her head attempting to force
her head down onto his penis.  In its case-in-chief, the government introduced
several graphic pornographic images that had been recovered from L.S.'s
computer to show the defendant's "lustful disposition."  *See McDonald v. State*,
249 Ga. App. 1 (2001).  On or about January 13, 2000, the jury convicted the
defendant of count one—child molestation—and the court sentenced the
defendant to 10 years state prison.  PSR ¶ 107.  The defendant appealed[6] and
the Georgia Court of Appeals reversed the defendant's conviction, finding that
the pornographic materials were erroneously admitted because they were not

---

[6] On March 8, 2000, the trial court granted the defendant a $50,000 bond pending his
appeal.  *See* Exhibit D (Appeal Bond).  The defendant violated his bond.  Effingham County
Sheriff's Office executed a state search warrant for the purpose of locating evidence
regarding allegations against the defendant for rape, aggravated sodomy, and false
imprisonment.  *Id.*  During the search warrant, law-enforcement officers located
pornographic materials in the defendant's bedroom and in a building located on the curtilage
of the defendant's residence.  The court revoked the defendant's bond on October 6, 2000.
*See* Exhibit E (Motion and Order Revoking Appeal Bond).

relevant nor admissible to establish the defendant's "lustful disposition." *See id.* The Court of Appeals ordered a new trial but the case was ultimately dismissed in lieu of re-victimizing the child victim in a second trial.

### b.    *L.A.S.*

On or about September 11, 2000, L.A.S. contacted the Georgia State Board of Pardons and Paroles, concerned and distraught that the defendant was "out on bond." L.A.S. reported that the defendant had raped her at knife point, sodomized, and otherwise physically and sexually abused her[7] and that he had discussed his intentions of committing sexually abusive acts on a small girl that they had seen at a restaurant. *See* Exhibit B (Letter to Assistant District Attorney Baskin from Georgia State Board of Pardons and Paroles). L.A.S. provided a detailed and graphic account of the sexual and physical abuse that she had suffered at the hands of the defendant. *See* Exhibit C (Notarized Letter from L.A.S. to the Georgia State Board of Pardons and Paroles). In her four-page handwritten letter, L.A.S. described the defendant as "a sick rapist—molesting pig." L.A.S. recounted that while the defendant was out on his appeal bond, on or about June 27, 2000, she and the defendant were at a Japanese restaurant and the defendant stared at two little girls the entire time. The defendant told L.A.S. that: he wanted to see her "lick their

---

[7] L.A.S. made an initial report but never pursued formal changes against the defendant.

pussies;" "he knew how 'tight' they must be;" and "it was their purity that made him want them." Exhibit C at 3.

Based on L.A.S.'s report, the Effingham County Sheriff's Office executed a state search warrant for the purpose of locating evidence regarding allegations against the defendant for rape, aggravated sodomy, and false imprisonment. *Id*. During the search warrant, law-enforcement officers located pornographic materials in the defendant's bedroom and in a building located on the curtilage of the defendant's residence. The court revoked the defendant's bond on October 6, 2000. *See* Exhibit E (Motion and Order Revoking Appeal Bond).

On or about April 25, 2017, HSI agents interviewed L.A.S. regarding her relationship to the defendant. Seventeen years after L.A.S. wrote to the Georgia parole board, L.A.S. is still traumatized by the defendant and suffers from manic depression.

### c.    *D.H.*

On or about March 20, 2017, HSI agents interviewed D.H. regarding her relationship to the defendant. D.H. stated that she and the defendant attended the same high school and she met the defendant at the age of 15 years old. The two dated in high school and during junior college. D.H. told the agents that the defendant had physically and sexually abused her. Specifically, she recalled that when she was 18 or 19 years old, the defendant anally raped her and sodomized her because she had had sex with someone

else.  D.H. recalled another instance when the defendant pulled her out of a car window, held a knife to her ribs, and anally raped her.  D.H. never reported any of the incidents of physical or sexual abuse.

On or about December 12, 2000, while the defendant was incarcerated on the revocation of his appeal bond, Effingham County, Georgia, issued an arrest warrant for the defendant for invasion of privacy against D.H.[8]  *See* Exhibit F.  The arrest warrant details that in or about August 2000, the defendant distributed a videotape of the victim and the defendant engaged in sexual activity without the consent of victim.  D.H. explained to HSI agents that the defendant wanted to make a sex tape when she was 18 and one-half years old.  D.H. said that she had believed that the defendant had deleted the video until she later learned that the defendant had shown the video to people at school.  D.H. recalled that a few years after this, D.H. was contacted by Effingham County because they had found the video on a child pornography website and sought to list her as a potential witness in a pending case.

Years after these incidents, D.H. is still haunted by the defendant. During her interview with federal agents, D.H. was visibly shaken, upset, and cried during the interview.  D.H. stated that the defendant should not be allowed to walk to streets again so he does not hurt another child again.

---

[8] On that same date, Effingham County, Georgia, also issued two arrest warrants for defendant for misdemeanor sexual battery.  *See* Exhibit G (Arrest Warrant, case numbers 00-1567nc and 00-1568nc).  The victim of these offenses is unclear. The case was ultimately dismissed and the original case file has been destroyed.

2.    **The Defendant's 1999 Psychosexual Risk Evaluation.**

As a result of the defendant's Baldwin County, Georgia, charges the court ordered a psychosexual risk evaluation. *See* Exhibit H (Psychosexual Risk Evaluation). After the defendant's guilty verdict, the court relied on this evaluation in reviewing the defendant's presentence investigation report[9] and determining an appropriate sentence. The report, dated December 16, 1999, states that the defendant has "a strong arousal pattern to deviant stimuli." The defendant was in possession of pornography depicting coprophilia, bestiality, and women in bondage. While the licensed counselor found that the defendant did not appear to have a sexual interest in prepubescent children at that time, the report stated that defendant's sexually deviant interests "need[ed] to be closely monitored."

3.    **The Defendant's Alleged Sexual Abuse.**

There is no basis, under the advisory guidelines or 18 U.S.C. § 3553(a) for the Court to give the defendant's claims of prior victimization any weight in imposing a more lenient sentence. After the defendant learned he was facing a mandatory minimum term of 10 years' imprisonment and could serve up to life in federal prison, the defendant met with a probation officer from the United States Probation Office in preparation of his presentence investigation

---

[9] The United States obtained a copy of the defendant's presentence investigation report, which was filed in the defendant's Baldwin County, Georgia, case and has attached it to this memorandum underseal as Exhibit I.

report. The defendant made several revelations about past-unreported sexual abuse to the probation officer. PSR ¶ 113. The defendant advised that he had been sexually molested by an older student when he was in preschool. PSR ¶ 113. The defendant also reported that a high school teammate held him down and raped him at the age of 16. PSR ¶ 113.

This is the first time that the defendant has ever revealed these uncorroborated allegations and he has never sought treatment or support for these instances prior to the offense conduct. Notably, these allegations are missing from the defendant's very detailed 200-page presentence investigation report that had been compiled for the purposes of sentencing after his guilty conviction in 2000. The defendant's sexual abuse allegations are likely fabricated in an effort to obtain leniency and sympathy from the Court and should be disregarded.

"The victim-offender cycle in male sexual abuse has been popularized as an explanation of why some males sexually offend. However, there are serious limitations to this explanation . . . . " Lambie, Ian et al., "Resiliency in the victim-offender cycle in male sexual abuse" in *Sex Abuse: A Journal of Research and Treatment* 14(1) (2002) at 43. *See also*, Glasser, M. et al., "Cycle of child sexual abuse: links between being a victim and becoming a perpetrator" in *The British Journal of Psychiatry* 179 (2001) at 488 (noting that "the data do not provide strong support for a cycle of sexual substantial proportion of male perpetrators"); and Briggs, F. and R. Hawkins, "A Comparison of the

16

Childhood Experiences of Convicted Male Child Molesters and Men who were Sexually Abused in Childhood and Claimed to be Nonoffenders" in *Child Abuse & Neglect* 20(3) (1996) at 230 (concluding that "[S]exual abuse at particular ages and frequency of abuse do not of themselves necessarily lead to an increased likelihood of perpetuating abuse across generations.").

Moreover, with respect to studies which have suggested that "prior victimization may have some effect in a minority of perpetrators . . . [a]nother possibility is that some sexual perpetrators may feign sexual victimization in order to gain sympathy, preferential treatment, or therapy."  Glasser, M. et al., "Cycle of child sexual abuse: links between being a victim and becoming a perpetrator" in *The British Journal of Psychiatry* 179 (2001) at 488.  *See also*, Hall, R.C.W., "A Profile of Pedophilia: Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues" in Mayo Clinic Proceedings 82(4) (2007) at 464 ("There is also legitimate concern regarding the validity of many of the self-reports of pedophiles who claim to have been abused as children themselves.  These statements are often made in a legal or group treatment setting, in which pedophiles may be trying to mitigate their sentence or gain sympathy for their behavior."); Haywood, Thomas et al., "Cycle of Abuse and Psychopathology in Cleric and Noncleric Molesters of Children and Adolescents" in *Child Abuse & Neglect* 20(12) (1996) at 1234 ("Studies into prevalence of childhood sexual abuse among sex offenders have produced mixed results with 8% to 60% of child molesters reporting having been

17

sexually abused as a child. Variability in prevalence rates across studies may be due in part to differing motivations on the part of subjects to give self-serving histories. . .") (citations omitted); and Briggs, F. and R. Hawkins, "A Comparison of the Childhood Experiences of Convicted Male Child Molesters and Men who were Sexually Abused in Childhood and Claimed to be Nonoffenders" in *Child Abuse & Neglect* 20(3) (1996) at 232 ("Perpetrators may lie about their actions or attempt to excuse their behavior by pointing to their own victimization as children. . . Excuse-making may be more prevalent in settings where such behavior may be useful, such as in the early stages of therapy (before learning that excuse-making is not acceptable) or during the trial process (perhaps under the guidance of enthusiastic defense lawyers).").

Indeed, "when verified by polygraph . . . the percentage of offenders who experienced sexual victimization in their own lives drops significantly." Hindman, Jan et al., "Shedding Light on the Histories of Sex Offenders Using Clinical Polygraphy" in *The Sexual Predator* (vol. IV) (2010) at 20-5. *See also* Hindman, Jan et al., "Polygraph Testing Leads to Better Understanding Adult and Juvenile Sex Offenders" in Federal Probation 65(3) (2001) at 8.

In this case, the abuse claimed by the defendant, alleged molestation by an older student and rape by a high school teammate, bears little resemblance to the defendant's collection of child pornography, including bondage and bestiality of mostly female prepubescent children, or his sexual abuse of the child victim for his own sexual gratification. The notion that the defendant's

18

claimed abuse is any way related to his prior or current offense conduct is unsupported.  The defendant provides no evidence to support the idea that his allegations are at all relevant to his child pornography collection or his repeat sexual exploitation of minors.  There is no basis under the advisory guidelines or 18 U.S.C. § 3553(a) for the Court to give these claims any weight in imposing a more lenient sentence.

### C.    Seriousness of the Crime, Promote Respect for the Law, and Need for Just Punishment.

As the Eleventh Circuit explained in a child exploitation case, "the greater the harm the more serious the crime, and the longer the sentence should be for the punishment to fit the crime."  *United States v. Irey*, 612 F.3d 1160, 1206 (11th Cir. 2010), *cert. denied*, 131 S. Ct. 1813 (2011).  "Child sex crimes are among the most egregious and despicable of societal and criminal offenses ...."  *United States v. Sarras*, 575 F.3d 1191, 1220 (11th Cir. 2009) (discussing how courts have upheld lengthy sentences in cases involving child sex crimes as substantively reasonable).  Congress has explained that the "just deserts" concept in sentencing is a means of reflecting the "gravity of the defendant's conduct," as well as the "harm done or threatened by the offense."  S.Rep. No. 98-225, at 75-76, 1984 U.S.C.C.A.N. 3258-59.  Because "[t]he seriousness of the crime varies directly with the harm it causes or threatens ..." this Court should impose the maximum sentence possible.  *Irey*, 612 F.3d at 1206.  The sexual abuse committed by the defendant is beyond egregious and

undoubtedly inflicted irreparable harm on the child victim. The child victim will forever need the benefit of therapeutic treatment as she matures throughout life and learns to develop appropriate and healthy relationships. The significant harms inflicted and threatened by the defendant's conduct designate the seriousness of the offense and the need for a lifetime of imprisonment.

### D.    Adequate Deterrence to Criminal Conduct and Need to Protect the Public from Further Crimes of the Defendant.

The Seventh Circuit has explained why deterrence is so important for crimes involving the sexual abuse of children, including child pornography. *See United States v. Goldberg*, 491 F.3d 668 (7th Cir. 2007). "Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor." If sentences are more severe, like-minded individuals will be deterred, and the incarceration of those convicted of such crimes will help to protect the public. Furthermore, the Supreme Court has noted "grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class...." *Smith v. Doe*, 538 U.S. 84, 103 (2003). The defendant's pattern of sexual exploitation of minors is evidence of his recidivism. Accordingly, there is a strong need to protect the public from further crimes of the defendant.

In an effort to abate similar conduct in the future, this Court should impose a severe sentence that will serve as a warning to individuals

considering similar conduct.  A lengthy sentence will deter comparable activities and convey that such behavior is unacceptable and will be adjudicated harshly within the Eleventh Circuit.  Moreover, there is a strong need to protect the public from further crimes of defendant.  He has a long history of sexually abusing children.  The defendant has demonstrated no signs of changing his sexually exploitive ways, and he continues to pose a serious danger to society.  By repeatedly sexually exploiting minors, the defendant has volunteered to illustrate the repercussions for behavior civilized society deems unacceptable.

IV. **Conclusion**

The defendant's sentence should fairly account for the history of the defendant's predatory nature and the scope of the defendant's criminal endeavors, acknowledge the harm that he has caused to the child victim, and acknowledge the severe ramifications of his actions.  For the aforementioned reasons, the United States respectfully requests that this Court issue the only reasonable sentence for the defendant—life imprisonment.

Respectfully submitted,

W. STEPHEN MULDROW
Acting United States Attorney

By:    */s/ Lisa M. Thelwell*
       Lisa M. Thelwell
       Assistant United States Attorney
       Florida Bar No. 100809
       400 N. Tampa Street, Ste. 3200
       Tampa, FL 33602-4798
       Telephone: (813) 274-6000
       Facsimile: (813) 274-6178
       E-mail: lisa.thelwell@usdoj.gov

**U.S. v. Richmond Joseph McDonald        Case No. 8:16-cr-517-T-33AEP**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on November 1, 2017, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Kevin Beck, Esq.

/s/ Lisa M. Thelwell
Lisa M. Thelwell
Assistant United States Attorney
Florida Bar No. 100809
400 N. Tampa Street, Ste. 3200
Tampa, FL 33602-4798
Telephone: (813) 274-6000
Facsimile: (813) 274-6178
E-mail: lisa.thelwell@usdoj.gov

T:\_Cases\Criminal Cases\M\McDonald, Richmond_2016R02521_LYT\Sentencing\p_sentencing memo_McDonald.docx