```
                    UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
                          TAMPA DIVISION


UNITED STATES OF AMERICA,      )  Tampa, Florida
                               )
                 Plaintiff,    )  No. 8:16-cr-517-T-33AEP-2
                               )
          vs.                  )  November 3, 2017
                               )
SHAUNA MARYANN BOSELLI,        )  9:00 a.m.
                               )
                 Defendant.    )  Courtroom 14B
_____)
```

VOLUME I

**TRANSCRIPT OF SENTENCING HEARING**
BEFORE THE HONORABLE VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

*Official Court Reporter:*

*Scott Gamertsfelder, RMR, FCRR*
*801 North Florida Avenue*
*Tampa, Florida 33602*
*Telephone:  (813) 301-5898*

*(Proceedings reported by stenotype; Transcript produced by computer-aided transcription.)*

**A P P E A R A N C E S**

**GOVERNMENT COUNSEL:**

      **Lisa M. Thelwell, Assistant U.S. Attorney**
      **Stacie Harris, Assistant U.S. Attorney**
      United States Attorney's Office
      400 North Tampa Street, Suite 3200
      Tampa, Florida 33602
      (813) 274-6000


**DEFENSE COUNSEL:**

      **Stephen M. Crawford, Esq.**
      Law Office of Stephen M. Crawford
      600 South Magnolia Avenue, Suite 275
      Tampa, Florida 33606
      (813) 251-2273


               **ALSO PRESENT:**

                 Terri Botterbusch, Agent
                 Homeland Security
                 Investigations

                 David Tremmel,
                 Probation Officer

                 - - -

### TABLE OF CONTENTS

#### EXAMINATIONS

| GOVERNMENT WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| TERRI L. BOTTERBUSCH | 33 | 48 | 54 | |

| DEFENDANT WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| KAROL ANN DAWSON | 67 | 79 | | |
| NIKKI ANN DANIELS | 84 | 92 | 100 | 100 |
| VALERIE McCLAIN, PH.D. | 103 | 112 | 120 | |

#### EXHIBITS

| GOVERNMENT | PAGE | LINE |
|---|---|---|
| 1 through 35............. | 38 | 17 |
| 40...................... | 45 | 11 |
| 50...................... | 47 | 17 |

| DEFENDANT | PAGE | LINE |
|---|---|---|
| 1....................... | 86 | 20 |

- - -

1                      **P R O C E E D I N G S**

2      November 3, 2017                                    9:07 a.m.

3                             - - -

4              COURT SECURITY OFFICER:  All rise.

5              The United States District Court in and for the

6      Middle District of Florida is now in session.  The Honorable

7      Virginia M. Hernandez Covington presiding.

8              Please be seated.

9              THE COURT:  Good morning.

10             We are here for the sentencing in *United States*

11     *versus Shauna Maryann Boselli*, Case No. 8:16-cr-517-T-33AEP.

12             I'll begin by having counsel state their

13     appearances.  Who do we have for the government?

14             MS. THELWELL:  Good morning, Your Honor.  Lisa

15     Thelwell on behalf of the government.

16             MS. HARRIS:  Stacie Harris on behalf of the United

17     States, Your Honor.

18             THE COURT:  Who else is with you at counsel table?

19             MS. HARRIS:  To my left is Homeland Security

20     Investigations Special Agent Terri Botterbusch.

21             THE COURT:  Thank you.

22             For the defendant.

23             MR. CRAWFORD:  Good morning, Your Honor.  Steve

24     Crawford on behalf of Miss Boselli, who is seated to my right.

25             THE COURT:  And we have Mr. Tremmel from

1    probation.

2              MR. CRAWFORD:  Judge, could you give us a quick

3    moment to talk about an exhibit?

4              THE COURT:  Sure.

5              (*Brief pause.*)

6              MR. CRAWFORD:  Thank you, Your Honor.

7              THE COURT:  You are welcome.

8              I had originally scheduled the sentencing of the

9    co-defendant to coincide at this time; but as you know, I

10   received a motion to continue, and under the circumstances, I

11   felt that I needed to do it.  I think we have a date

12   scheduled for that.

13             Is that right, Miss Teasley?

14             THE COURTROOM DEPUTY:  Yes, Your Honor.  November

15   21st.

16             THE COURT:  Miss Thelwell, do you have a conflict

17   for that date?

18             MS. THELWELL:  We do, Your Honor.  I do anticipate

19   that Agent Botterbusch will testify at the hearing, and she

20   is out on leave during that time.

21             THE COURT:  We will have to find a date that is

22   acceptable.  It's been really frustrating on this case to try

23   to find a date that's perfect for everybody, and I just can't

24   do it.  This case has been continued, continued, continued.

25   Now, granted, one of those was my issue because I was in the

 1   middle of a trial that ran longer than what I anticipated,

 2   and that's why I had to reschedule this from last week or two

 3   weeks ago.  I had a civil case moving forward and I was in

 4   trial that day.  But as I said, there have been numerous

 5   continuances, and it can't be the perfect situation where

 6   it's just perfect for everybody.

 7            To me, a date in December was not good.  Why?

 8   Because justice needs to be moved forward.  Things have to be

 9   resolved, and it can't be six months into the future, even

10   though that's the perfect date.  So I want this case resolved

11   at a reasonable date in the future.

12            If the case agent can't testify, we will have to

13   come up with a way to preserve her testimony or to do part of

14   it on one day, part of it on another day.  I don't know.  But

15   if that's not the perfect date, then we need to come up with

16   a date not in December, not in January, not in February, but

17   in the next few weeks.

18            MS. THELWELL:  Your Honor, I believe she's

19   available the Monday after Thanksgiving.

20            THE COURT:  I can't do it that week.  People are

21   going to have to adjust their schedules because I have other

22   matters that week.  That's why I'm going forward today, even

23   though I have a strong preference for sentencing defendants

24   together.  I have really been put in a challenging situation;

25   but given what Mr. Beck raised in his motion, that, to me,

1   was a very easy decision to continue it.  Just no choice in

2   the matter.  But your request to move this three weeks from

3   now or a month from now, in December, when there is a history

4   of continuances -- I mean, just look at this.  It's

5   continuance after continuance after continuance, after

6   continuance.  At some point it has to stop.

7         MS. THELWELL:  Your Honor, so I'm clear on what's

8   expected --

9         THE COURT:  Well, you can ask your question, sure.

10  I didn't mean to cut you off.  Go ahead.

11        MS. THELWELL:  I just wanted to be clear on what's

12  expected today.  Is Your Honor expecting to sentence

13  Miss Boselli absent considering Mr. McDonald's sentencing

14  hearing?

15        THE COURT:  Well, I'm going to decide, and I have

16  not made up my mind, and I may have to delay pronouncing

17  sentence, if I don't feel comfortable doing that, or I may be

18  able to move forward.  I'm going to decide at the appropriate

19  time.

20        MS. THELWELL:  Thank you.

21        THE COURT:  I'll also note, while we are talking

22  about the co-defendant, as I understand, there was a witness

23  who was going to testify today where Mr. Beck had waived his

24  right to cross-examine that witness; is that right?

25        MS. THELWELL:  Yes, Your Honor.  And it's the

1  victim's mother, and I'm not intending to put her on the

2  stand, but she does want to be heard by the Court.

3          THE COURT:  Okay.  That's as to both defendants?

4          MS. THELWELL:  Correct.

5          THE COURT:  Okay.  That's fine, then.

6          I don't have the memo here.  I'm trying to see

7  your motion where you suggested a date, Miss Thelwell, in

8  late December or mid-December.  Here we are on November 3rd.

9  So you are going to have to put your heads together with

10 Mr. Beck, when he's able to, and come up with a date sooner

11 than that.

12         I said the Monday or Tuesday before Thanksgiving.

13 We can do it Monday if your case agent is traveling for

14 Thanksgiving.  We can do it Monday.  I'll move the hearing

15 that I have that day to Tuesday, and you can have all day

16 Monday if you would like.

17         There have been so many gosh darn continuances.

18 Mr. Crawford has had several, and I've granted them, by

19 months, to accommodate people.  At some point it's just the

20 end of the line, and that's the way I feel right now.  It's

21 just the end of the line with these continuances.

22         All right.  We are ready to move forward.

23         Shauna Maryann Boselli, on April 24th, 2017, you

24 entered a plea of guilty to Count One of the Indictment,

25 charging you with enticement of a minor, in violation of

1  Title 18, United States Code, Sections 2422(B) and 2.  The

2  Court has previously accepted your guilty plea and has

3  adjudged you guilty of that offense.

4        We have now reached the stage in the proceedings

5  where it is my duty to address several questions to you and

6  your attorney and the counsel for the government.

7        I'll begin with Miss Thelwell.  Have you had the

8  opportunity to read the presentence report?

9        MS. THELWELL:  Yes, Your Honor.

10        THE COURT:  And do you have any objections as to

11  the factual accuracy of the report?

12        MS. THELWELL:  Your Honor, the only objection --

13        THE COURT:  Did you note it in your objections to

14  the presentence report?

15        MS. THELWELL:  I did, Your Honor.

16        THE COURT:  Okay.  What page is that so that I

17  can -- I have this electronically, so you are going to need

18  to call my attention to it.  Just give me one second, please.

19        Okay.  I have it in front of me.  Where should I

20  turn?

21        MS. THELWELL:  Yes, Your Honor.  If you look

22  beginning on page -- it's document 105, beginning on Page 27

23  of 47.

24        THE COURT:  Okay.  Give me one second.

25        Okay.  I see your letter there.  Right.

1          MS. THELWELL:  Specifically, the only thing that

2   was unresolved is paragraph 4 of my factual objections.  I

3   laid out on pages 28 through 31 the content of some of the

4   images and videos depicting the defendant engaged in

5   activity -- sexual activity with a minor; and so I asked

6   probation to include that in the offense conduct, but instead

7   it's been attached as an addendum to the PSR.

8          THE COURT:  Okay.  And what is that -- why is that

9   a concern to you, that it's been handled that way as opposed

10  to the way you prefer?

11         MS. THELWELL:  Your Honor, it's the content of the

12  images are explicit; and the way that the descriptions are

13  written make it very clear as to what occurred at the hotel,

14  and it should be included in the actual body of the PSR as

15  opposed to an addendum.

16         THE COURT:  Okay.  So it's because the content of

17  the images?  In essence, is that what is the biggest

18  objection to you, Miss Thelwell?

19         MS. THELWELL:  Yes, Your Honor.

20         THE COURT:  All right.  Mr. Tremmel, do you have a

21  response to that?

22         THE PROBATION OFFICER:  Your Honor, I apologize.

23  I thought we had resolved this, which is why I did not

24  address it in the addendum.  I did mention in the addendum --

25         THE COURT:  I thought it had been resolved, too.

1    That's why I was caught a little bit off guard.

2              THE PROBATION OFFICER:  Miss Thelwell did

3    communicate with me a few days ago, and she was still

4    concerned, and I explained it in detail, and I thought she

5    understood.

6              MS. THELWELL:  I understand his position, but I

7    still disagree with it, Your Honor.

8              THE COURT:  He thought it had been resolved, as

9    did I.  All right.  Do you need to take a minute to look at

10   that, Mr. Tremmel?

11             THE PROBATION OFFICER:  Your Honor, I can just

12   quickly say that in Chapter 6 of the guidelines, it talks

13   about the fact when there is a stipulation --

14             THE COURT:  Let me pull mine, as well.  Go ahead.

15             THE PROBATION OFFICER:  When there is a

16   stipulation in a case, as there was in this plea agreement,

17   any concern the government has or the parties have need to be

18   stipulated to in the stipulation itself or detailed elsewhere

19   in the plea agreement regarding the concerns that they may

20   have.

21             That wasn't done in this case.  That's why the

22   probation office was most comfortable -- and in the interest

23   of fairness to the defendant -- to do it the way we did.

24             THE COURT:  Mr. Crawford, do you have a position

25   on this?

1          MR. CRAWFORD:  No, ma'am.

2          THE COURT:  I'm going to ask Miss Thelwell.  I

3    think we are going to take a five-minute recess.  I'll stay

4    here.  Miss Thelwell, in talking to Mr. Crawford and

5    Mr. Tremmel, see if you can come up with a solution that's

6    acceptable to you, and then we will resume at five minutes.

7    I'm just going to stay here and take a five-minute recess.

8          We are in recess.

9          (Recess taken from 9:19 a.m. to 9:21 a.m.)

10          THE COURT:  Okay.  Miss Thelwell, were you able to

11    resolve this?

12          MS. THELWELL:  Yes, Your Honor.

13          THE COURT:  So how is this being resolved?

14          MS. THELWELL:  I believe probation will, after the

15    sentencing, file an amended final presentence investigation

16    report to include the descriptions as I've laid out in my

17    objections.

18          THE COURT:  And, Mr. Tremmel, that's okay with

19    you, then?

20          THE PROBATION OFFICER:  It is, Your Honor.

21          Mr. Crawford did not object to that resolution.

22    The concern might be this may also arise with Mr. McDonald,

23    but Mr. Beck is not here.

24          THE COURT:  Well, if it's an issue in the other

25    sentencing, we will take it up when we have that sentencing.

 1  But with respect to this defendant, it seems that you've been

 2  able to resolve it.  Terrific.

 3          What other objections do you have, Miss Thelwell?

 4          MS. THELWELL:  That is it, Your Honor.

 5          THE COURT:  That's it?

 6          MS. THELWELL:  Yes, Your Honor.

 7          THE COURT:  Okay.  Thank you.

 8          Let me turn to Mr. Crawford.  Mr. Crawford, have

 9  you had the opportunity to read and discuss with Miss Boselli

10  the presentence report?

11          MR. CRAWFORD:  Yes, Your Honor.  We have gone over

12  it together several times.

13          THE COURT:  Do you have any objections as to the

14  factual accuracy of the report?

15          MR. CRAWFORD:  The factual accuracy, yes, ma'am.

16          THE COURT:  Okay.  I'm happy to hear you now on

17  those objections.  I've also reviewed those, so I'm happy to

18  go through what is still unresolved.  Let me just turn to

19  that.  Should I look at page 24 on document 105?  That's your

20  letter of September 3rd.

21          MR. CRAWFORD:  Yes, ma'am.  And that outlines

22  exactly where I'm going.

23          THE COURT:  Go ahead, Mr. Crawford.

24          MR. CRAWFORD:  As you can see, Your Honor, I'm

25  concerned about the use of the word "they" and the

1  combination.  It seems to join matters that were done

2  exclusively by Mr. RJ McDonald and not my client.  It's a

3  continual thing; and I understand, when you are trying to

4  summarize, that type of language can sneak in.  But I want to

5  make very sure that the Court understands and is aware that

6  the RJM337 was the husband's user name for his Kik account,

7  not my client's.

8          My client doesn't even have a Kik account.  And

9  since a lot of the conversations and communications between

10 he and Mr. Esposito were on this, I just want to make sure

11 the Court has clear in your mind that there is a distinction

12 what RJ was doing on his account, and that had absolutely

13 nothing to do with mine.

14         The same can be said for -- and this one is a

15 little misleading because I think all of us jumped to this

16 conclusion.  When you see the name Tampacouple337, you just

17 automatically assume it would be Mr. RJ McDonald and his wife

18 Shauna Boselli.  But, in fact, this was created well before

19 Mr. McDonald even met my client and was actually the title --

20 whatever we call this, that was with RJ and his former

21 girlfriend Christy.

22         I believe that has now been established, and I

23 want to make sure that when the Court sees that, again, this

24 is a communication name that was used exclusively by RJ and

25 not by my client, Shauna Boselli.

1            So when you look at the exchanges that are

2   delineated by the probation office in paragraphs 13 through

3   37 -- I'm sorry, 13 through 57, and then again paragraphs 59

4   through 63, all of those exchanges, even though it indicates

5   it's Tampacouple337, have nothing to do with my client.

6            My client is not on them.  She's not

7   participating.  That is specifically communication between

8   Esposito and McDonald.  I just was a little concerned, again,

9   because of the use of the word "joining" and that somehow

10  being attributed to my client.

11            THE COURT:  The concern is, at least on the

12  RJM337, that it's the husband's Kik account and Tampacouple

13  was created by the co-defendant and that was his former

14  girlfriend Christy.  It's your concern that the Court be

15  aware of those two facts.

16            Do you want that --

17            MR. CRAWFORD:  I don't think it necessarily needs

18  to be amended in the PSR.  You understand the point, and I'm

19  sure it will factor into your sentencing accordingly.

20            THE COURT:  Anything else, Mr. Crawford?

21            MR. CRAWFORD:  With respect to factual accuracy,

22  no, ma'am.

23            THE COURT:  Okay.  Thank you very much.

24            Do you wish to make any objections to the

25  probation officer's application of the guidelines?

1          MR. CRAWFORD:  I do, Your Honor.

2          THE COURT:  Okay.  I'm happy to hear you now,

3    Mr. Crawford.

4          MR. CRAWFORD:  Thank you.  I would start with

5    paragraph No. 77 on page 10.  It should be 78.

6          THE COURT:  Okay.  Paragraph 77, yes, sir.

7          MR. CRAWFORD:  It should be 78.

8          THE COURT:  Paragraph 78, okay.

9          MR. CRAWFORD:  In this one she is given a

10   two-level enhancement because my client unduly influenced the

11   victim.  And I understand the legal arguments that because of

12   my client's age and because of the age of the victim there is

13   an assumption of undue influence.

14          But I would ask the Court to keep in mind what was

15   really happening here; that is, that the father,

16   Mr. Esposito, and Mr. McDonald were the ones that planned

17   this and thought about this and discussed it and went back

18   and forth and back and forth and back and forth on their

19   various electronic accounts.

20          Basically, my client was used as bait in order

21   to -- as they put it or as they thought, it was their way of

22   getting the young child to feel more at ease with what was

23   going to occur.

24          My client did not participate in that.  She was

25   used by that.  So to assess her two levels for undue

1    influence when, in fact, the facts indicate she was being

2    used by the other two men would make it inappropriate in the

3    unique facts of this case.

4              THE COURT:  All right.  Keep on going with your

5    objections, and I'll hear from the government all at once.

6              MR. CRAWFORD:  Thank you, Your Honor.

7              Paragraph 79 would be my next objection, and that

8    is the use of a computer.  I would argue it this way:  Is

9    there a child pornography or a child solicitation case that

10   does not involve a computer?

11             You know, the computer is all but inherent or is

12   kind of a run-of-the-mill type of device that's used in all

13   of these cases.  And I tried to find a particular case on

14   point.  I came up with one that is more of a child

15   pornography case than it is child solicitation case, but I

16   think it makes the point.

17             Back in April of this year, a Second Circuit case

18   was handed down, *U.S. versus Jenkins;* and in there, they

19   talked about the fact that 95 percent of all of the cases

20   involving the computer porn cases used a computer.  I'm

21   sorry, child pornography cases used a computer.

22             The Court reminded us that the purpose of special

23   offense characteristics is to make a case that deviates from

24   the norm, enhanceable or more serious or to provide more

25   punishment or, in rare cases, less punishment.

```
 1              The point the Court makes in Jenkins on the child
 2   pornography case and that I am now trying to extrapolate over
 3   to a child solicitation case is that a computer is always
 4   involved.  There is nothing special and there is nothing
 5   unique about that.
 6              Back in 2014, 95 percent of all of the children
 7   porn cases involved the use of a computer, and the Court's
 8   argument is that that doesn't make it a special
 9   characteristic.  That makes it a usual characteristic that
10   should be punished by a base offense level, not some special
11   characteristic.
12              My argument is the same by parallel.  All of these
13   cases have a computer or phones that are used like a
14   computer.  Therefore, it's not a special characteristic; and,
15   therefore, it should not be assessed against my client.
16              THE COURT:  Anything from the Eleventh Circuit on
17   that?
18              MR. CRAWFORD:  No, I couldn't find anything, and I
19   couldn't find anything really directly on point from
20   anywhere.  The Jenkins case was as close as I could get; and,
21   as you see, I'm extrapolating myself.
22              THE COURT:  Okay.  What's the next objection?
23              MR. CRAWFORD:  The next one would be paragraph 86.
24   That was on our objection to the issue of penetration.  I
25   will tell the Court, with the help of the government and
```

1   looking at various matters, we will withdraw that objection

2   at this point.

3          THE COURT:  That was raised in the case against

4   the father of the child.

5          MR. CRAWFORD:  Correct.

6          THE COURT:  Then it was withdrawn at the time of

7   sentencing if I'm not mistaken.

8          MR. CRAWFORD:  That's my understanding also.

9          The difficulty for us was Esposito, during this

10  episode, continually told the individual actors that he

11  didn't want this.  He didn't want this.  He didn't want this,

12  meaning penetration; and that's what my client remembered.

13  But looking closely at the definition of penetration and

14  looking at the photographs and the videos, I'm withdrawing

15  the objection on that.

16         THE COURT:  Okay.  So 86 is withdrawn.

17         MR. CRAWFORD:  Judge, those are my arguments.

18         I do have a request pursuant to minor role and

19  the mental health condition.  Do you want me to address those

20  now?

21         THE COURT:  No, I'm just going to do objections

22  first.  In essence, you have two objections.  No. 1, to

23  paragraph 78, and it's your position that she should not

24  receive that enhancement for the ten years older, even though

25  she is ten years older and was ten years older at the time of

1    the offense, in the sense you are arguing she was bait.  I

2    think those were the words you used, and was a type of

3    victim, too.  In essence, that's what you said to me,

4    although you may not have used those words.

5             In paragraph 79, the enhancement for the computer

6    because all of these offenses, in essence, involve the

7    computer, so it's no longer a specific -- it's no longer

8    appropriate to have an enhancement since they all involve

9    computers.  In essence, those are your arguments.

10            MR. CRAWFORD:  You summarized it very well.  Thank

11   you.

12            THE COURT:  Thank you, Mr. Crawford.

13            Let me hear from the government.

14            MS. THELWELL:  Your Honor, as it relates to

15   paragraph 78, the undue influence, the notes to 2G1.3 are

16   very clear when you look at the application notes.

17            There is a presumption that when the participant

18   is at least ten years older than the minor that because of

19   the fact of such a large age difference it necessarily means

20   that there is undue influence.

21            The fact that Miss Boselli thinks that she was

22   somehow a victim, too, and used as bait by Mr. McDonald and

23   Mr. Esposito does not take away from the fact that she had a

24   substantial age difference over the young victim in this case

25   and still continued to engage in those activities with her.

1              As to paragraph 79, the computer enhancement,

2    while in this day and age a lot of child pornography cases

3    and child enticement cases do occur with computers, the

4    Sentencing Commission is well aware of that and they still

5    have decided to include the two-level enhancement for use of

6    a computer as a special characteristic.  And until the

7    Sentencing Commission says otherwise, the Court should apply

8    the two-level enhancement.

9              It's no doubt that a computer or electronic

10   devices that access the internet were used in this case, and

11   that's not up for dispute.  So based on those two things,

12   Your Honor, the guidelines as applied by probation are

13   correct as to paragraphs 78 and 79.

14             THE COURT:  I agree.  They are correct.  Your

15   objections are noted, Mr. Crawford, but overruled.

16             Any other objections?  I think you said that was

17   it as to the guidelines and statement of facts, correct?

18             MR. CRAWFORD:  That is correct.

19             THE COURT:  The Court adopts the undisputed

20   factual statements and guideline applications contained in

21   the presentence report.  As to the controverted factual

22   statements and guideline applications, the Court adopts the

23   position of the probation office as stated in the addendum.

24   Therefore --

25             MR. CRAWFORD:  Judge, I'm sorry for interrupting.

1  I do have an argument on minor role.  Do you want to include

2  that?

3            THE COURT:  I asked you if you had any --

4            MR. CRAWFORD:  My mistake.  I apologize.

5            THE COURT:  Okay.  So you have an additional --

6            MR. CRAWFORD:  It is a guideline issue, that is

7  correct.

8            THE COURT:  Go ahead.  What paragraph should I

9  focus on?

10            MR. CRAWFORD:  All right.  In my letter dated

11  September 3rd, 2017, I do ask the probation office to

12  consider a minor role adjustment pursuant to United States

13  Sentencing Guideline 3B1.2.  I would like to be heard on that

14  issue if I could at this time.

15            THE COURT:  Yes, that would be fine.

16            MR. CRAWFORD:  Thank you.

17            Judge, as you know, the activity in this case

18  started even before July 2016.  We will concede that my

19  client appears in several videos that are sent by her husband

20  to Mr. Esposito and that she did participate in the actual

21  liaison that occurred later that month.

22            But I want the Court to keep in mind the following

23  facts that underlie this.  First of all, the videos that were

24  sent were made and directed and produced by RJ McDonald.

25  What would typically happen is my client -- typically what

1  happened is that his wife would come home from having worked

2  an eight-, ten-, twelve-hour shift and he would be on a Skype

3  with Mr. Esposito and that he would then direct Shauna

4  Boselli what to say and how to say it.

5         THE COURT:  You lost me there with the wife and

6  the client McDonald.  Go back and start that paragraph over

7  again.  I wasn't able to follow what you were saying.

8         MR. CRAWFORD:  Well, that's good.  I wasn't

9  either.  Thank you for the do-over.

10         All right.  So what would happen is on these

11  videos, Shauna Boselli would come home from working ten-,

12  twelve-hour shifts, and McDonald would often be on the Skype,

13  connected with Mr. Esposito.  Mr. McDonald would be talking

14  back and forth and that he would then direct Shauna Boselli

15  to pose, to say something cutesy like can't wait to see you.

16  Wave.  Look forward to seeing you.  That type of thing.  That

17  would be the videos, and then that would be sent on.

18         So I want the Court to understand that while my

19  client does appear in a couple of videos that are utilized by

20  RJ to be sent to Esposito as part of this bait scenario, my

21  client had nothing to do with their production, what was

22  said, and how it was said.  It was just a quick thing done,

23  generally, when she was coming home after being exhausted

24  from working all day.

25         RJ and Esposito initiated the contact.  They kept

1    contact.  They discussed the issues back and forth, and you

2    can see it from the interchanges between the two.  They are

3    the ones that planned the liaison.  They are the ones that

4    basically manipulated the girls.  If I can use that phrase in

5    this particular case, they ordered it.  They directed it.

6    They filmed it.  They participated in it.  To use the term

7    here, they ejaculated.

8                THE COURT:  When you say, "girls," do you mean the

9    victim and your client or do you mean somebody else?

10               MR. CRAWFORD:  I mean both the victim and my

11   client, yes.

12               THE COURT:  I would say any woman over the age of

13   18 is a woman.

14               MR. CRAWFORD:  Shouldn't use the word girls.  I

15   mean, Your Honor, manipulated the young girl and my client.

16               They celebrated afterwards and they started

17   planning for more.  So we have the primary, almost exclusive,

18   you know, individuals that are planning and manipulating this

19   whole process are RJ and Esposito.  My client was told what

20   she was to do and when she was to do it and how she was to do

21   it.

22               So the guidelines give us five factors that are

23   listed in the application notes that they ask the Court to

24   consider.  And as you well know, on a minor role

25   consideration, it is very fact specific.  So I want to try to

1   give you some additional facts to help you reach the

2   appropriate conclusion.

3          The first consideration that you should take into

4   consideration is whether or not -- or the scope and structure

5   of the alleged crime, what role did my client play in that.

6   And the answer is, none.  She had nothing to do with the

7   planning of it and the conceiving of it and where it was

8   going to be and how it was going to be.  She basically was

9   told when and where to be.

10          The second factor is, again, planning and

11   organization.  Again, none.  She had nothing to do with that.

12   She was told where to go and when to be there.  In fact, when

13   it was originally -- I put in my sentencing memorandum.  When

14   it was originally broached, my client objected to it and said

15   she had no interest in that type of liaison.  RJ's response

16   was, well, she is probably not a real person anyway.  It was

17   not until two days before we have the liaison at the Lowry

18   Park Zoo that my client was told this is where we are going

19   and this is what we are going to do.

20          The third factor is the exercise of

21   decision-making authority.  Again, my client had absolutely

22   no decision-making authority in this particular relationship.

23   As you've seen from the psychological reports -- and you'll

24   hear it later -- the relationship between RJ and Shauna was

25   unique in the sense there was a dominant and submissive

1  aspect to it.  This was also encoded or enshrined in a

2  written contract.  So to say that my client had any

3  decision-making authority in this liaison would just not be

4  the case.

5          Participation is the one area that my client is

6  involved.  So of the five factors, one of them she was

7  involved in, just like your typical mule in a drug case.

8  There is one part of the participation or there wouldn't be

9  any guilt at all.  And she did participate in the two days of

10 the liaison, and there are some Skype video communications

11 that she is in, again, directed by her husband and produced

12 by her husband and sent by her husband.

13         The final factor is benefit.  My client got

14 absolutely no money from this.  Absolutely no satisfaction

15 from the liaison.  The government's memo talks about how she

16 appears to be enjoying herself, nor does she show or appear

17 to be remorseful.  Well, that's their interpretation of the

18 clip.

19         Having discussed this with my client on many

20 occasions, I can assure the Court that my client got no

21 benefit from it, satisfaction or monetary or any other

22 benefit from this entire liaison.  In fact, only thing she is

23 going to get is a lengthy prison sentence, and she's aware of

24 that.

25         So of the five factors, four of them my client has

1  absolutely nothing to do with.  By my mathematics and the

2  facts of this case, that means she is a minor player, and we

3  would ask the Court to deviate two levels based on that.

4          THE COURT:  Okay.  Thank you, Mr. Crawford.  Let

5  me hear from the government.

6          MS. THELWELL:  Your Honor, Miss Boselli was not a

7  minor participant in the events that took place.

8          Mr. McDonald, while he may have initiated contact

9  with Esposito online, at every step of the way Miss Boselli

10 was aware.  I can proffer for the Court that Agent

11 Botterbusch would testify that in examining Mr. Esposito's

12 electronic devices, they recovered multiple videos sent by

13 Mr. McDonald and Miss Boselli to Mr. Esposito where in those

14 videos the defendant and her husband are clearly talking to

15 the child victim.  As indicated in the PSR, in the Kik

16 conversation, one of the videos shows Miss Boselli saying hi.

17 I can't wait to meet you.

18          There was also --

19          THE COURT:  Let me go back and ask you something.

20 I just want to make certain I'm clear on that.  You said the

21 multiple videos were sent by Mr. McDonald and Miss Boselli.

22          So did Miss Boselli send some?  Did Mr. McDonald

23 send others?  Let's talk about this defendant and what's

24 attributable to her.

25          What evidence do you have that she sent the

1   videos?

2           MS. THELWELL:  Yes, Your Honor.

3           So, to be clear, I would probably have to defer to

4   the agent, but I'm not sure it is clear which one of them

5   sent the videos.  The fact is both of them are in the videos

6   and they were on Mr. Esposito's devices.  It shows that there

7   was an ongoing communication between the defendant and the

8   child victim in this case.

9           THE COURT:  I just want you to be clear on that

10  because it's a point that Mr. Crawford raised.  So when you

11  say, "they sent," I just wanted you to tell me, how do you

12  know that it was her?  In all fairness to her, I think you

13  need to be crystal clear on that.

14          MS. THELWELL:  I understand.  Let me back up,

15  then, Your Honor.

16          THE COURT:  Okay.

17          MS. THELWELL:  We know that Miss Boselli had

18  ongoing communications with the child victim because of her

19  post-*Miranda* statement.

20          The night of the search warrant she sat with Agent

21  Botterbusch and Miss Boselli admitted to her that the child

22  victim liked to show her her room on Skype.  So that

23  statement in and of itself shows that Miss Boselli had spoken

24  to the child victim on Skype at least more than one time

25  because the Kik chat conversation that we were able to

1  recover and that is published in the PSR does not talk about

2  at any point the child victim showing the defendant her

3  bedroom.

4           So that indicates that in addition to this video

5  of the defendant saying, Hi, I can't wait to meet you,

6  clearly directed at the child victim, there is at least

7  another occasion where the defendant has admitted speaking to

8  the child victim on Skype because the child liked to show her

9  her room.

10          Having that fact, when the agents reviewed

11 Esposito's electronic devices, they were able to recover not

12 only images and videos of the actual abuse that took place at

13 the hotel room, but they also recovered videos of the

14 defendant and McDonald appearing together, making comments,

15 being -- and, Your Honor, I have them for the Court if the

16 Court would like to have them admitted as an exhibit. I had

17 provided an exhibit list to the Court and to the defense

18 counsel. It's Exhibit 40. It's a CD containing about eleven

19 separate videos. I think it's 40A through -- I can't recall

20 the last letter.

21          THE COURT: I see 40K. Through 40K.

22          MS. THELWELL: Thank you, Your Honor.

23          And each of those videos that were found on

24 Esposito's devices contain Miss Boselli and the defendant,

25 and one of the videos she is holding a stuffed animal and

1   says she likes foxes, too.  In another one of the videos,

2   it's actually a video of the child victim speaking to the

3   camera, saying, I'm excited.  I can't wait to meet you.

4          Given all of these facts and, additionally, with

5   what actually happened, once the child victim was in Tampa --

6   again, on my exhibit list I have -- and I've provided the

7   Court with a binder.  There are multiple photos that were

8   taken by Esposito that we were able to recover that show step

9   by step what happened when the child got to Tampa.

10          THE COURT:  I think you need to put the case agent

11   on the stand and hear testimony from her in light of

12   Mr. Crawford's objections.  I'm going through here the

13   fact-base determination in determining whether to apply

14   subsection A or B or intermediate adjustment, the five

15   factors that Mr. Crawford referred to.

16          The degree to which the defendant understood the

17   scope and structure of the criminal activity; the degree to

18   which the defendant participated in planning or organizing

19   the criminal activity; the degree to which the defendant

20   exercised decision-making authority or influenced the

21   exercise of decision-making authority; the nature and extent

22   of the defendant's participation in the commission of the

23   criminal activity, including the acts the defendant

24   performed, responsibility and discretion the defendant had in

25   performing those acts; the degree to which the defendant

1    stood to benefit from the criminal activity.

2           Let's see, those are some -- did I miss one,

3    Mr. Crawford?

4           MR. CRAWFORD:  The last two are participation and

5    benefit.

6           THE COURT:  Participation and benefit.  Thank you.

7           So, for instance, I'll give you an example that

8    Mr. Crawford alluded to which I see here.  I see that request

9    made on a regular basis and I deny it on a regular basis;

10   that is, the individuals that come from Colombia or Ecuador

11   sometimes with the submersible vessels filled with cocaine.

12   Of course, it's somebody else who has planned this, but

13   you've got two or three people in a little boat filled with

14   cocaine.  They always ask for minor role reduction.  I think

15   the case law in the Eleventh Circuit is pretty clear that

16   you're not entitled to it.

17          I just think that for purposes of this record that

18   we need to make certain that this has been scored correctly.

19   And I think that in light of Mr. Crawford's specific

20   objection, I think it's the case agent, not through a proffer

21   through you, or not via proffer through you, but via her

22   testimony, needs to be abundantly clear of this defendant's

23   involvement in the case.  I think that's the way you need to

24   proceed.

25          MS. THELWELL:  Yes, Your Honor.  If I may call

1   Agent Botterbusch to the stand.

2           THE COURT:  Thank you.  You may do so.

3           THE COURTROOM DEPUTY:  Please raise your right

4   hand.

5           Do you solemnly swear or affirm under penalty of

6   perjury that the testimony you shall give in this cause will

7   be the truth, the whole truth, and nothing but the truth?

8           THE WITNESS:  Yes.

9           THE COURTROOM DEPUTY:  State your full name for

10  the record and spell your last name.

11          THE WITNESS:  Terri Lynn Botterbusch.

12          THE COURTROOM DEPUTY:  Please have a seat.

13          THE COURT:  Let me just ask you to indulge me for

14  a second.  As you can see, I'm fighting allergies.  If you

15  will, give me five minutes.

16          (Recess taken from 9:51 a.m. to 9:55 a.m.)

17          COURT SECURITY OFFICER:  All rise.

18          This Honorable Court is now in session.

19          THE COURT:  Thank you.  If I have to cough or

20  something, I'll halt the proceedings and step outside; but

21  it's just the way it is this time of the year, my problems

22  with allergies.  Bear with me.

23          Go ahead, Miss Thelwell.

24                  TERRI L. BOTTERBUSCH,

25  having been first duly sworn by the Courtroom Deputy,

```
 1   testified as follows:
 2                       DIRECT EXAMINATION
 3   BY MS. THELWELL:
 4   Q.    Could you please state your name for the record.
 5   A.    Terri Lynn Botterbusch.
 6   Q.    Where are you employed?
 7   A.    I'm employed with the Department of Homeland Security,
 8   Homeland Security Investigations.
 9   Q.    What is your current assignment?
10   A.    I am a special agent and criminal investigator and I am
11   responsible for conducting online child exploitation
12   investigations.
13   Q.    How long have you been investigating online child
14   exploitation cases?
15   A.    I would say approximately ten years.
16   Q.    Okay.  Were you involved in the investigation of Shauna
17   Boselli and Richmond McDonald?
18   A.    Yes, ma'am.
19   Q.    What was your role in the investigation?
20   A.    I was the case agent here in Tampa for this
21   investigation.
22   Q.    Okay.  Throughout your investigation, did you have an
23   opportunity to meet with Shauna Boselli?
24   A.    Yes, ma'am.
25   Q.    Did you interview her?
```

 1   A.    Yes, I did.

 2   Q.    Did she agree to speak with you?

 3   A.    Yes.

 4   Q.    Did you provide her with her Miranda warnings?

 5   A.    Yes, I did.

 6   Q.    And did she indicate she understood those warnings?

 7   A.    Yes, ma'am.

 8   Q.    At any point did she seem not to understand what you

 9   were saying?

10   A.    No.

11   Q.    At any point did she request to stop?

12   A.    No.

13   Q.    Did you threaten her in any way to get her to provide a

14   statement?

15   A.    No, ma'am.

16   Q.    Did you coerce her into providing a statement?

17   A.    No, ma'am.

18   Q.    Did you force her to provide a statement?

19   A.    No, ma'am.

20   Q.    Was anyone else in the -- well, when was the interview

21   that you had with Miss Boselli?

22   A.    I believe it was either November 30th or December 1st,

23   because I think we began November 30th, but it went into

24   December 2016.

25   Q.    Was anyone else present at the time of the interview?

1   A.    Yes, ma'am.  Special Agent Don Shrinker with the

2   Florida Department of Law Enforcement.

3   Q.    Did he make any threats to Miss Boselli?

4   A.    No, ma'am.

5   Q.    Did he coerce her in any way to provide a statement?

6   A.    No, ma'am.

7   Q.    Did he force her to provide a statement in any way?

8   A.    No, ma'am.

9   Q.    What did she say to you once she waived her right to

10  remain silent?

11  A.    She made a variety of statements.

12  Q.    Did she indicate whether or not she knew why you were

13  there?

14  A.    Eventually.  Later on in the interview she did.

15  Q.    Okay.  What did she say?

16  A.    I believe she said, when we first arrived, she knew

17  immediately why we were there.

18  Q.    Did she admit to her involvement with sexually abusing

19  the child victim in this case?

20  A.    Yes, ma'am.

21  Q.    Specifically, what did she tell you as it relates to

22  what she knew about the child coming to Tampa?

23  A.    Well, she told us that she would talk to them over

24  Skype and that she had seen -- the child victim would show

25  her her bedroom, that they went to the zoo when they first

1   met the father and the child victim.  Then after that, I

2   think they bought the child a gift at the zoo.  They went to

3   get ice cream, bought the child ice cream.

4            Then they went to their residence in Tampa.  They

5   played in the backyard, and there were some sex acts that

6   occurred at the residence.  Then a couple of days later they

7   met at a hotel in Tampa where they went swimming and

8   additional sex acts occurred in the hotel, and then they went

9   and got some lunch at Bahama Breeze.

10  Q.    During your post-*Miranda* interview with the defendant,

11  did she indicate whether or not she was engaging in sex acts

12  with Mr. Esposito?

13  A.    No.  She said she refused to engage in sex acts with

14  him.

15  Q.    When you say she refused to engage in sex acts with

16  Esposito, did she indicate who she was refusing to do that?

17  A.    At one point she said that RJ sort of pushed her on him

18  or it was suggested that they engage in sex acts, which she

19  didn't want to do that, she said.

20  Q.    When you said, "RJ," who do you mean?

21  A.    McDonald, her husband.

22  Q.    So she had told Mr. McDonald that she did not want to

23  engage in sex acts with Mr. Esposito?

24  A.    From what I understand, yes.

25  Q.    Did she ever indicate that she had told her husband,

1   Mr. McDonald, that she did not want to engage in sex acts

2   with the child?

3   A.    No.

4          MS. THELWELL:  May I approach, Your Honor?

5          THE COURT:  Yes.

6          (Documents tendered.)

7   BY MS. THELWELL:

8   Q.    Agent Botterbusch, I've just handed you a binder of the

9   government's exhibits.  If you could, look through each item

10  there; and when you are done, look up.  It's Government

11  Exhibits 1 through 35.

12         Do you recognize Government's Exhibits 1 through

13  35?

14  A.    Yes.

15  Q.    What are they?

16  A.    They are photographs pretty much that are

17  non-pornographic or child pornographic in nature of

18  Miss Boselli, Mr. McDonald, the child victim, and some images

19  of Mr. Esposito at the zoo where they met.  There are images

20  at the ice cream store where they went after the zoo.  Images

21  of the McDonald-Boselli residence in Tampa, the backyard, the

22  inside of the residence.

23         There are images of the hotel room in Tampa, to

24  include the pool where they played at and went swimming; and

25  then images -- it looks like at the restaurant where they had

 1   lunch after the hotel encounter.

 2   Q.    And do these images fairly and accurately depict the

 3   images that you had recovered from Mr. Esposito as well as

 4   from the search warrant?

 5   A.    Yes, ma'am.

 6         MS. THELWELL:  Your Honor, at this time the

 7   government seeks to admit Government Exhibits 1 through 35.

 8         THE COURT:  Okay.  Just so we are clear -- I'll

 9   ask Mr. Crawford if he has an objection -- that does not

10   include this document, correct, the manila envelope?

11         MS. THELWELL:  That's correct, Your Honor.

12         THE COURT:  Any objection to 1 through 35,

13   Mr. Crawford?

14         MR. CRAWFORD:  No, ma'am.

15         THE COURT:  Government Exhibits 1 through 35 are

16   received into evidence.  Go ahead.

17         (*Government Exhibits 1 through 35 received in*

18   *evidence.*)

19         THE COURT:  We have our copies here.  Thank you

20   very much, Miss Thelwell.

21   BY MS. THELWELL:

22   Q.    Who is depicted in this picture, Agent Botterbusch?

23   A.    Looks like Shauna Boselli, Richmond McDonald, and the

24   child victim.

25   Q.    Where was this picture?

1  A.    At the Lowry Park Zoo.

2  Q.    Exhibit 4, please.  Who is depicted in this particular

3  picture?

4  A.    That is Shauna Boselli and the child victim, as well,

5  at the Lowry Park Zoo.

6  Q.    Exhibit 3, please.  Again, who is in this picture?

7  A.    Shauna Boselli and the child victim at the Lowry Park

8  Zoo.

9  Q.    And Exhibit 9, please.  Who is in this picture?

10  A.    That would be Shauna Boselli, the child victim, and

11  Richmond McDonald at the ice cream store in Tampa.

12  Q.    When speaking with Miss Boselli, did you learn who paid

13  for the ice cream?

14  A.    I'm not sure.  I can't recall exactly at what point how

15  I learned, but I was told that Richmond McDonald paid for the

16  child's ice cream.

17  Q.    Exhibit 10, please.  And who is in this picture?

18  A.    Shauna Boselli and the child victim at the ice cream

19  store in Tampa.

20  Q.    And do you see anything of interest on Miss Boselli's

21  right arm?

22  A.    It's a bracelet.

23  Q.    What kind of bracelet?

24  A.    It's a silver bracelet.  I think she calls it -- I

25  forget what she called it specifically.  Something like a

1    slave bracelet.

2    Q.    And Exhibit 14, please.  Where was this picture taken?

3    A.    This had been in either McDonald and Boselli's backyard

4    or right next door to them.  In the backyard area.  Either

5    their yard or their neighbor's yard.

6    Q.    Just to be clear, the pictures we have looked at so

7    far, what date did this occur?

8    A.    This is July 19th, 2016.

9    Q.    Exhibit 17, please.  Can you tell us what's depicted in

10   this picture.

11   A.    This is like a pop-up tent that was inside the living

12   room area of the McDonald-Boselli residence.

13   Q.    What is inside of the tent if you can tell?

14   A.    There is a little stuffed tiger, a pillow, blankets,

15   maybe a child's book.

16   Q.    What, if anything, do you know about this tent as it

17   relates to the events that took place at the residence on

18   July 19th, 2016?

19   A.    Through this investigation I learned that this is where

20   the sexual contact was initiated with the child victim while

21   at the residence on July 19th, 2016.

22             THE COURT:  Do you mean under the tent?  Is that

23   what you are referring to?

24             THE WITNESS:  Inside the tent.

25             THE COURT:  Thank you.

1    BY MS. THELWELL:

2    Q.    Who was inside the tent with the child?

3    A.    As I understand, Shauna Boselli and the child victim

4    began playing in the tent, sort of like play wrestling.

5    That's how it started.  Then Richmond McDonald undressed and

6    got in the tent with them.  Actually, they had just come out

7    of the shower and they were playing in the tent because they

8    had been outside playing in the backyard, and they needed to

9    shower because they were muddy.

10    Q.    So to backtrack, regarding the shower, who took a

11    shower specifically?

12    A.    Shauna Boselli and the child victim took a shower.

13    Q.    Where was McDonald and Esposito at this time?

14    A.    I think they were inside the residence, talking, I

15    think, in the computer room.

16    Q.    Exhibit 18, please.  Do you recognize this towel?

17    A.    I recognize it from the photograph.  I didn't actually

18    see it at the residence.

19    Q.    Is there anything significant about this towel?

20    A.    I believe the child victim ended up wearing the towel,

21    I think, when she came out of the shower.  And I think they

22    ended up giving her this, as well, as a gift, but I'm not

23    positive.  I recall it from the photo, but I don't recall

24    seeing it at the residence because I didn't have a chance to

25    see it there.

1  Q.    Exhibit 19.  What's in Exhibit 19?

2  A.    Those are children's books that were photographed at

3  the McDonald-Boselli residence.

4  Q.    Before we move on from July 19th, in speaking with the

5  defendant post-*Miranda*, what specifically did she admit that

6  she did to the child victim while at the residence?

7  A.    I believe that --

8          THE COURT:  Do you need your report to refresh

9  your memory?  It looked like you were struggling there.

10          THE WITNESS:  I do have some notes, but I think I

11  remember that she engaged in oral sex on the child and the

12  child engaged in oral sex on, I think, her for a short time,

13  and RJ, and RJ engaged in oral sex on the child, as well.

14  Excuse me.  McDonald did.

15  BY MS. THELWELL:

16  Q.    Can I see Exhibit 20.  What's in this picture?

17  A.    That is a picture of the hotel room in Tampa.  It's the

18  child victim on the bed.

19  Q.    What's next to the child victim?

20  A.    A stuffed panda.

21  Q.    Is there anything significant about the stuffed panda?

22  A.    Yes.  We learned through this investigation that Shauna

23  Boselli and Richmond McDonald bought the child victim this

24  stuffed panda while at the zoo.  The and despair Zoo.

25  Q.    Can I see Exhibit 23, please.  What do you see in this

1    picture?

2    A.    This is a picture of the pool at the hotel in Tampa.

3    Richmond McDonald, Shauna Boselli, and child victim are in

4    the picture.

5    Q.    Exhibit 31, please.

6            Again, who is in this picture?

7    A.    Richmond McDonald, the child victim, and Shauna Boselli

8    at the hotel pool in Tampa.

9    Q.    Does Miss Boselli appear to be in any distress?

10   A.    No, ma'am.

11   Q.    And, again, just to be clear, this image and the last

12   couple of images I've shown you, what date were they taken?

13   A.    This date is July 21, 2016.

14   Q.    And they were taken at the hotel in Tampa?

15   A.    Yes, ma'am.

16   Q.    Can I see Exhibit 33, please.  Who is in this picture?

17   A.    That is Shauna Boselli, the child victim, Richmond

18   McDonald in the lobby area of the hotel in Tampa.

19   Q.    Again, does Miss Boselli appear to be in any distress?

20   A.    No, ma'am.

21   Q.    Does she appear unhappy to be where she is?

22   A.    No, ma'am.

23   Q.    Exhibit 34, please.  Where is this?

24   A.    That is inside the hotel room at the hotel in Tampa.

25   It's Miss Boselli, Mr. McDonald, and the child victim.

1  Q.    Exhibit 35, please.  Where is this?

2  A.    This is at the Bahama Breeze, which is next door to the

3  hotel in Tampa.  It's Mr. Esposito, the child victim,

4  Mr. McDonald, and Miss Boselli.

5  Q.    And for the timeline, at what point is this on July 21?

6  Is this before or after the sexual activity in the hotel

7  room?

8  A.    This is after the sexual activity in the hotel room.

9  Q.    Does Miss Boselli appear to be in distress?

10  A.    No, ma'am.

11            MS. THELWELL:  May I approach, Your Honor?

12            THE COURT:  Yes.

13            (Item tendered.)

14  BY MS. THELWELL:

15  Q.    Agent Botterbusch, I just handed you Government's

16  Exhibit 40 and Government's Exhibit 50.  Do you recognize

17  them?

18  A.    Yes.

19  Q.    Okay.  Taking Government's Exhibit 40, what is it?

20  A.    Exhibit 40 is going to be a CD containing the videos

21  off of Esposito's cell phone that depict the enticement of

22  the minor by Miss Boselli and Mr. McDonald that occurred over

23  Skype.

24  Q.    How do you recognize that as that CD containing those

25  videos?

1    A.    It's got my signature and today's date on it.

2    Q.    And you had viewed the videos prior to this morning,

3    correct?

4    A.    Yes.

5          MS. THELWELL:  Your Honor, at this time the

6    government seeks to admit Government's Exhibit 40.

7          THE COURT:  Okay.

8          MR. CRAWFORD:  No objection.

9          THE COURT:  Okay.  Government's Exhibit 40 is

10   received into evidence.

11          (*Government Exhibit 40 received in evidence.*)

12          MS. THELWELL:  One moment, Your Honor.

13          THE COURT:  Yes.

14          MS. THELWELL:  Thank you, Your Honor.

15   BY MS. THELWELL:

16   Q.    The videos on Government's Exhibit 40, can you just

17   briefly describe some of the videos that are on Exhibit 40.

18   A.    Sure.  I mean, there is various wrote-out little

19   statements they made from the video.

20   Q.    Do you need a copy of your notes?

21   A.    I have a copy.

22   Q.    Do you need to refer to your notes to refresh your

23   recollection?

24   A.    Yes.

25   Q.    Please do.  Once your recollection is refreshed, look

1   up and let me know.

2   A.    Do you want me to read or say specific statements that

3   were on the video?

4   Q.    How about this.  I will direct your attention to a

5   specific video.

6   A.    Okay.

7   Q.    The video ending in IC87, which is Government's

8   Exhibit -- excuse me.  It's 1C87, Government 40H.

9   A.    All right.  That is a video of McDonald and RJ --

10  excuse me, McDonald and Shauna where Shauna says, "Oh, my

11  God.  You are so cute."

12  Q.    And the video above that, which is Government's Exhibit

13  40G.  It ends in 7E00.

14  A.    That is a video of Miss Boselli giving Mr. McDonald

15  oral sex; and she looks up and says, "We would love for you

16  to visit," into the camera.

17  Q.    One last video.  It's going to be Government's Exhibit

18  40C and ends in BC41.

19  A.    That is a video of Mr. McDonald and Miss Boselli.

20  Miss Boselli is nude.  She looks at the camera and says, "You

21  know, this feels good.  You should ask Daddy.  He'll do it to

22  you."  While this is going on, RJ is kissing -- excuse me,

23  McDonald is kissing Miss Boselli's body.

24  Q.    If you could, take a look at Government's Exhibit 50.

25  I've handed it to you.

1   A.    Yes, ma'am.

2   Q.    Do you recognize it?

3   A.    Yes.

4   Q.    What is it?

5   A.    This CD or DVD contains the images and videos of the

6   child pornography that was produced at the hotel here in

7   Tampa on July 21, 2016.

8   Q.    How do you recognize that CD as the CD containing those

9   videos and images?

10  A.    It has my signature and date on it.

11             MS. THELWELL:  At this time, Your Honor, the

12  United States seeks to admit Government's Exhibit 50 into

13  evidence.

14             MR. CRAWFORD:  No objection.

15             THE COURT:  Government's Exhibit 50 is received

16  into evidence.

17             (*Government Exhibit 50 received in evidence.*)

18  BY MS. THELWELL:

19  Q.    A quick question regarding Government's Exhibit 40.

20             The Kik chat video or the video that was sent over

21  Kik that you had outlined in your previous reports where the

22  defendant says, "Hi, I can't wait to meet you," is that video

23  also contained on Government's Exhibit 40?

24  A.    No.  I mean, there is one similar to it, but that one

25  is not the same one.

1  Q.     Okay.

2              MS. THELWELL:  One moment, Your Honor.

3              THE COURT:  Yes.

4              MS. THELWELL:  No further questions at this time,

5  Your Honor.

6              THE COURT:  Any cross-examination, Mr. Crawford?

7              MR. CRAWFORD:  Yes, Your Honor, please.

8              THE COURT:  You may proceed, sir.

9                         CROSS-EXAMINATION

10 BY MR. CRAWFORD:

11 Q.    So, it's my understanding that you captured

12 Mr. Esposito's phone and you were able to download it and see

13 what was on there; is that correct?

14 A.    What do you mean captured it?

15 Q.    Seized it.

16 A.    So, yes, the agents in Orlando -- that's how this case

17 started.  They executed a search warrant at his residence and

18 were able to forensically examine his cell phone, yes.

19 Q.    In addition to Mr. Esposito's telephone, you also got

20 Mr. Esposito's computer or computers and did the same thing?

21 A.    I'm not sure.  I'm sure there was computers involved.

22 There were several electronic -- his electronic devices were

23 forensically examined, yes.

24 Q.    Okay.  When you forensically examined Mr. Esposito's

25 devices, were you able to determine where the information had

1 come from?  In other words, who sent it to him?

2 A.    I mean, I'm assuming, yes, they did.  If you have --

3 yeah, I mean, I don't know.  You would have to look at their

4 forensic report.

5 Q.    Right.  And isn't it fair and true that all of the

6 information relevant to this case came to Mr. Esposito, his

7 phone, his computers, from accounts that are related to RJ

8 McDonald?

9 A.    What we know, yes.  The communication occurred over the

10 Kik accounts, text messaging, and a Skype account and

11 Snapchat, as well.

12 Q.    Let's come forward.  When you arrest RJ McDonald and

13 Shauna Boselli, at that time you also seized their computer

14 and their phones?

15 A.    Yes, sir.

16 Q.    The same sort of forensic analysis was applied to those

17 devices?

18 A.    Yes, sir.

19 Q.    And there is no connection at all between any of the

20 devices owned by Miss Boselli and Esposito, right?

21 A.    She did not -- the Kik account was not on her device,

22 and the text messaging came from Mr. McDonald's phone.  And

23 the Skype account, from what we know, was on Mr. McDonald's

24 computer.

25 Q.    Okay.  Thank you for firming that up.

1            All right.   Do you have the photographs in front

2  of you?

3            MR. CRAWFORD:   May I borrow the government's?

4            MS. THELWELL:   Yes.

5            MR. CRAWFORD:   Would you prefer, if you have them

6  up there, for me just to refer to the number?

7            THE COURT:   You can refer to number, Mr. Crawford.

8            MR. CRAWFORD:   Thank you, ma'am.

9  BY MR. CRAWFORD:

10 Q.    If you would, look at Exhibit No. 19, which is the

11 books, the children's books.

12 A.    Yes, sir.

13 Q.    Okay.   You recognize the two of those three books are

14 in Russian?

15 A.    Yes.

16 Q.    Okay.   Let's go to 18, which is the photograph before.

17 You interpret this as something to be used or to entice the

18 child?

19 A.     No, it was at the house.   I believe there is some sort

20 of statement that the child wore it after she got out of the

21 shower.

22 Q.    But other than the fact it's at the house, you don't

23 know the history behind this, who purchased it, what it was

24 used for or anything?

25 A.    I know that it was at the residence.

1   Q.   Okay.  If you look at photograph 21, that appears to be

2   taken from a balcony?

3   A.   Yes.

4   Q.   And is it fair that in the picture you can see walking,

5   you can see the child, you can see Miss Boselli, and you can

6   see Mr. McDonald, correct?

7   A.   Yes, sir.

8   Q.   Fair to assume that Mr. Esposito took the picture?

9   A.   Yes.

10  Q.   It was seized from his phone, correct?

11  A.   Yes, sir.

12  Q.   Same with photographs 22, 23, 24, 25, 26, 27, 28, 29,

13  30, 31, and 32.  All of those appear to be taken by

14  Mr. Esposito because he's not in any of the pictures and most

15  of the other individuals are, correct?

16  A.   Yes.

17  Q.   Okay.  At any of these pictures, does it indicate

18  Miss Boselli looking up or show she even knows she's being

19  photographed?

20  A.   I have no idea if she knows she's being photographed.

21  What we understand, he was up in the hotel room making a

22  phone call.

23  Q.   Then, if you look at No. 33, where you offered the

24  opinion that she seemed to be having a good time, is it fair

25  to say when someone points a camera at you and says smile or

1  I'm going to take your picture that most people will pose and

2  smile?  Has that been your experience?

3  A.    I guess.

4  Q.    Okay.  The videos that are contained in Government's

5  Exhibit No. 40, do you know who filmed those?

6  A.    They were -- it looks like they took place in the

7  office area of their home.

8  Q.    Okay.  So they were either filmed by Mr. McDonald or

9  someone else, or the camera was set up for one of the shots

10  he was in?

11  A.    Skype is a webcam-based thing, so it's the computer

12  screen.

13  Q.    Okay.  Do you know who directed who?  Who gave who

14  instructions as to what to say, what to do, and how to do it?

15  A.    No.

16  Q.    Okay.  You do know, though, that -- well, Skype is a

17  realtime communication, correct?

18  A.    Yes, I believe so.

19  Q.    And there is one exception in that there is a video

20  made that is sent.  Do you have any idea who made that video?

21  A.    I'm not sure what you are referring to.

22  Q.    There is one video where I understand my client waves

23  and says looking forward to seeing you or something like

24  that.

25          That's different than the ones that were captured

1   on Skype; is that right?

2   A.    The one that's in the original affidavit?

3   Q.    Yes, ma'am.

4   A.    I'm not sure how that was originally made.  It could

5   have been made with the iPad that it was transferred to, it

6   could be Kik or transferred over Kik.  I'm not sure.

7   Q.    You don't know?

8   A.    No.

9   Q.    Fair enough.

10          Let's look at five factors.  The scope and the

11  structure of this criminal activity.  The conversations back

12  and forth between Esposito and Mr. McDonald were either on

13  his Skype account or his Kik account or his cell phone via

14  text; is that true?

15  A.    That's how we understand they took place.

16  Q.    And even after forensically examining Miss Boselli's

17  electronic devices, there is no conversations between

18  Miss Boselli and Mr. Esposito?

19  A.    No, sir.

20  Q.    Do you have any evidence at all that establishes that

21  my client benefited monetarily from this episode?

22  A.    Monetarily?

23  Q.    Correct.

24  A.    No.

25          MR. CRAWFORD:  If I could have one moment, Your

1  Honor.

2              THE COURT:  Sure.

3              MR. CRAWFORD:  Thank you, Your Honor.

4              THE COURT:  All right.  Anything else,

5  Miss Thelwell, on redirect?

6              MS. THELWELL:  Briefly, Your Honor.

7              THE COURT:  Sure.

8                    REDIRECT EXAMINATION

9  BY MS. THELWELL:

10 Q.   Agent Botterbusch, were Miss Boselli's devices

11 forensically examined?

12 A.   Yes, ma'am.

13 Q.   Was her cell phone forensically examined?

14 A.   Yes, ma'am.

15 Q.   Do you recall whether or not the extraction report was

16 able to recover text messages or communications around the

17 dates of the incidents in this case?

18 A.   I do recall that, yes.  There was no communication

19 recovered.  Text messages were all deleted around that time.

20 Q.   Thank you.

21             MS. THELWELL:  Your Honor, I don't have any

22 additional questions for the witness.

23             THE COURT:  Okay.  Thank you.

24             Anything else, Mr. Crawford?

25             MR. CRAWFORD:  On this witness, no, ma'am.

1          THE COURT:  You can return to counsel table.

2    Thank you very much.

3          All right.  I want to hear your argument now.

4    Mr. Crawford made his argument, and I'll come back to you in

5    a second, Mr. Crawford, to see if you would like to say

6    anything else.

7          You can now sum up why you think that this was

8    appropriately scored.  In other words, why she's not entitled

9    to a reduction for her role.

10         MS. THELWELL:  Yes, Your Honor.

11         I'm just going to take the factors one by one.

12         THE COURT:  Okay.

13         MS. THELWELL:  So the first one is the degree to

14   which the defendant understood the scope and structure of the

15   criminal activity.

16         It's clear, based on the agent's testimony and the

17   evidence that has been admitted to the Court, that the

18   defendant was aware and she did understand the scope of the

19   criminal activity involving Esposito and the child victim in

20   this case.

21         It's clear from her post-*Miranda* statements,

22   indicating that there were multiple conversations with the

23   child victim over the internet.  It's clear from Exhibit 40,

24   which contains, I believe, 10 or 11 individual videos

25   depicting the defendant along with Mr. McDonald that were

1    found on the defendant's device -- excuse me, Mr. Esposito's

2    device.

3            So whether or not the defendant is the one who

4    sent these to Mr. Esposito is irrelevant.  It doesn't have to

5    do with whether or not she actually understood what was going

6    on.

7            Earlier this morning, at some point

8    Mr. Crawford -- and I think even in his memorandum --

9    indicated that the defendant didn't know up until maybe a

10   couple of days before the child victim came to Tampa what was

11   really going on.  Or at one point it was suggested to her

12   that maybe it's not even a real child.

13           Obviously, we know that's false because we have

14   videos that show that she's talking to Esposito and her

15   statements that she had seen the child or at least the child

16   liked to show her her room on Skype.  Then, also, on

17   Government's Exhibit 40 there is a video of the child herself

18   speaking to the camera, saying, I'm so excited.

19           THE COURT:  But the degree that she understood the

20   scope and structure of the criminal activity is very relevant

21   because that's one of the factors.

22           MS. THELWELL:  That is relevant.  What I'm saying

23   is whether or not she was the one who actually transmitted

24   the video on her own device is irrelevant to whether or not

25   she understood the scope.  She doesn't have to be the one to

1    transmit the videos to be able to understand what's

2    happening.

3           Additionally, the fact this occurred over a

4    two-day period, if she was confused at any point on July

5    19th, she certainly knew what was happening or was going to

6    happen on July 21st when she showed up two days later and

7    went to the hotel.

8           And if the Court -- I would also -- for

9    Government's Exhibit 50, which contains the graphic images

10   and videos of what occurred inside that hotel room in the

11   manila envelope that I provided both to the Court and to the

12   defense counsel there are the still images, if the Court

13   needs further evidence of the fact that the defendant

14   understood the scope of the criminal activity that was set to

15   occur.

16          The degree to which the defendant participated in

17   the planning -- I'm going on to No. 2, Your Honor.

18          THE COURT:  That's fine.  Go ahead.

19          MS. THELWELL:  -- participated in the planning or

20   organizing of the criminal activity, I think, again that,

21   just dovetails into some of the evidence that I've just

22   recounted for the Court, based on the agent's testimony, as

23   well as the exhibits that have been admitted into evidence.

24          While Mr. McDonald may have been the one to

25   initiate contact with Mr. Esposito, the defendant in this

1   case certainly continued to contribute to the grooming or the

2   enticement and inducing of the child up until she got into

3   Tampa and once she did arrive in Tampa.

4           The degree to which the defendant -- No. 3, the

5   degree to which the defendant exercised decision-making

6   authority or influenced the exercise of decision-making

7   authority.

8           What's very interesting, Agent Botterbusch

9   testified that at one point Miss Boselli tells her

10  post-*Miranda* that McDonald wanted to -- quote-unquote -- pass

11  her off to Mr. Esposito, and the defendant didn't want to do

12  that.  So what did she do?  She said no.

13          Apparently that's all she had to do, say no.  And

14  Mr. McDonald did not force her, coerce her, threaten her, or

15  beat her or anything to have sexual contact with

16  Mr. Esposito, because she said no.

17          Theoretically, if Miss Boselli had said no to

18  engaging in sexual activity with a minor, she would have said

19  no and she would not have continued to engage in those sex

20  acts on a two-day period.

21          No. 4, the nature and extent of the defendant's

22  participating in the commission of a criminal activity,

23  including the acts the defendant performed and the

24  responsibility and discretion the defendant had in performing

25  those acts.

1        I don't think that there is any doubt or any

2   dispute as to the pervasiveness of the defendant's

3   involvement in the sexual abuse of a child in this case.  I

4   guess there is a dispute as to whether or not she enticed

5   her, but it's clear from the videos and it's clear from the

6   photographs that the defendant was used almost like a bridge

7   to induce and make the child victim feel comfortable with

8   engaging in sex acts with her and with McDonald.

9        Exhibit 40, honestly, Your Honor, speaks for

10  itself.  If Your Honor were to watch each of those very short

11  videos, as the agent testified, in at least one of the videos

12  she looks at the camera while engaging in sexual contact with

13  her husband, Mr. McDonald, and says, This feels great.  You

14  should have Daddy do it to you.

15       The degree to which the defendant stood to benefit

16  from the criminal activity.  I think we are all stumped as to

17  how the defendant could possibly benefit from abusing a

18  seven-year-old child.  Obviously she did not benefit

19  monetarily; but I would argue to the Court, in viewing

20  Government 50, those pornographic images, she did benefit by

21  gaining some sort of sick sexual arousal from engaging in the

22  sex acts with the child.

23       So for all of those reasons the defendant is not

24  entitled to a minor role participant because she was not a

25  minor role participant and the defendant's request should be

1  denied.

2          THE COURT:  I'll give you the final word on that,

3  Mr. Crawford, before I rule.

4          MR. CRAWFORD:  Thank you, Your Honor.

5          Judge, the way I see the argument at this point,

6  the defense readily admits and agrees that we participated in

7  the illegal sexual activity with a minor child.  So one of

8  the four has been established.

9          However, it is still our belief that we had

10  nothing to do with the scope or structure of the crime.  We

11  had absolutely nothing to do with the planning and organizing

12  of it.  We had nothing to do with the decision-making

13  authority, and we didn't benefit.

14          Now, the government tries to counteract that by

15  showing these films that were sent by RJ to Esposito with my

16  client in them as part of the grooming process, as part of

17  the enticement process.

18          Again, when you are directed and when you are told

19  and when you are forced to participate in that type of thing,

20  it is a question of really how much she should be held

21  accountable for those particular factors.

22          THE COURT:  How would you respond to the

23  government's argument that your client was used as a bridge?

24  Those are the words that the prosecutor used.  But the words

25  that I would use are something along the lines of some little

1  girls just feel more comfortable around women.  They are not

2  as intimidating physically as men can be.  So if you are

3  trying to lure a child in, that's the way you do it, because

4  a woman is just -- well, just less intimidating.

5          So that's, in essence, the argument that the

6  government has made.  I've just phrased it differently.  And

7  if you look at the transcript that I think was part of -- or

8  the verbiage that was part of the presentence report, I think

9  the child's father said at one point she's going to be

10 willing to come to Miss Boselli.  She's going to seek you

11 out, or something to that effect.  I mean, that's how I would

12 interpret it.

13         So how do you respond to that in terms of how she

14 really had been appropriately scored given that particular

15 role?

16         MR. CRAWFORD:  I would concede she was used as a

17 bridge.  I would try to make this analogy.  There is an

18 attractive photograph of Miss Boselli, and that photograph is

19 shown to the child victim repeatedly.  This is who you get to

20 go meet.  This is who you get to be with, et cetera.

21         The question is how did that picture come into

22 being, and Miss Boselli did not do that voluntarily and

23 willingly.  She did that because she was told what to do, how

24 to do it, and what they were going to do.  So that's the

25 distinction I'm trying to make.  She didn't build her own

1 bridge.  She was used as a bridge.

2          THE COURT:  But she stood up enough when she

3 didn't want to have sex with or get involved with the child's

4 father.

5          MR. CRAWFORD:  It's not that simple.  Yes, they

6 did discuss that Esposito wanted to have sex with

7 Miss Boselli and, Miss Boselli made it clear that she did not

8 want to have that occur.  But as is often the case in these

9 types of relationships, she could and did often object to

10 certain things only to then be threatened and/or beaten and

11 then acquiesced.

12          So she fully expected in this particular case, if

13 Esposito pushed, that RJ would force her -- in order for him

14 to get to the child, would force her to have sex with

15 Esposito.  That's what was expected.  She didn't like it.

16 She told him no, but that's what she was expected to do.

17          Is that acquiescing?  Is that playing a major role

18 or even a role in it?  Not under these circumstances.

19          I may want to suggest this to the Court.  I know

20 99 percent of the time we need to come up with a guideline

21 recommendation range and then move on to mitigating and

22 aggravating.

23          It may not be a bad idea in this case to compute

24 the guidelines with minor role and without minor role.  I

25 think we can all agree what that number will be; and then, if

1  you listen to my psychiatric and psychological testimony

2  during the mitigation aspect, that's going to relate back

3  to this, and that's fact specific, to I think help you

4  determine this minor role issue.

5          THE COURT:  But today, under the guidelines, which

6  are advisory, even if I did not give her the minor role

7  reduction, which, quite frankly, Mr. Crawford, based on what

8  I've heard, I don't think she's entitled to, I could still

9  factor everything that your psychologist is going to say, all

10 of these other factors, even though she's not entitled to a

11 minor role adjustment.

12          MR. CRAWFORD:  Understood.

13          THE COURT:  That is my ruling.  I was just pulling

14 these cases.  Let's see.  One of the last words out of the

15 Eleventh Circuit is *United States versus Palma-Meza*.  Again,

16 all of these cases that I was able to pull come from the boat

17 cases.

18          In that case, the Eleventh Circuit tells us the

19 factors that we need to apply in determining whether a minor

20 role adjustment should be made.

21          When I look at that case, along with the seminal

22 case of *De Veron*, which I just reviewed a few minutes ago,

23 quite frankly, in a scheme you have some people who play

24 larger roles and some people that play a less significant

25 role; but that doesn't necessarily mean that they are

1   entitled to that particular adjustment downward, and that's

2   what *Palma-Meza* tells us at 2017 Westlaw 1371385.

3          Of course, the seminal case of *De Veron* tells us

4   the same thing, that you look at these factors, the five

5   factors that we have articulated earlier, the degree to which

6   the defendant understood the scope and structure of the

7   criminal activity.

8          To me there is no doubt she was part and parcel of

9   this.  She may not have been the account holder on those

10  accounts or on the e-mail account or on the phone or any of

11  that, but that's truly of no significance as far as I'm

12  concerned.

13         When all is said and done, I agree with the

14  government.  That's not relevant.  Miss Thelwell, I think you

15  made a good argument.  It truly isn't relevant to the

16  determination of her role here.

17         I think she was part and parcel of the planning

18  and organizing.  I think she exercised decision-making

19  authority based on what I've heard from the agent's testimony

20  and the nature and extent of her participation in the

21  commission of the criminal activity.

22         I think that she was in many ways the lure,

23  because I think many little girls can be much friendlier to

24  an adult woman than they would be to an adult man.  They are

25  just less scared, less intimidated, and I think she provided

1  that lure based on what I heard her father say in that

2  transcript, based on my review of that file, and that case

3  the other day when I was becoming familiar with the father's

4  case so that I could understand what went on in his criminal

5  case.  Based on that, I think that this defendant was very

6  much used as a lure.

7          How she stood to benefit from this criminal

8  activity?  You know what?  I could only have to guess what

9  benefit these people found in this.  I have no idea because I

10  don't have that type of mind that can even begin to

11  understand that.  So they do it for their own reasons.

12          But I think particularly revealing are, as you

13  look through these pictures and you see her, for instance,

14  carrying the little girl, that shows that bond.  You show her

15  the picture with, for heaven's sake, ice cream, where she

16  puts the ice cream on the little girl's nose and then licks

17  it off.  That's an unfortunate foreshadowing of what was

18  going to go on here, and you can just see her preparing her

19  for what was going to go on.

20          She was part and parcel of this.  I don't need to

21  look at that movie or video to figure that out.  So the

22  objection is noted, but it's overruled.  I think this has

23  been appropriately scored.

24          Mr. Crawford, however, I have listened very

25  intently to some of your -- do you have another objection?

1          MR. CRAWFORD:  Judge, I do.

2          THE COURT:  Okay.  But hold on.  Let me say, some

3    of your points, however, were well made, Mr. Crawford.  These

4    are things that I can consider in the 3553 factors, if

5    appropriate, for a reduction.  It doesn't mean I'm shutting

6    that door.  I just mean that with respect to an adjustment,

7    she's not entitled to it.

8          What other objection do you have?

9          MR. CRAWFORD:  Understood.

10         The final one, Judge, is we would ask the Court to

11   consider pursuant to 5H1.3 my client's mental and emotional

12   health.

13         THE COURT:  As a role adjustment?

14         MR. CRAWFORD:  Yes, ma'am.

15         THE COURT:  Go ahead.

16         MR. CRAWFORD:  As you saw from the reports from

17   the mental health specialist and from the forensic

18   psychologist, my client suffers from post-traumatic stress

19   disorder, severe depression, and there is an attachment

20   disorder aspect of this that is factored in.

21         I find it interesting that these are called

22   disorders because they are not normal.  That's why they are

23   called dis-orders.  That's why I would like at this time, if

24   the Court would allow me, to call three witnesses to proceed

25   on this matter.

 1          THE COURT:  Sure, of course.  Absolutely.  Call

 2  your first witness.

 3          MR. CRAWFORD:  Miss Karol Dawson.

 4          THE COURTROOM DEPUTY:  Please raise your right

 5  hand.

 6          Do you solemnly swear or affirm under penalty of

 7  perjury that the testimony you shall give in this cause will

 8  be the truth, the whole truth, and nothing but the truth?

 9          THE WITNESS:  So help me God.

10          THE COURTROOM DEPUTY:  State your full name for

11  the record and spell your last name.

12          THE WITNESS:  Karol Ann Dawson, D-a-w-s-o-n.

13          THE COURTROOM DEPUTY:  Please have a seat.

14          THE COURT:  Go ahead, Mr. Crawford.  You may

15  proceed.

16          MR. CRAWFORD:  Thank you.

17                    KAROL ANN DAWSON,

18  having been first duly sworn by the Courtroom Deputy,

19  testified as follows:

20                    DIRECT EXAMINATION

21  BY MR. CRAWFORD:

22  Q.    If you would, please tell us your full name.

23  A.    Karol Ann Dawson.

24  Q.    I understand you have what we would consider a

25  generally unique of spelling Karol.  If you would, help the

1   court reporter and spell that out.

2   A.    K-a-r-o-l.

3   Q.    What is your relationship with Miss Shauna Boselli?

4   A.    I'm her mother.

5   Q.    Where do you presently live?

6           THE COURT:  Just take your time.  I know this is

7   very emotionally draining for you.  So you need to just take

8   your time and speak when you are able to.

9           THE WITNESS:  Do you need my full address?

10  BY MR. CRAWFORD:

11  Q.    In what town do you live?

12  A.    Largo, Florida.

13  Q.    Who lives there with you?

14  A.    Thomas Dawson.

15  Q.    That is your husband?

16  A.    Yes.

17  Q.    What do you do for a living, Miss Dawson?

18  A.    I am an instructional designer and corporate trainer.

19  Q.    For who?

20  A.    HSN.

21  Q.    All right.  And do you spend a bit of time on the road

22  or remote location?

23  A.    Yes.

24  Q.    Where is that?

25  A.    Tennessee.

1   Q.    And then you come back here on the weekends?

2   A.    Pretty much, yes.

3   Q.    Okay.  It's my understanding that you adopted Shauna

4   Boselli when she was approximately five years old?

5   A.    Yes.

6   Q.    Tell the Court that story.  Tell her how you came to

7   adopt Miss Boselli.

8   A.    When I was in college, the Iron Curtain was dissolving,

9   and we actually had a Russian General come to our school and

10  ask for help for the kids that were being abandoned.  So my

11  ex-husband and I traveled to Russia to adopt her.

12          What else would you like to know?

13  Q.    Okay.  Now, at this time, were you still in school or

14  had you graduated and you were working?

15  A.    Yes, we both had graduated.

16  Q.    Okay.  What type of work were you and your ex-husband

17  doing at that time?

18  A.    At the time I was studying to become a music minister

19  and he was studying to become a pastor.

20  Q.    All right.  And, so, did it turn out that you and your

21  husband ended up developing what I'm going to call missionary

22  work at this particular part of Russia?

23  A.    Yes.  After traveling over to adopt Shauna, we saw the

24  enormous need and had gotten involved with Josh McDowell's

25  Ministries, who would take humanitarian aid to the kids in

1    Russia, Belarus, and Ukraine several times a year.  We

2    started traveling with them.  And over a period of five

3    years, we developed a relationship, especially in Belarus,

4    with some people who asked us to come and help since we had a

5    adopted a child and knew the situation and the climate that

6    the kids were trying to grow up in.  We were asked to come

7    over and help full-time with the kids, so we did that.

8    Q.    In addition to your personal experience of adopting

9    Miss Boselli, your daughter, you also spent considerable time

10   over there in being involved in the adoption process in

11   Belarus or Russia or both?

12   A.    Belarus.  We traveled into Russia from time to time to

13   Smolensk, but it was mostly in Belarus because that's where

14   we were invited.  You had to be invited into the country.

15   Q.    Right.  Okay.  So based on this experience, did you

16   develop some knowledge about the way abandoned children were

17   maintained in the hospital for the first year of their life?

18   A.    Yes.  We went many times ... we went many times to the

19   abandoned children's ward.  All the hospitals have abandoned

20   children's wards.

21   Q.    Help us understand what that is and how that operated

22   in Russia.

23   A.    It's usually a very small room with nothing on the

24   walls, just cribs lined.  If this were this space, they would

25   just be lined up, one next to each other (indicating).  You

1    can't get in between them.  Just lined with cribs, with

2    children lying in them.

3    Q.    Okay.  Did you come to learn from this experience over

4    a number of years and also from your experience of adopting

5    Shauna specifically that these children basically laid in

6    their crib except for two times a day when they were fed?

7    A.    Yes.  They did not get picked up.  When we would pick

8    up the kids, they would arch their backs because they weren't

9    used to being touched.

10         One of the little kids was starting to speak

11    English because we spoke to them more than anybody spoke to

12    them in Russian.  But usually they would just lay them on the

13    mat.  It was like a rubber mat in the bottom of the crib, and

14    they would just come in and clean them, feed them, and leave.

15    Q.    So did you come to understand that that is the

16    conditions your daughter grew up in in the first year of her

17    life?  She basically had limited physical contact with other

18    human beings other than twice a day when she was fed?

19    A.    Yes.  She was born prematurely, and her birth mother

20    did not come back to get her, and she stayed at the hospital

21    for almost eight months before they finally decided to move

22    her to an orphanage.

23    Q.    So let's now move from the hospital, which generally is

24    in charge the first year, and go to the orphanage.  In your

25    experience as a missionary in that part of the world, did you

1    spend time in orphanages and come to learn how they operate?

2    A.    Yes.  Up to the age of five they kept them in a

3    deski-dome, which is a children's home.  When Shauna arrived

4    there, her paperwork stated that she was very developmentally

5    delayed, and remained so throughout her time at the

6    orphanage.  They did give her vaccinations and that sort of

7    thing, but they don't get a lot of interaction.  They don't

8    get --

9    Q.    When you say, "interaction," you mean human physical

10   interaction?

11   A.    Yes.  They are not supposed to pick them up.  They were

12   not supposed to touch them.  All the pictures that we have of

13   her with the people that took care of her, they don't touch

14   her at all.  She had never celebrated her birthday.

15   Q.    Okay.  So it's fair to say, then, that this was

16   confirmed by your experience while you were there as a

17   missionary and also from your specific experience with your

18   daughter?

19   A.    Yes.

20   Q.    Okay.  It's my understanding in these orphanages there

21   is kind of a grouping of the children based on age and

22   sometimes on disability?

23   A.    Yes.

24   Q.    What did you learn specifically about the group of the

25   small children that Shauna was raised with for the first

1   years of her life?

2   A.    The areas where they have the kids divided, they

3   basically try to make it like a little home where they have a

4   sleeping area and then a living area where they also eat.

5          Most of the kids that were in her group had either

6   fetal alcohol syndrome or some sort of disability.  There was

7   a little boy that was blind.  So she picked up a lot of what

8   we called orphanage-isms.  She would roll on the floor, she

9   would bark, she would get overstimulated very easily, and her

10  eyes rolled.  Her eyes would roll back in her head.  It was a

11  little scary.

12  Q.    I understand.

13         Okay.  So at some point -- I guess you adopted her

14  when she's five?

15  A.    Yes.

16  Q.    You all moved back to the United States and/or you are

17  based in the United States.  What part of the country are you

18  living in at that time?

19  A.    Albuquerque, New Mexico.

20  Q.    Did there come a point when you moved to Pennsylvania?

21  A.    Yes.  We adopted her when she was five.  We lived in

22  Albuquerque and were traveling with Josh McDowell when she

23  was five to ten and then moved overseas from the age of 10

24  until she was 15.

25  Q.    All right.  Let's focus on the time that you were in

1  Pennsylvania.  Where in Pennsylvania were you?

2  A.     Shortly after we adopted Shauna my mother had open

3  heart surgery, so we moved back to Pennsylvania so I could

4  care for her.  It was in Mount Carmel, Pennsylvania.

5  Q.     And did there come -- during this time frame, was it

6  fair to say that the family shared the raising of Shauna's

7  responsibility -- shared the responsibility of raising Shauna?

8  A.     Yes, yes.

9  Q.     Okay.  Were there times based on your missionary needs

10 that you and your husband would have to be out of town

11 raising money and funds for the return trips to wherever you

12 were going to be going?

13 A.     Yes.

14 Q.     Okay.  So Josh McDowell Ministries runs like other

15 ministries.  You have to raise the money to go do what you

16 are going to do.

17 A.     Yes.

18 Q.     During this time frame, did you leave Shauna in the

19 care of your mother or her grandmother?

20 A.     Yes.

21 Q.     All right.  At this time, was her brother, or who would

22 be Shauna's great uncle, also living there or living nearby?

23 A.     Yes.  He owned the home.

24 Q.     Okay.

25 A.     And he basically had my mom live there the last few

1   years before he retired so that he didn't have to worry about

2   somebody paying rent and destroying the property, because he

3   wanted to move in when he retired.  So once he retired, he

4   moved in there, too.

5   Q.    Did there come a time when you learned that there had

6   been inappropriate physical contact between your uncle and

7   Shauna's great uncle and Shauna?

8   A.    Shauna told the youth minister's wife at our church

9   when they were on a youth retreat that my uncle had

10  repeatedly sexually abused her pretty much from the time we

11  moved in with my mom.

12  Q.    So this was about a five-year period?

13  A.    Yes.

14  Q.    All right.  And was that case ultimately turned over to

15  the authorities in Pennsylvania?

16  A.    As soon as we -- as soon as we were told about it, we

17  reported it here in Florida.  From that point on I was just

18  concerned about her.  We did have to go to Pennsylvania and

19  give testimony regarding that.  I know that they told us here

20  in Florida that if it had occurred in Florida that he would

21  be in jail.

22  Q.    All right.  But it was handled by the authorities up in

23  Pennsylvania?

24  A.    Correct.

25  Q.    You participated somewhat in the criminal justice

1   process?

2   A.    Yes.

3   Q.    And that case was resolved?

4   A.    Yes.

5   Q.    But there was a finding of fact or guilt that your

6   uncle did abuse your daughter?

7   A.    Yes.

8   Q.    Okay.

9           MR. CRAWFORD:  If I could have just a moment.

10          THE COURT:  That would be fine.

11          Let me ask, Mr. Tremmel, is that what your

12  presentence report says about that?  Take a look at your

13  presentence report.

14          MR. CRAWFORD:  Miss Dawson, thank you, ma'am.  The

15  government may have some questions.

16          THE COURT:  Any cross-examination of this witness?

17          MS. THELWELL:  Yes, Your Honor.

18          THE COURT:  And I'm still just trying to find that

19  in the report.  I know there was a mention of it.

20          THE PROBATION OFFICER:  There is mention, Your

21  Honor.  Paragraph 97.

22          THE COURT:  Let me turn to that.  Give me a

23  second, please.

24          THE PROBATION OFFICER:  Bottom of Page 12, Your

25  Honor.

1            THE COURT:  Okay.  Right.  The last line of the

2    presentence report Mr. Crawford says the uncle was reportedly

3    prosecuted, but not convicted of these offenses.

4            That's different than what I just heard a minute

5    ago.

6            MR. CRAWFORD:  There's been some ambiguity about

7    the final result that I haven't been able to confirm one way

8    or the other.

9            THE COURT:  Because that's what the report says,

10   and I just heard her say in response to your question -- your

11   question was:  Was there a finding of fact or guilt that your

12   uncle did abuse your daughter?  Answer:  Yes.

13           Those are two different answers.  Well, the report

14   says one thing; her answer just said something else.

15           MR. CRAWFORD:  Okay.  If I could address that?

16           THE COURT:  Why don't you do that.  That's why I

17   asked the probation officer, because it's completely

18   different.

19           MR. CRAWFORD:  I understand.

20                    DIRECT EXAMINATION (resumed)

21   BY MR. CRAWFORD:

22   Q.    Do you know what happened in Pennsylvania?

23   A.    From my understanding, it was children services --

24   whatever the Pennsylvania equivalent of that is --

25   investigated him and found him guilty.  He was able to --

1    what's the word when you -- he was able to protest or take it

2    to court to try to argue that, and he actually lost.

3    Actually, I don't know what it's called.  I don't know -- I

4    don't know what the Pennsylvania version of children services

5    is.

6            My understanding is they were going to continue to

7    press the issue legally, and I repeatedly called about it and

8    nothing occurred.  Basically I had the case officer say that

9    it would be his word against hers and there is nothing more

10   they could do about it.

11   Q.   Okay.  So it could have been dropped.  It could have

12   been dismissed.  You don't know?

13   A.   I don't know.

14   Q.   Let me ask you this.  This is important.  Did you ever

15   confront your uncle about molesting your child?

16   A.   Yes.  We sat in a courtroom like this and I had to

17   state who I was.  It was official.

18   Q.   Did you ever talk to him one on one, face to face at

19   the house or outside the courtroom in any way?

20   A.   I don't know that would have been a good idea.

21   Q.   Okay.  You did not.

22           Any doubt in your mind that he did it?

23   A.   He would not look at me the entire time we were in the

24   courtroom.  To me, because he never could look at me, there

25   was no doubt in my mind.

1              MR. CRAWFORD:  Got it.  Thank you, ma'am.

2              THE COURT:  Thank you, Mr. Crawford.

3          Miss Thelwell.

4                        CROSS-EXAMINATION

5    BY MS. THELWELL:

6    Q.    Good morning.

7    A.    Good morning.

8    Q.    Regarding the abuse by your uncle on your daughter, was

9    your uncle ever actually arrested?

10   A.    No.  We were trying to get him arrested.  When we

11   reported it in Florida, the sheriff said that had what she

12   was stating occurred in Florida, he would have been arrested

13   immediately; but Pennsylvania had different laws, had

14   different rules, was my understanding.

15   Q.    So based on what you were telling us about going to

16   court and providing testimony, that was not in a criminal

17   setting.  That was in a child services/family court type of

18   setting?

19   A.    Yes.

20   Q.    Thank you for the clarity.

21          Earlier you testified you had also written a

22   statement that you provided to the defense attorney that the

23   Court has that outlines your daughter's upbringing in Russia.

24          You indicated that before you brought her back to

25   the United States she was evaluated; is that correct?

1  A.     Uh-huh.

2  Q.     And that at that time the doctor had told you she

3  suffered from some developmental delays and other issues; is

4  that correct?

5  A.     Reactive Attachment Disorder.

6  Q.     Thank you.  That was the word I was looking for.

7          What is your understanding of -- well, let me

8  rephrase.

9          After you learned this diagnosis, what did you do?

10  A.     At the time when people were adopting children from

11  Eastern Europe they thought that just letting the kids grow

12  up in a loving home would fix the problem.  They are now

13  starting to recognize that's not the case.  I should have put

14  her in therapy.

15  Q.     So she did not go to therapy?

16  A.     No.

17  Q.     Okay.  So when you came back to the United States --

18  and earlier you testified that she had some barking and just

19  doing things that are abnormal.

20          At that time did you seek any sort of services or

21  therapy?

22  A.     We took her regularly to the doctor, medical doctor.

23  He kept reassuring us that she would overcome her delays with

24  attention and love and affection and she would basically grow

25  out of it.  To some extent she did.  She doesn't bark anymore.

1  Q.    Okay.  And at what age did she leave your house?

2  A.    Twenty.  When she met RJ.

3  Q.    Up until then she had always lived with you; is that

4  correct?

5  A.    Yes, uh-huh.

6  Q.    From the time that she had been in your home, had she

7  ever gone to therapy?

8  A.    When we reported her sexual abuse, they offered -- the

9  state of Florida offered free counseling and both she and I

10  went to that.

11  Q.    What age was that, that she reported her abuse?

12  A.    Sixteen, seventeen.  Sixteen, I would say.

13  Q.    So a couple of years before --

14  A.    No, it was earlier than that.  Fifteen.  Fourteen or

15  fifteen.

16  Q.    Fourteen or fifteen you think?

17  A.    Uh-huh.

18  Q.    You indicated you both went to therapy?

19  A.    Yes.

20  Q.    Was it a group, like together, or was it individual

21  therapy?

22  A.    Individual.

23  Q.    And how long did that go on?

24  A.    Maybe six months.

25  Q.    Is there a reason why she stopped going?

1    A.    She wasn't seeing any value in it.  I think she was too

2    young to take it seriously.  I think you have to own whatever

3    is going on inside of you to be able to work through it with

4    a counselor, and I don't think she was ready to do that.

5    Q.    Is that what she had told you, that she didn't see

6    value in the therapy?

7    A.    Yes, there were things.  She had told me that she

8    didn't feel like she was getting anything out of it.  She

9    really didn't like her counselor.

10   Q.    Had she only been to that one counselor?

11   A.    Yes.

12   Q.    Did you attempt to find her a different counselor?

13   A.    I would have if she had stated she wanted to speak to

14   someone.  At the time, she felt she was handling it okay.

15   Q.    When she was speaking to the therapist -- or I guess

16   from the time she had disclosed the sexual abuse, do you know

17   whether or not she had been diagnosed with anything medically

18   regarding her mental health at that point?

19   A.    In her paperwork from the orphanage when she went from

20   the initial hospital to the deski-dome, the children's home,

21   they said that she was severely developmentally delayed.  By

22   the time she left that orphanage with us, the "severe" term

23   had gone away.

24   Q.    So they just said developmentally delayed at that

25   point, not severely?

```
1    A.    Correct.  But then when she was evaluated when we

2    left -- when we left Moscow, before we could get her visa to

3    come to the United States, the doctor that saw her there --

4    they had to be evaluated by an American-trained doctor, and

5    he said that she was showing signs of Reactive Attachment

6    Disorder.

7    Q.    And that was when she was about five?

8    A.    Yes.

9    Q.    Had she been diagnosed with anything else since the age

10   of five?

11   A.    No.

12              MS. THELWELL:  No further questions.  Thank you.

13              THE COURT:  Anything else, Mr. Crawford?

14              MR. CRAWFORD:  No, thank you, Your Honor.

15              THE COURT:  Thank you.  You are excused to return

16   back to the audience.

17              MR. CRAWFORD:  Your Honor, with the Court's

18   permission, if I could ask to call Miss Nikki Daniels.  Her

19   report is attached to the PSR.  I do have her curriculum

20   vitae and report if the Court would like me to provide you

21   with another copy.

22              THE COURT:  No, I have it right here.  Thank you.

23              THE COURTROOM DEPUTY:  Please raise your right

24   hand.

25              Do you solemnly swear or affirm under penalty of
```

1    perjury that the testimony you shall give in this cause will

2    be the truth, the whole truth, and nothing but the truth?

3            THE WITNESS:  I do.

4            THE COURTROOM DEPUTY:  State your full name for

5    the record and spell your last name.

6            THE WITNESS:  Nikki Ann Daniels.

7            THE COURTROOM DEPUTY:  Please have a seat.

8                    NIKKI ANN DANIELS,

9    having been first duly sworn by the Courtroom Deputy,

10   testified as follows:

11                   DIRECT EXAMINATION

12   BY MR. CRAWFORD:

13   Q.    If you would, please tell the Court your full name.

14   A.    Nikki Ann Daniels.

15   Q.    Do you know an individual by the name of Shauna Boselli?

16   A.    I do.

17   Q.    Was she a client of yours?

18   A.    Yes, she was.

19   Q.    Client, patient?  What is the appropriate term?

20   A.    Client.

21           THE COURT:  Mr. Crawford, I'm sorry.  I thought I

22   had it, but I don't have it.

23           MR. CRAWFORD:  All right.

24           THE COURT:  So you will have to give me a copy of

25   it, if you have an extra copy.

1          MR. CRAWFORD:  I do.  This is her CV and treatment

2  summary.

3          (*Documents tendered.*)

4          THE COURT:  Thank you.

5  BY MR. CRAWFORD:

6  Q.    Okay.  What is your present profession?

7  A.    I'm a licensed clinical social worker and I work in

8  private practice as a therapist.  I also am adjunct professor

9  at the University of South Florida.

10  Q.    And let's walk through that for just a moment.

11          As far as your education, where did you originally

12  go to school to receive your Bachelor of Science?

13          MR. CRAWFORD:  Judge, this is on the second page

14  of her curriculum vitae.

15  BY MR. CRAWFORD:

16  Q.    Where did you go to undergrad?

17  A.    I graduated from the University of Massachusetts.

18  Q.    What year?

19  A.    1985.

20  Q.    And did you do any graduate work after that?

21  A.    I did.

22  Q.    Where?

23  A.    The University of South Florida.

24  Q.    What type of master's degree did you receive from USF?

25  A.    Master's in social work.

1  Q.    Okay.  Let's talk about where you went to work.

2  Starting in June of '84 and --

3            THE COURT:  Mr. Crawford, I think it speaks for

4  itself.  I can take note of this.

5            Are you okay with this, Miss Thelwell?  Is there

6  any reason to go through this?

7            MS. THELWELL:  No, Your Honor.

8            THE COURT:  She's clearly an accomplished

9  professional, and I can read her resumé or curriculum vitae

10  and understand her accomplishments, so I think we are fine

11  with just moving on.

12            MR. CRAWFORD:  Thank you, Your Honor.

13  BY MR. CRAWFORD:

14  Q.    Let's move on, then, and talk about your patient or

15  client Shauna Boselli.

16            THE COURT:  By the way, we will call this a court

17  exhibit or a defendant's exhibit if you would like.

18            MR. CRAWFORD:  That would be fine.

19            THE COURT:  That way it's part of the record.

20            *(Defendant Exhibit 1 received in evidence.)*

21  BY MR. CRAWFORD:

22  Q.    How did Miss Boselli become a client?

23  A.    Miss Boselli came to me originally seeking assistance

24  with sexual abuse issues that she had suffered as a child.

25  Q.    All right.  And do you have the report in front of you?

1  A.     I do.

2  Q.     Tell us specifically what dates you met with her as

3  part of this treatment.

4  A.     Absolutely.  I met with her 12 different times in my

5  office beginning on May 20th, 2016.

6         Do you want me to read all 12 dates?

7  Q.     Well, it's fair to say you would see her once a week

8  for the succeeding weeks until July; is that fair?

9  A.     That is fair.

10 Q.     And then it appears you saw her on July 1st and then

11 there appears to be a gap before you saw her July 29th, which

12 is interesting.  That's when this particular offense

13 occurred.  Then you saw her in August again; is that correct?

14 A.     That is correct.

15 Q.     And then through September, and then she's arrested.

16        You did get a chance to also visit with her

17 several times in the Pinellas County Jail?

18 A.     That is correct.  I visited with her three times.

19 Q.     Okay.  If you would, tell us what type of history was

20 presented to you from her and from her family and other

21 sources with respect to Miss Boselli.

22 A.     Miss Boselli, at the intake appointment, of course, in

23 gathering her history talked about the adoption from the

24 Russian orphanage, that she was five and remembered a lot of

25 the stories from her family.  Really I think more about the

1   behaviors she had and the severe negligence she suffered in

2   the orphanage.  We, of course, know the attachment issues

3   that then resulted from that.

4          She talked about being sexually abused as a child,

5   talked about that being ongoing for years, talked about when

6   she reported that, that was a very difficult time for her.

7   Obviously, with her and her family.

8          She did talk a little bit about the therapy she

9   had gone to, but didn't remember who she went to.  When I

10  first saw her she was engaged to Mr. McDonald at that point,

11  and she talked about being involved in the adult film

12  industry and her role as a dancer and how he really was very

13  abusive and controlling.

14         She at times would talk more about his abuse and

15  control.  Other times I think she was too afraid to be able

16  to do that and would not talk as much about it.  So we went

17  back --

18  Q.   At times you sensed a reluctance for her to discuss

19  that with you?

20  A.   Absolutely.  I had to really kind of pull a lot of it

21  out of her.  She wouldn't talk in detail about any of the

22  abuse he perpetrated except talking about him being very

23  controlling sexually.

24         She did talk about the ceremony to become a

25  collared slave.  She did talk about how he didn't kind of

1    follow the rules of the bondage-domination lifestyle.  She

2    talked about some of that in her sessions.

3    Q.    Let's back up and talk about that.

4              There is, I understand, a community out there that

5    has this, I don't know, dominant-submissive aspect to it?

6    A.    Yes.

7    Q.    If you would, elaborate a little bit on that.

8    A.    It's BDSM, bondage domination submissive masochism; and

9    there is a community of folks who get involved in the

10   lifestyle.  It's very much about the person who was dominant,

11   the male, probably always, at least as far as I'm aware,

12   dominating over the female in the relationship.

13             If they move that relationship forward, it becomes

14   a collared slave.  There was a ceremony, almost like a

15   wedding that really kind of solidifies that relationship,

16   almost like a marriage does in a way.

17   Q.    Are you aware that there actually was a ceremony?

18   A.    I am aware.  I saw pictures.

19   Q.    Of Shauna Boselli and RJ McDonald of this collared

20   slave relationship?

21   A.    Yes.

22   Q.    Are you experienced or have run into these types of

23   situations in your experiences?

24   A.    I have.  I have.

25   Q.    So you are --

1   A.    Pretty familiar.

2   Q.    -- familiar with it?

3   A.    Uh-huh.

4   Q.    All right.  Please continue.

5   A.    So we went back and forth between talking about her

6   sexual abuse as a child.  She was also sexually assaulted at

7   her job, and that was another issue that came up in therapy.

8   It alternated between the sexual-assault-type issues and this

9   relationship with her, at the time, fiancée and then husband.

10  Q.    So we have a child that is adopted out of an orphanage

11  in Russia and all that entails?

12  A.    Uh-huh.

13  Q.    Then we have an teenager that is molested by her

14  great-uncle, and now we have someone who is involved in a

15  relationship that is dominant-submissive and has a collar

16  involved?

17  A.    Uh-huh.

18  Q.    And that's what you are dealing with?

19  A.    Uh-huh.  In the ceremony there was actually a collar

20  placed around her neck at that point.  That collar is not

21  left on, but it is part of the ceremony.

22  Q.    When they say collared ceremony, that's literal?

23  A.    It really means it, yes.

24  Q.    All right.  Based on your experience, the people that

25  suffer from these somewhat abnormal relationships, how does

1  that manifest itself in their ability to interact with other

2  human beings?

3  A.    The attachment issues that she would have struggled

4  with as a child, for her, they can go one of two ways really.

5  One way being they don't trust anyone.  They won't go near

6  anyone.  For her, it was the opposite, where she had really

7  very they boundaries in how she interacted with people and

8  would engage with people quickly.

9          She couldn't really discern throughout her whole

10  life most likely; but at least by the time I saw her she

11  couldn't really discern who to trust and not trust.  She felt

12  very unsafe in the world.  And her husband, fiancée at the

13  time when I met her, Mr. McDonald, provided her a sense of

14  safety from the outside world.

15          He provided structure.  The BDSM relationship is

16  very structured.  There are ceremonies, rituals, daily

17  rituals that have to happen.  So for her, that felt safe.  If

18  you haven't come from that type of background, of course,

19  that sounds absurd; but for her, that provided a level of

20  safety.

21          Again, she doesn't -- given her childhood where

22  she had no interaction with other people that were healthy or

23  appropriate or consistent, she doesn't know how to tell or

24  really how to discern what's safe, what's not safe, who to

25  trust, who not to trust.

1  Q.   You saw that attachment disorder concern from her youth

2  manifesting itself in her adult relationship with RJ McDonald

3  at the time?

4  A.   Absolutely.

5  Q.   All right.  Quite frankly, that sums it up quite well.

6  Do you think there is anything else the Court needs to hear?

7  A.   No.

8  Q.   Okay.  The judge does have your report in front of her,

9  Miss Daniels.  Thank you.

10 A.   Thank you.

11        THE COURT:  All right.  Miss Thelwell, any

12 cross-examination?

13        MS. THELWELL:  Yes, Your Honor.

14              CROSS-EXAMINATION

15 BY MS. THELWELL:

16 Q.   Good morning.

17        How did you come to meet Miss Boselli?

18 A.   She presented for therapy with me.

19 Q.   Do you know how she found you as a therapist?

20 A.   She has a friend named Toni who helped her find me.  I

21 don't remember honestly.  They may have told me.  I don't

22 remember exactly how she found me.  My specialty is domestic

23 and sexual violence.  So, if you Google that, you would find

24 me.

25 Q.   And your report indicates -- or your treatment summary

1  report indicates that she first appeared for intake on about

2  May 20th, 2016?

3  A.    That's correct.

4  Q.    What did she tell you was her reason for coming in to

5  see you?

6  A.    She initially said she was coming because of sexual

7  abuse issues and she felt like her sexual abuse as a teenager

8  was impacting her currently.  She reported nightmares,

9  flashbacks, depression.

10 Q.    In that specific session, the intake session, was that

11 the only abuse that she reported to you, the abuse that

12 occurred when she was a teenager?

13 A.    As well as the neglect as a young child, yes.  But,

14 yes, that is the only abuse she reported in that very first

15 session.

16 Q.    At what point did she disclose to you that she was also

17 being abused -- or had been abused by her father?

18 A.    Her father?

19 Q.    Yes.  Your report indicates that her father then began

20 to sexually abuse her as well.  Is that a mistake?

21 A.    Hang on.  What paragraph are you on?

22 Q.    It appears to be part of the first paragraph, toward

23 the bottom.

24 A.    Oh, okay.  I'm sorry.  Her understanding was that she

25 had been sexually abused by her father.  That may be a

1    mistake.  I can go back and look at my notes.  That may be a

2    mistake.

3    Q.    Do you have your notes with you?

4    A.    I do.  I do.  Just a moment, please.

5          I have in my notes that she reported she had been

6    abused by her father.

7    Q.    And that was when?  Was that during the May 20th?

8    A.    That was during the May 20th, yes.

9    Q.    So during the May 20th, 2016, intake she indicated she

10   had been abused as a teen by uncle and also by her father?

11   A.    I'm going to apologize here because I'm trying to hurry

12   as I'm reading, and I apologize.

13   Q.    Take your time.

14   A.    I'm very sorry.  I did write her father, and I

15   apologize because that is a mistake, because then this talks

16   about talking to the police and he was found guilty.  It was

17   her uncle that I should have stated there.  It was not her

18   father.  I apologize for that.  Thank you for clarifying.

19   Q.    The one disclosure she made as a teen was abuse from

20   her uncle?

21   A.    Uncle.

22   Q.    So that is incorrect in your report?

23   A.    It is incorrect, and I apologize.

24   Q.    That's fine.

25          At what point did she disclose to you that she was

1   being sexually assaulted at work?

2   A.    In the very next section she actually talks about that.

3   Q.    What did she say?

4   A.    She said the she was -- as you know, she's a dancer and

5   that she was performing and there is a room that people can

6   rent where they can have private time with the dancers.  In

7   that room she was sexually assaulted by a customer.

8   Q.    What did she do about it?

9   A.    She did not talk to her husband -- at that time

10  fiancée -- about it.  She was afraid that he would abuse her

11  and more afraid really, I think, that he wouldn't believe her

12  and wouldn't care she had been sexually assaulted.

13          As you can imagine, a dancer at a strip club no

14  one is really going to take seriously a report of sexual

15  assault, so she did not report it to police.

16  Q.    At what point did she disclose that she was in a BDSM

17  relationship?

18  A.    Early on in the treatment.  Let me check my notes again

19  to see if that was in the very first session.

20          Yes, the first session.

21  Q.    Do you have a lot of clients that engage in BDSM

22  relationships?

23  A.    I don't have a lot, but I've had a couple over the

24  years.

25  Q.    Is that how you became familiar with the intricacies of

1    BDSM?

2    A.    I became familiar with the intricacies because of one

3    particular client who had been abused by her therapist and

4    went through a year-and-a-half process with the state to get

5    his license taken away.  So I learned a lot about it in that

6    process.

7    Q.    You saw Miss Boselli around or on July -- in July of

8    2016; is that correct?

9    A.    That's correct.  July 1st to July 29th.

10   Q.    At any point between May 20th, 2016, and July 29th,

11   2016, did Miss Boselli ever disclose to you that she, in

12   fact, had sexually abused the child victim in this case?

13   A.    No, she did not.

14   Q.    I want to turn your focus to the July 29th, 2016,

15   meeting.  During that meeting, did she -- how did she appear

16   in that meeting?

17   A.    She was kind of her typical self.  She's very

18   personable and engaging.  She kind of sits right down,

19   talking.  She's very artistic.  She plays with a lot of toys

20   that are in my office.  Her usual self.

21         She talked about that she was upset that her

22   husband was still having sex with other women and talked

23   about that and was upset by that.

24   Q.    Okay.

25   A.    She also talked about the stress of planning what she

1  called with me her wedding, but basically the collaring

2  ceremony.

3  Q.    Is that the meeting in which she showed you the

4  photographs?

5  A.    No.  That would have been after -- actually, you know

6  what?  I'm sorry.  At that session she showed me the

7  photographs of the dress she planned to wear and how she

8  wanted her hair done.

9  Q.    July 29th?

10  A.    July 29th.  And then -- I'm sorry.  I'm looking at my

11  notes still.

12  Q.    It's perfectly fine.

13  A.    I appreciate it.

14          So earlier she had shown me pictures how she

15  wanted her hair done.  July 29th she showed me a video clip

16  of her and Mr. McDonald doing a dance at the wedding.

17  Q.    At what point did you learn of Miss Boselli's acts on

18  the child victim in this case?

19  A.    Whatever day it was -- because that's not in my

20  notes -- that I saw it in the newspaper.

21  Q.    So she never told you between -- she never told you?

22  A.    No, huh-uh.

23  Q.    Going back to your report that you provided -- and I

24  know that you indicated that it says it's supposed to say

25  uncle not father.

1  A.     Yes.

2  Q.     Can you then explain -- you go on to say -- I'm going

3  to start from the beginning of the sentence.  "When she told

4  about the abuse, she reports that her father" -- which we now

5  know is uncle -- "then began to sexually abuse her as well,

6  and her relationship with her mother was even more conflicted

7  than it had been prior."

8              Can you expand on what you mean by the

9  relationship with her mother being more conflicted than it

10  had been prior?

11  A.     She felt like at the time that her mom didn't believe

12  her when she reported the abuse by her uncle, and that was a

13  difficult time for her and felt disconnected from her mom.

14  Q.     Had been more conflicted than it had been prior, which

15  suggests that there was some sort of conflict between

16  Miss Boselli and her mother prior to disclosing the sexual

17  abuse; is that correct?

18  A.     Yes.  She talked about some typical teenage, you know,

19  girls fighting with their parents kinds of things.  She saw

20  her relationship with her mom as being somewhat conflicted.

21  Q.     As her therapist, did you provide any advice to her, or

22  did you just allow her to speak about her frustrations and

23  how she was feeling?

24  A.     A lot of allowing her to speak about frustrations and

25  help her really look at that she has the right to set limits

1   and boundaries on what her fiancée and then husband was

2   doing.  Really encouraged her to think carefully about this

3   marriage and suggested it wasn't going to be a healthy

4   marriage and she might want to reconsider that.

5           Of course, I can't tell her what to do, obviously,

6   or I would have because I really felt strongly about it.  I

7   definitely gave her the advice that this person certainly

8   doesn't seem to care about her feelings.  He's having sex

9   with other women and you are upset about that and he

10  continues to do it.

11          There is a safe word that's supposed to be in

12  these relationships and that she would try to get him to stop

13  certain acts and he wouldn't stop.  He refused.

14  Q.   And all of this was prior to her actually -- I think

15  you called it a slave-cuffing ceremony or something along

16  those lines?

17  A.   Yes.  Before the ceremony, yes.

18  Q.   All right.  Thank you.

19          MS. THELWELL:  One moment, Your Honor.

20          THE COURT:  That would be fine.

21          MS. THELWELL:  No further questions, Your Honor.

22          THE COURT:  All right.  Mr. Crawford, anything

23  else?

24          MR. CRAWFORD:  Just one on redirect.

25  ///

```
                        REDIRECT EXAMINATION
 1
    BY MR. CRAWFORD:
 2
 3  Q.    After a brief respite when Miss Boselli stopped seeing
 4  you and you got to see her then again, did she tell you why
 5  she had stopped?  Why there had been an interruption?
 6  A.    She said her husband didn't want her to continue to see
 7  me.
 8  Q.    Did what you see and observe match up with what you
 9  understand someone suffering from post-traumatic stress
10  syndrome to be?
11  A.    Yes.  My diagnosis of her was post-traumatic stress
12  syndrome, as well as major depression.
13          MR. CRAWFORD:  Thank you, ma'am.
14          THE COURT:  Anything else from anyone?
15  Miss Thelwell?
16          MS. THELWELL:  I apologize, Your Honor.  I do have
17  just based on that last question.
18                      RECROSS-EXAMINATION
19  BY MS. THELWELL:
20  Q.    So, correct me if I'm wrong, because I don't want to
21  misstate your qualifications in any way.
22  A.    Thank you.
23  Q.    You have your master's in social work, so you are a
24  social worker?
25  A.    Uh-huh.
```

1   Q.    Are you a licensed mental health counselor?

2   A.    I'm a licensed clinical social worker.

3   Q.    Licensed clinical social worker.  With that license you

4   are able to make medical diagnoses?

5   A.    That is correct.

6   Q.    Okay.  At what point did you diagnose Miss Boselli with

7   Post-Traumatic Stress Disorder?

8   A.    Upon first meeting her.

9   Q.    And that would be as a result from the teenage sexual

10  abuse?

11  A.    Yes.

12  Q.    With your --

13  A.    I'm sorry.  The teenage sexual abuse and also her

14  current abuse by her husband, because she was currently being

15  abused.

16  Q.    Was she on any medication?

17  A.    No, she was not.

18  Q.    With your license, are you able to prescribe

19  medication?

20  A.    No.  I referred her to either her family doctor or a

21  psychiatrist to be considered for medication, but she didn't

22  want to follow through on that and didn't have insurance to

23  be able to pay for it.

24  Q.    When you started visiting her at the jail, did you

25  contact her?  Or how did that come about?

1   A.    I had read in the paper she was in jail.  She has a

2   friend that had helped her connect with me who had contacted

3   me also and let me know she was there and to set up a couple

4   of different visits with her.  They were not therapy

5   sessions.  They were more supportive counseling.

6            MS. THELWELL:  No further questions, Your Honor.

7            THE COURT:  Okay.  I'll excuse the witness.  Thank

8   you.

9            MR. CRAWFORD:  Finally, Your Honor, on this

10  particular issue, we would call Dr. Valerie McClain.

11           THE COURT:  Let's take about a five-minute recess

12  before you call her.

13           (Recess taken from 11:41 a.m. to 11:49 a.m.)

14           COURT SECURITY OFFICER:  All rise.

15           This Honorable Court is now in session.

16           THE COURT:  Welcome back.

17           Mr. Crawford, you may proceed, sir.

18           MR. CRAWFORD:  Your Honor, at this time we would

19  ask Dr. Valerie McClain to come forward.

20           Judge, I'll make the same offer.  I do have a copy

21  of her report and her curriculum vitae, which should have

22  been in the presentence report.

23           (Documents tendered.)

24           THE COURTROOM DEPUTY:  Please raise your right

25  hand.

```
1              Do you solemnly swear or affirm under penalty of

2    perjury that the testimony you shall give in this cause will

3    be the truth, the whole truth, and nothing but the truth?

4              THE WITNESS:  I do.

5              THE COURTROOM DEPUTY:  State your full name for

6    the record and spell your last name.

7              THE WITNESS:  Dr. Valerie R. McClain,

8    M-c-C-l-a-i-n.

9                   VALERIE MC CLAIN, PH.D.,

10   having been first duly sworn by the Courtroom Deputy,

11   testified as follows:

12                   DIRECT EXAMINATION

13   BY MR. CRAWFORD:

14   Q.    Good morning to you.

15             If you would, please tell the Court your full

16   name.

17   A.    Dr. Valerie R. McClain.

18             THE COURT:  I'm completely familiar with her

19   background.  She's testified in this court numerous times.

20   I've seen different reports on different defendants from her

21   numerous times.

22             So, Miss Thelwell, do you have any objection?  She

23   is a recognized expert in her field.  I don't need to have a

24   recitation of her background again.

25             MS. THELWELL:  No, Your Honor.  Thank you.
```

1          THE COURT:  All right.  So you may proceed,

2     Mr. Crawford.

3          MR. CRAWFORD:  Thank you, Your Honor.

4     BY MR. CRAWFORD:

5     Q.    I do want to ask one particular question which I think

6     is relevant to this case --

7     A.    Of course.

8     Q.    -- given your background.

9     A.    Certainly.

10    Q.    Is there any particular experience or education that

11    proved to be particularly helpful in this case?

12    A.    Yes.

13    Q.    And what is that?

14    A.    I received training in 2011 and 2012 through the FBI

15    sexually violent crimes classes that were offered.  It was

16    particularly important because Roy Hazelwood was one of the

17    professors of the academy and provided information and

18    details regarding sexual sadism, conditioning of compliant

19    victims; and I found that particularly important in terms of

20    conducting my evaluation.

21    Q.    All right.  Very good.

22          Did there come a time when I asked you to evaluate

23    Miss Shauna Boselli?

24    A.    Yes.

25    Q.    And the dates of the evaluation -- how many times,

1    approximately, did you get to see her?

2    A.    I met with her six times.

3    Q.    All right.  And in addition to meeting with her, did

4    you have occasions to meet with Mom and talk with her on a

5    few occasions about what she knew about Miss Boselli?

6    A.    I did.

7    Q.    And did you also have the opportunity to review the

8    report for Miss Nikki Daniels, who was her mental health

9    specialist or counselor at the time of this offense?

10   A.    Yes, sir.

11   Q.    Based on that, if you would, give us a brief summary of

12   what the history and background of Miss Boselli was that you

13   found pertinent and that you included in your report.

14   A.    Certainly.  I think that much of the information has

15   been discussed with regard to her developmental upbringing by

16   her mother -- biological mother, who described the fact she

17   was basically staying in an orphanage, was adopted by her

18   adoptive mother at age five.

19          There were some mentions of diagnoses such as

20   developmental delays, Reactive Attachment Disorder, which I

21   think is important in looking at some of the core dynamics as

22   far as Miss Boselli's ability to build trust, formulate

23   attachments, basically to establish boundaries.

24          So I think that the early developmental history is

25   particularly important with regard to some of the

1  difficulties that she has experienced throughout her lifetime.

2  Q.    Okay.  We have heard -- I think Miss Daniels brought it

3  up and the government also brought it up -- this concept of

4  Reactive Attachment Disorder.  If you could, elaborate a

5  little bit on what that is and how that may have manifested

6  itself in Miss Boselli's situation.

7  A.    Certainly.  There are different types of Reactive

8  Attachment Disorder.  One type is that the person has

9  difficulty forming attachments and tends to avoid individuals

10  trying to be close to the person.

11        They may exhibit irritability, anxiety, symptoms

12  such as what were described by the mother as far as acting

13  like a limb was hurt, rolling eyes back.  In other words

14  there is abnormal type of behaviors.  Much of it is couched

15  within the fact they don't have a stable environment or

16  stable caregivers.

17        So I think that early on in her development,

18  Mother was describing some of what you would classically see

19  as reactive attachment.  And her therapist, Nikki Daniels,

20  was very on point when she was talking about Shauna

21  indiscriminately just taking and trusting people.  That's

22  sort of the flip side of Reactive Attachment Disorder; the

23  lack of boundaries, going in and not knowing if they can

24  trust or not, but going in and trying to initiate contact.

25  Q.    All right.  And in your clinical findings, after you

1   interviewed her and administered your tests, et cetera, did

2   that comport and did that support the opinion that Shauna

3   Boselli did suffer from some sort of attachment disorder at a

4   young age?

5   A.    Yes.   I think that was documented in the history that

6   was provided by Mom; and, so, that was, I think, a

7   fundamental basis of looking at some of the other issues that

8   she developed.

9   Q.    All right.   Is it possible to grow out of it with a

10   family of love, put it behind you and it never bother you

11   again?

12   A.    In my experience with working with adults who have been

13   diagnosed with Reactive Attachment Disorder, it can improve,

14   but it never really goes away.

15   Q.    Okay.  Based on what you understand of the facts of

16   this particular case, does her conduct -- or best described

17   as misconduct, fit in with the type of situations that

18   someone that had suffered from Reactive Attachment Disorder

19   may experience later on in life when they are an adult?

20   A.    Yes.

21   Q.    Okay.  As part of your treatment of Miss Boselli, did

22   you administer certain tests and procedures?

23   A.    Yes.   And I just want to clarify.   I did not treat

24   Miss Boselli, but I did evaluate her.   I'm not a treating

25   therapist.   I'm a forensic evaluator, but I did conduct

1  testing.  Specifically, I used the Trauma Symptom Inventory 2.

2  Q.   If you would, tell us a little bit about the Trauma

3  Symptom Inventory 2.

4  A.   Certainly.  This particular measure was developed by

5  Dr. Briere, and it's designed to assess symptoms that are

6  consistent with the Diagnostic and Statistical Manual 5's

7  definitive diagnosis of Post-Traumatic Stress Disorder.

8  Symptoms such as anxious arousal, depression, dissociative

9  episodes, intrusive experiences, basically attachment issues.

10       There is suicidality that's measured on it, as

11  well.  So there is multiple measurers on it or what we would

12  call components of it that are all comprised of symptoms

13  consistent with post-traumatic stress.

14  Q.   All right.  In your section of your report entitled

15  Test Results and Interpretations, you make the statement that

16  results from the Trauma Symptom Inventory 2 are valid.

17  A.   Correct.

18  Q.   What does that mean?

19  A.   Basically, there are components of validities.  If

20  Miss Boselli, for instance, was exaggerating or reporting

21  excessive number of atypical symptoms, you cannot interpret

22  the results.  So what it means is that with regards to the

23  validity measures is that it's within normal limits.

24  Q.   All right.  Okay.  You later on report under Diagnostic

25  Impressions.  What were your conclusions at that point after

1  your testing was completed?

2  A.    Based upon my testing, also with the interviews that I

3  have with Miss Boselli, I diagnosed her with Post-Traumatic

4  Stress Disorder as well as major depression.

5  Q.    All right.  And so we know the malady.  We know it's

6  going to be there.  Let's talk a minute about hope.  Is there

7  a chance that she can receive treatment and be better, or is

8  this something that is going to create problems for not only

9  her, but society, for the rest of her life?

10  A.    Well, I think that there is definitely treatment

11  available.  Miss Boselli had initiated treatment with her

12  therapist, Nikki Daniels, preceding this particular series of

13  incidents, which is a positive factor in terms of her seeking

14  out treatment.

15        She had had prior treatment; but in my discussions

16  with Miss Boselli, the reason she didn't pursue it was some

17  of the advice she was given was advice that was not helpful

18  to her.

19        So she has benefited from treatment with an

20  appropriate therapist, Miss Nikki Daniels, and I think that

21  she will continue to evolve in her recovery.

22  Q.    Let's talk for a minute about boundaries.

23        What is it about her background and mental

24  condition that makes it difficult, if not impossible, for her

25  to understand the concept of boundaries?

A.    Well, it started early on, I think, in her lack of
appropriate attachment figures, if you will.  The fact she
was, basically, in an orphanage and not provided appropriate
stimulation and caregiving that would build trust early on.

         I think the adoptive mother, she did a very good
job with trying to compensate for that based on the advice
she was given.  I think it is going to take a lot of work in
helping her to know the difference between negative attention
and positive attention or appropriate attention.

         Some of the factors that I think affected that
were the abuse by her paternal uncle.  The conditioning
process and the grooming process involved, basically, giving
her food, giving her attention that you would normally give
to, for instance, an infant or toddler.  So there was a lot
of conditioning by an older figure.

         It was her maternal uncle, and I think that
discrepancy in power is a very important part of this.
Basically, it's a conditioning process, and it goes on for a
period of five years.  For her, a very delicate part of her
life; basically, going through puberty, if you will.  In
other words, her early sexual contact is inappropriate.

         She's conditioned to this, and so there is this
lack of knowing right and wrong boundaries, that type of
thing that goes on.  Also, the fear of actually telling
someone and disclosing it.  So there is a lot of shame

1    issues.

2          She did start to harm herself by cutting, if you

3    will, to try to relieve some of the thoughts and the emotions

4    that were going on, which I think led to an association

5    between the pain creating emotional relief with her as she

6    was trying to deal with the trauma related to the abuse by

7    her maternal uncle.

8    Q.    All right.  Do you see a natural progression, or do you

9    see the same thing when she has a relationship with RJ

10   McDonald?

11   A.    There is another part of her condition I think is

12   important, and I want to pause because there was some

13   confusion about the role of her adoptive father, ML Boselli,

14   that there was actually periods of discipline where she was

15   disciplined pretty harshly by him.  Parts of it would be to

16   have her pull her pants down, and so there was like kind of a

17   pseudo-sexual component to it, but being beaten with a

18   cutting board.  So I think that also was very hard for her.

19          Again, there is sort of a dynamic of harshness and

20   pain associated with attachment, but I think that it did --

21   in answer to your question -- set the stage for her seeking

22   out ways to create this safety, what I call false sense of

23   safety, but what she was conditioned to, which, based upon my

24   education and training, was more of a learned helplessness.

25   So it's basically a continuation when she seeks out the BDSM

1    involvement and, basically, meets her future husband,

2    Mr. McDonald.

3    Q.    Okay.  So you call it a learned helplessness?

4    A.    Yes.  There is, basically -- in her situation with the

5    abuse by the maternal uncle, there is a sense of not having

6    the power to speak up, to refuse, and then you are reinforced

7    by the occasional ice cream, the occasional money that might

8    be given.  And it's set up at a point where she is basically

9    a child, much like the victim in this case is a child.

10          I'm not saying that she is currently a child.

11   What I'm saying is that the conditioning occurred when she

12   was a child and that there was not really any intervention

13   until much later.

14   Q.    Those are all the specific questions I have.

15          Is there anything that you want to add or you

16   believe the Court should know about this situation?

17   A.    I don't think so.

18   Q.    Thank you, ma'am.

19   A.    Certainly.

20          THE COURT:  Any cross-examination?

21          MS. THELWELL:  Yes, Your Honor.

22                    CROSS-EXAMINATION

23   BY MS. THELWELL:

24   Q.    Good afternoon, Dr. McClain.

25   A.    Good afternoon.

1  Q.    You indicated that you've seen or met with Miss Boselli

2  on five occasions -- excuse me.  You testified to six

3  occasions?

4  A.    Six occasions.

5  Q.    When was the sixth occasion?

6  A.    The last time I saw her would have been Monday of this

7  week.

8  Q.    So that was October 30th?

9  A.    That's correct.

10 Q.    And you were contacted by Mr. Crawford, is that

11 correct --

12 A.    Correct.

13 Q.    -- for the purposes of evaluating Miss Boselli for her

14 upcoming sentencing?

15 A.    That's correct.

16 Q.    How many times have you provided expert testimony in

17 federal court, would you say?

18 A.    I would say over 50 times.

19 Q.    How many of those times have you testified on behalf of

20 the United States?

21 A.    I've not been asked to.

22 Q.    I'm going to go through your report because I just have

23 a few questions.  So, on Page 1 of your report, under the

24 history and background information, you indicate that

25 Miss Boselli had indications of -- quote -- significant

1    medical and psychiatric issues.

2            So, first, you talk about the medical issues where

3    you indicate she has hypoglycemia?

4    A.    Yes.

5    Q.    What is that?

6    A.    Hypoglycemia is, basically, where a person has periods

7    where they experience low blood sugar; and in those periods,

8    they may have alterations in consciousness and experience

9    symptoms such as hypothermia, difficulties concentrating,

10   dizziness.

11   Q.    It's low blood pressure; is that correct?

12   A.    No, not low blood pressure.  Low blood sugar.

13   Q.    You also indicated she was involved in some motorcycle

14   accident in 2016.

15   A.    That's correct.

16   Q.    Did she tell you when in 2016 that occurred?

17   A.    She did not give the exact month.

18   Q.    You have no way of knowing whether or not this happened

19   in July or if this happened shortly before her arrest?

20   A.    No.

21   Q.    And along those lines, you've learned this information

22   from the defendant; is that correct?

23   A.    That's correct.

24   Q.    You also indicate that you reviewed the presentence

25   investigation report and amended plea agreement, and those

1  would be the only court documents or documents related to

2  this investigation that you have reviewed; is that correct?

3  A.    That's correct.

4  Q.    So you did not meet with the case agent and review any

5  of the evidence in this case; is that correct?

6  A.    I did not meet with the case agent, no.

7  Q.    Regarding the reports of her medical history, is that

8  all self-reporting through the defendant and the defendant's

9  mother?

10 A.    That's correct.

11 Q.    So you did not obtain any medical reports for

12 Miss Boselli; is that correct?

13 A.    I don't have any medical reports, no.

14 Q.    Would that include the initial diagnosis of the

15 reactive detachment disorder that was made at age five, as

16 reported by the defendant's mother?

17 A.    No, I don't have those documents.

18 Q.    So, again, your knowledge as far as her past history of

19 medical and psychiatric issues is really all based on

20 self-reporting either by the defendant herself or by the

21 defendant's mother; is that correct?

22 A.    No, not really, because the therapist for her, Nikki

23 Daniels, also testified, and it was also based upon her

24 summary of her treatment with Miss Boselli.

25 Q.    But her summary of her treatment is Miss Boselli's

1    statements to her; is that correct?

2    A.    That's correct.

3    Q.    So, again, you did not review any medical documents or

4    anything else related to her medical history or psychiatric

5    history; is that correct?

6    A.    No, because I did review a document related to her

7    psychiatric history from her therapist, so technically that

8    is a psychiatric document.

9    Q.    Okay.  That's based on self-serving statements -- or

10   not even self-serving statements.  Let me rephrase.

11           Self-reporting statements by the defendant; is

12   that correct?

13   A.    Self-reporting would be correct, yes.

14   Q.    You indicated that when she told about this motorcycle

15   accident in 2016, she suffered a head injury because she was

16   not wearing a helmet?

17   A.    That's correct.

18   Q.    Did she go to the hospital?

19   A.    Her husband did not want her to go to the hospital, so

20   they did not go to the hospital.

21   Q.    So she did not go to the hospital, and she had a head

22   injury?

23   A.    Correct.

24   Q.    Did she describe the head injury to you?

25   A.    She described basically what had happened.  I'll read

1    it to you.  They went to an emergency walk-in clinic.  She

2    did not have a helmet on.  She was not taken to the hospital.

3    She said it happened approximately one year ago from the time

4    that I first saw her.  So I would assume that would be in

5    July of 2016, based upon my notes.  The beginning of the

6    summer is what she detailed.

7              What they did with the motorcycle, he took a quick

8    turn and they ended up going into the ditch.  She had had

9    some headaches, is what my notes reflect, afterwards.

10   Q.    That's another question I wanted to clarify.

11             The headaches that she reported to you, that's

12   because of her alleged head injury?

13   A.    She reported that she does have headaches at times,

14   both related to the injury, but also to the hypoglycemia.

15   Q.    So she's had migraines for years, or at least before

16   the accident?

17   A.    I don't have documentation of migraines, so I don't

18   want to speculate; but she did report headaches.

19   Q.    Okay.  So you would characterize hypoglycemia and head

20   injury that she did not get treatment for -- and that you

21   haven't really reviewed any medical documents -- as

22   significant medical issues?

23   A.    They certainly are, yes.

24   Q.    Okay.  On Page 2 of your report you indicated she had

25   met her husband on an online dating BDSM website?

1    A.    Correct.

2    Q.    So she went on the website herself and accessed and met

3    Mr. McDonald that way; is that correct?

4    A.    That is correct.

5    Q.    And I think earlier on direct examination with

6    Mr. Crawford you attempted to explain the next sentence

7    preceding that -- or after that, that says, "Miss Boselli

8    struggled with depression related to the abuse by her

9    adoptive father and uncle and developed a pattern of cutting

10   herself to deal with the emotional pain."

11   A.    That's correct.

12   Q.    So, are you saying that Miss Boselli has told you that

13   she was sexually abused by her uncle, but physically abused

14   by her father?

15   A.    That is correct.

16   Q.    So it's not a sexual abuse by her father?  I understand

17   it's sexual in nature, but it's a physical abuse of

18   discipline?

19   A.    Yes.

20   Q.    Thank you.

21         Did she tell you at what point she started cutting

22   herself to deal with the emotional pain?

23   A.    She did not specify the exact time.

24   Q.    Did you observe any marks on her arms?

25   A.    I did not.

1    Q.    Regarding her mental status and behavioral

2    observations, you indicated that her thought processes were

3    clear and logical and goal directed.

4    A.    Correct.

5    Q.    You also testified on direct examination with

6    Mr. Crawford that as a result of her reactive detachment

7    disorder, that led her to commit the sexual offense on the

8    child victim?

9    A.    No, I didn't make that statement.  Not at all.

10   Q.    Maybe I misheard.  So, how, if at all, is her reactive

11   detachment disorder related to her criminal offense conduct?

12   A.    First, I want to make sure of what you are calling it

13   because, for the purposes of the court record, it's reactive

14   attachment, not reactive detachment.

15   Q.    Thank you.

16   A.    No problem.

17         I think I understand your question.  If I'm not

18   answering it in the right direction, let me know.

19         With regard to her attachment issues, that goes to

20   the issue of her relationship with the co-defendant,

21   Mr. McDonald, and forming a relationship with someone who is

22   inherently abusive based upon even the nature of their

23   connection -- BDSM.  The type of relationship they had, we

24   have already heard --

25   Q.    Actually, I want to stop you because what I'm focused

1   on is not her relationship with Mr. McDonald.  I want to know

2   how her Reactive Attachment Disorder caused her to sexually

3   abuse a seven-year-old child victim.

4   A.    Oh, no, I never made that statement about causality.  I

5   don't think Reactive Attachment Disorder caused her to

6   sexually abuse a seven-year-old victim.

7   Q.    Do you think her Post-Traumatic Stress Disorder caused

8   her to abuse the child victim in this case?

9   A.    I don't think that the mental health disorder caused

10  the behavior.

11  Q.    Thank you.

12          MS. THELWELL:  One moment, Your Honor.

13          No further questions.

14          THE COURT:  Thank you.

15          Anything else, Mr. Crawford?

16          MR. CRAWFORD:  Just briefly, Your Honor.

17          THE COURT:  Sure.

18                   REDIRECT EXAMINATION

19  BY MR. CRAWFORD:

20  Q.    Certainly -- and nobody indicated otherwise -- the

21  mental health disclosures do not cause the criminal

22  misconduct, but do they help understand the criminal

23  misconduct?

24  A.    I think that's a very important point in this case, and

25  especially for Miss Boselli.  Obviously, I haven't evaluated

1   the co-defendant.  But I will say that with the early onset

2   of the Reactive Attachment Disorder, basically born into that

3   environment, not having what we would call healthy

4   relationships to build trust, to get your basic needs met,

5   there is an ongoing struggle for Miss Boselli.  To the great

6   respect for her mother, her adoptive mother, in trying to

7   mitigate that, essentially fix it, it's not really completely

8   fixable, if you will.

9           I will say that the abuse -- the grooming the

10  abuse that occurs for her at a prepubescent period where she

11  was a child certainly is instrumental in later being

12  victimized in her relationship with the co-defendant.

13          I think the physical abuse by the adoptive father

14  is significant in that, again, sexually and physically she is

15  basically subjected to violence.

16  Q.    Exactly.  Thank you, ma'am.

17  A.    Certainly.

18          THE COURT:  Anything else from this witness?

19          MS. THELWELL:  No, Your Honor.

20          THE COURT:  Okay.  I'll excuse you.  Thank you.

21          THE WITNESS:  Thank you, Your Honor.

22          MR. CRAWFORD:  Judge, that is all the testimony I

23  have.

24          On my last point on the sentencing guidelines,

25  with respect to either a variance or downward departure,

 1   whatever phraseology we are supposed to use with respect to

 2   the mental health issue justifying a downward departure --

 3            THE COURT:  Well, I'll hear your argument now

 4   based on that.

 5            MR. CRAWFORD:  All right.

 6            Judge, it is our position that Post-Traumatic

 7   Stress Disorder is a disorder because it is not order; and,

 8   therefore, is, under the mental and emotional health, a

 9   distinction, a uniqueness that allows you to depart downward

10   pursuant to 5H1.3.

11            The same comes with attachment disorder.  It is

12   not normal.  It is unique; and, therefore, my client is in a

13   unique position to receive this type of departure or variance

14   based on the fact that she does suffer from these mental

15   health issues, which have been clearly established by the

16   forensic psychologist and also her mental health counselor at

17   the time of the offense.

18            That basically is the essence of our argument.

19            THE COURT:  Okay.  I'll hear a response from the

20   government.

21            Let me make certain, by consulting with

22   Mr. Tremmel, that I understand this correctly.

23            I'm looking at Section 5H1.3, Mr. Tremmel.  Here's

24   what it says.  "Mental and emotional conditions may be

25   relevant in determining whether a departure is warranted, if

1   such conditions, individually or in combination with other

2   offender characteristics, are present to an unusual degree

3   and distinguish the case from the typical cases covered by

4   the guidelines."

5           So it sounds like Mr. Crawford is asking me to

6   depart at this juncture when we are still listening to

7   objections to the probation officer's application of the

8   guidelines, as opposed to at the end when I determine if a

9   departure is warranted based on certain conditions.

10          As I've re-read this, it seems to me it's much

11  more applicable to the end, if the judge thinks a variance or

12  departure is warranted.  Sometimes I'll do that based on the

13  defendant's age and other characteristics.

14          What are your thoughts on this, Mr. Tremmel?

15          THE PROBATION OFFICER:  Your Honor, I've been kind

16  of confused.  I thought Mr. Crawford was talking about an

17  objection to minor role.

18          THE COURT:  Well, he was earlier, right.

19          THE PROBATION OFFICER:  Then there is no break

20  between this.  I thought this actually pertained to that.  So

21  I'm actually -- but then he just referenced a departure,

22  which, of course, as you mentioned, is a separate area.

23          THE COURT:  I mean, which one are you talking

24  about?  I ruled on the minor role.  I denied it.  But to me,

25  this comes at the end, Mr. Crawford.

1          She's entitled to have the judge vary down or

2    depart down because of these reasons, not that the probation

3    officer inappropriately calculated the guidelines.

4          MR. CRAWFORD:  I understand.  I'm attempting to,

5    quite candidly, get two bites at the apple.  I am making my

6    argument under the guidelines for you to consider pursuant to

7    5H1.3; and if you find we meet the criteria, then I

8    appreciate the downward departure.

9          If you hesitate or do not believe I have legally

10   met my burden, then I agree.  At the end, when you are

11   considering the 3553 issues, you can use that to vary

12   downward from the guideline range.

13         THE COURT:  Thank you.

14         Miss Thelwell, I'll let you respond.

15         MS. THELWELL:  Your Honor, I had in my sentencing

16   memorandum addressed the defendant's request for a departure

17   under 5H1.3.  It's my reading of the statute, as well as the

18   guidelines, that 5H1.3 does not apply.  Specifically, when

19   you look at 18 U.S.C. 3553(b)(2)(A), there is a section that

20   specifically talks about sentencing with child sex crimes.

21   It says that a court may depart -- typically, the Court

22   should sentence within the guideline range on child sex

23   crimes.

24         THE COURT:  Okay.  But just a second because you

25   are getting a little bit far afield.  I kind of got a split

1   answer from Mr. Crawford.  How is this an objection to the

2   calculation of the guidelines?

3           MS. THELWELL:  It's not, Your Honor.

4           THE COURT:  Okay.

5           MS. THELWELL:  I agree with Your Honor that this

6   is proper argument after both parties have determined what

7   the guidelines are.  After we have established what they are

8   and the Court has adopted them, then it comes to whether or

9   not the Court is going to vary under 3553(a) or any other

10  reason under Chapter 5, and that's where this would fall.

11          THE COURT:  No kidding.  That's exactly what it

12  is.

13          Your objection is noted, but most certainly

14  overruled, Mr. Crawford.

15          THE PROBATION OFFICER:  Your Honor, I don't know

16  if this clarifies or not or helps, but the calculations are

17  in section A of the report.  Then, of course, at section E of

18  the report, the very end, we talk about factors that may

19  warrant departure.  So it's a separate --

20          THE COURT:  Mr. Crawford is off on bringing this

21  up now.  Mr. Crawford, you are incorrect, and you shouldn't

22  get two bites at the apple.  You bring these things up --

23  now, if you want to take witnesses out of order, I'm happy to

24  accommodate professional witnesses.  That's not what you

25  said.

1          Anyway, his objection is most certainly overruled.

2          Thank you, Miss Thelwell.  We will deal with the

3    rest of these when we do the 3553 factors and talk about

4    whether a downward departure is warranted or not.

5          Any other true objections, Mr. Crawford?

6          MR. CRAWFORD:  Judge, those are the only

7    objections that I have to the guidelines at this point.

8          THE COURT:  Thank you.

9          The Court adopts the undisputed factual statements

10   and guideline applications contained in the presentence

11   report.  As to the controverted factual statements and

12   guideline applications, the Court adopts the position of the

13   probation office as stated in the addendum.

14         Therefore, the Court determines that the advisory

15   guidelines are:

16         Total Offense Level 43, Criminal History

17   Category I, life imprisonment, five years to life of

18   supervised release, restitution is not applicable, a 50,000

19   to $250,000 fine, and a $100 special assessment.

20         Is there a representative for the victim present

21   in the courtroom who wishes to make a statement?  Are you

22   familiar with this, Miss Thelwell?

23         MS. THELWELL:  Yes, Your Honor.  Two matters.  I'm

24   not sure if Your Honor said it, because I don't know if I

25   heard it, to be honest.  There is restitution as part of the

1   plea agreement.

2          THE COURT:  I don't think that I have gotten to

3   the restitution issue yet.

4          MS. THELWELL:  Okay.  Thank you.  We will deal

5   with that later.

6          Yes, the victim's mother is present and would like

7   to be heard.  Your Honor, I understand this is an open

8   courtroom; however, the victim's mother has indicated she

9   would prefer, if there is any media in the courtroom, that

10  they be excused while she reads her statement.

11         THE COURT:  Well, I don't know.  Is there a

12  representative of the media in the courtroom?  I kind of wish

13  I had known this.  These are issues that we need to deal with

14  that are of a sensitive nature, Miss Thelwell.

15         Obviously, the media has a right to be here.  It's

16  an open courtroom, but I most certainly am very cognizant of

17  the very difficult position that she finds herself in.  I

18  need some time to look into that.  I can't just say, media

19  representatives, leave.  I just can't say that.

20         MS. THELWELL:  I apologize for not bringing that

21  to the Court's attention earlier.

22         THE COURT:  That's the kind of thing I need to --

23  these are two pretty darn important rights.  Pretty two

24  important rights, the right to an open public proceeding and

25  the right for her to not -- the right for her to be able to

1   give her statement in a comfortable setting.

2           MS. THELWELL:  Your Honor, may we approach

3   briefly?

4           THE COURT:  Yes, why don't you do that.

5           (*The following was held at sidebar:*)

6           THE COURT:  For Heaven sake, you tell me at 12:30

7   and she is getting ready and we have been here since 9 a.m.

8   This is the kind of thing I could have had somebody do

9   research on so I would get it right and talk to the newspaper

10  people.

11          MS. HARRIS:  Your Honor, if I may --

12          THE COURT:  Whoever it was should have told me at

13  9 o'clock, and you all knew about it.

14          MS. HARRIS:  When we spoke to her this morning she

15  did make that request.  We did explain to her that there is a

16  right for the media to be here.

17          THE COURT:  Of course there is.

18          MS. HARRIS:  And she understands that and she is

19  prepared to go forward to make her statement.

20          THE COURT:  Then, why didn't Miss Thelwell say

21  that?

22          MS. HARRIS:  Because we told her we would ask and

23  advise the Court, because she did feel uncomfortable, but she

24  understands that most likely the Court could not rule in her

25  favor.

```
 1              THE COURT:  But you are asking me to rule -- so
 2   you are taking that off your back and putting it on my back.
 3   You've had the chance to research it.  You've had the chance
 4   to make the right decision, but I haven't had that chance.
 5              MS. HARRIS:  We haven't had the chance to research
 6   it.
 7              THE COURT:  Will you've known since what time?
 8              MS. HARRIS:  Since right before the hearing.
 9              THE COURT:  At 9 o'clock.  There are two of you,
10   and you've chosen not to say a word to me?  Just sit there
11   silently.  Then, by the way, there is an issue you might want
12   to know about.  Don't you think that would have been the
13   courteous thing to have done?
14              MS. HARRIS:  We did, but we didn't perceive it as
15   an issue because we told her most likely that it could not
16   happen.
17              THE COURT:  Listen to what you've just said.
18   Listen to what you've just said.  If you listen to it, what
19   you've done is you've taken responsibility off your shoulders
20   and put it squarely on mine.  That's not fair when you've had
21   the chance to think about what the right result is and I
22   haven't.
23              So I just don't think that's the way -- I just
24   don't think that is the courteous thing to do.  Anyway, I'll
25   think about it in just a minute.
```

 1              Please don't do that again.  When you know about

 2    something, as a matter of courtesy, you ought to tell the

 3    judge so the judge isn't blindsided.

 4              MS. THELWELL:  I apologize.

 5              THE COURT:  You need to think about those things,

 6    because you know what?  You have just as much of a vested

 7    interest in protecting victims as I do in the criminal

 8    justice system.

 9              MS. HARRIS:  For sure.

10              THE COURT:  And I want to get it right and not be

11    blindsided when you sat on information for three-and-a-half

12    hours and chosen not to say a word to me.  That's really,

13    I'll just say, discourteous, at best.

14              Okay, Mr. Crawford.

15              MR. CRAWFORD:  I just want -- it's my

16    understanding she testified in open court in Orlando.

17              THE COURT:  Okay.  Anything else you want to say

18    Mr. Crawford?  Anything else?

19              MR. CRAWFORD:  I just thought that might be

20    helpful, Your Honor.

21              THE COURT:  Okay.

22              (*Sidebar ended.*)

23              THE COURT:  Well, as I told counsel at sidebar,

24    I've just been presented this right now.  I didn't have an

25    advance warning or heads-up or anything at all that this

1    would be an issue.

2          I'm very sensitive to the rights of victims, but I

3    will also say that the right of the press to be in a

4    courtroom -- our First Amendment rights are pretty paramount

5    in our country, and I'm not going to tell a newspaper

6    reporter, or whatever organization that reporter is from,

7    that they have to leave the courtroom.  I just can't do that.

8          I will just ask the government, in the future,

9    when you have these issues and you are aware of them that you

10   let the Court know in advance that there is an issue to see

11   if there is a way that it can be resolved so that everybody

12   is satisfied with the solution or the resolution to the

13   problem.  But just having been told this five -- we started

14   this hearing at 9 o'clock.  Just having been told about this

15   five minutes ago, that's my decision, balancing the two

16   factors here.

17         I'm sure most newspaper agencies and organizations

18   have their own internal structure that they look to to make

19   certain that the victims of sexual abuse are protected.  At

20   least I always see in a newspaper report, we are not

21   reporting the name of the victim here because it's our policy

22   not to report names of victims, and that they will endeavor

23   to do that.

24         So, again, it's my job here to balancing these two

25   factors.  And as I balance them -- this is an open

1  proceeding, and the news organization has every right to be

2  in here.  So I'm not going to ask them to leave.

3          All right.  I'm happy to hear the statement now.

4  Is there a representative for the victim present in the

5  courtroom who wishes to make a statement?

6          Yes, ma'am.  You may proceed.

7          MS. ESPOSITO:  Yes, Your Honor.

8          I am Miss Esposito, the child victim's mother.

9          I have never met the defendants in this case, but

10  their pictures are forever burned into my memory.  I see

11  their mugshots when I try to go to sleep at night, and they

12  haunt me.  I can only imagine what mental images my daughter

13  has of these people.  Memories that she can never forget.

14          The impacts of this trauma and the fallout from

15  the discovery of this sexual abuse and assault have been so

16  invasive and omnipresent in all of our lives.  It's like a

17  bomb went off in our world and we are still dealing with the

18  shockwaves.

19          I can only imagine what my child had suffered

20  with, unable to come out and tell what had happened to her,

21  suffering alone with her secret, scared and confused.

22          Who could do this to an innocent and defenseless

23  child?  Evil, lowlife monsters who prey upon the weak, with

24  no regard for the lives that they destroy.

25          My daughter is a loving, peaceful, compassionate

little girl.  And I can assure you, she is very real.  She is

extraordinarily kind and caring.  She had a vibrant energy

and joyfulness and a laugh that was infectious.  She was a

girl who loved softball, skating, reading, her friends, and,

especially, going to the beach.

At seven years old, she was assaulted by the

defendants and by her father.  These depraved predators

preyed upon her innocence and robbed her of it.  They

violated her in the most foul and disgusting ways.  They took

pictures of it.  Three grown adults.  She was seven.

Seven-year-old child.

They have traumatized her and scarred her for

life.  Damage that is irreparable.  And it is not just

shameless, heartless, or reprehensible.  What they have done

is unthinkable.  It's horrific.  It's utterly inhuman and

sickening, and it is absolutely unforgiveable.

At seven years old, my daughter will have to

undergo testing for STDs.  She had to be physically examined

and relentlessly questioned.  Everything that was familiar to

her -- her home, her family, her school, her friends, her

community -- are all gone from her world now.

She was ripped from her life and ripped from me.

She was displaced from her home and school twice in the last

year.  She can have no contact with any of her friends or

teachers from the past.  She can never return to the life

1 that she had, the friends she knew, or the only home she ever

2 had.

3          She is frequently frightened and anxious.  She is

4 afraid to be alone and is insecure.  She is fearful and

5 distrusting of men, of couples, of crowds.

6          I see her reactions.  How uncomfortable she is

7 around men.  She won't sit or stand near strangers.  She's

8 intensely anxious in crowds and in public.  She cannot go out

9 into public places without feeling fearful, self-conscious,

10 and unsafe.  She clings to me, and it breaks my heart to see

11 her so fragile.  She's afraid to be alone.  She can't bear to

12 be alone in any room by herself.

13          How can she or I ever trust anyone ever again?

14 How can I teach her to love and to trust in someone when

15 trust is so irrevocably broken for us?

16          Miss Boselli's role was to engender trust, and

17 that's what she did.

18          My child is frequently angry.  She has outbursts.

19 She gets irritated at the slightest thing.  She is

20 distressed, withdrawn, contrary, argumentative, sad.  She has

21 trouble fitting in and making friends.  She feels different

22 and alone.  She shows signs of anxiety and depression.

23 Nighttime is the worst.  She fears to go to sleep alone; begs

24 to sleep in my room with me or for me to stay with her.  She

25 avoids bedtime altogether, if she can, because she can't fall

1  asleep or stay asleep.  She awakens in the middle of the

2  night.  She has nightmares that she's too afraid to talk

3  about.  She says she can't tell me.

4         She is socially withdrawn, has fallen behind in

5  school, and has an inability to focus on schoolwork and to

6  pay attention.  She says she is always thinking about what

7  happened.  Grieving.  She is plagued by intrusive thoughts

8  and has difficulty with even basic tasks.  Life's everyday

9  stresses send her into a tailspin, meltdown, of distress, and

10  sobbing.  The impacts of the sexual assault committed upon my

11  daughter have been devastating and profoundly damaging.

12        It has pervaded every aspect of our lives.  My

13  family is heartbroken.  Our lives shattered.  We were filled

14  with shock, disgust, and despair.  And we still, almost a

15  year out, continue to grieve, to struggle, and to find

16  healing.  There is not a day that goes by that I don't think

17  about this every moment of every day.

18        She and I have both been in specialized counseling

19  for almost a year and will continue with therapy

20  indefinitely.  It will always be a part of our lives, because

21  as the years progress and the milestones and the stages of

22  life for her change, she will have new needs for therapy to

23  try and help her sort out how to cope with the impacts of the

24  abuse and how to lead a safe and healthy life and to not

25  become a victim herself or someday victimize others.

1           For my family, over this past year dealing with

2     Homeland Security, Child Protective Service, the Juvenile

3     Court system, Children's Homes Society, Children Advocacy

4     Center, guardian ad litem, investigators, attorneys, doctors,

5     counselors, interrogations, interviews, medical evals, psych

6     evals, home visits, therapy, court dates, it has all been so

7     stressful and frustrating and exhausting.

8           This past year has left us emotionally and

9     physically drained.  And for her, it's also confusing and

10    scary.  She doesn't understand.  She is caught up in the

11    system, and she feels threatened and afraid by every new

12    person that enters the equation; and it takes her a long time

13    for her to build trust.

14          I myself have suffered with trauma, stress,

15    depression, insomnia, as well as debilitating anxiety and

16    panic attacks.  I'm haunted by recurring nightmares of the

17    horrific trauma that my daughter has suffered.  I had to take

18    leave of absence from work, and I continue to take

19    intermittent leave in order to deal with all of the

20    aftermath -- appointments, court dates, therapy.  I have been

21    in private therapy myself for almost a year, and now we are

22    also in group therapy weekly.

23          I now struggle to cope as a single parent to a

24    troubled child.  I often feel alone and isolated.  I am

25    unable to reach out to friends for support and protection of

1   our privacy.  I have also had to break off contacts with

2   friends, former co-workers, teachers, and people in our

3   community.  I had to purge any and all belongings of her

4   father's and move to a new home and start a new life for my

5   daughter and me.  It has been an exhausting process.

6           And it ... it's so painful knowing that the past

7   that we left behind no longer has meaning or value in our

8   lives.  It's like all of these last years of our family's

9   life together were just wiped out, gone, erased.  All of the

10  family photos of her growing up, every special moment that

11  was captured, I lost it all, and I cannot get that back.

12          I can't even drive on that side of town without

13  having just crushing, intense anxiety or breaking down in

14  tears.  I won't take her to that side of town either.  We

15  live in a new place, and we won't go back there.

16          For the rest of my life I will bear the guilt that

17  I wasn't there to stop this, that I didn't know or suspect

18  the depths and the despicable evil that he could be capable

19  of, or any person could be capable of, and that he would seek

20  out and find others as sick and as depraved as him who are

21  all too willing to take part in violating a young, innocent

22  girl for their own sick pleasure and selfish gratification.

23          I am deeply concerned that if these two people,

24  the defendants in this case, were allowed to be freed that

25  someone else's daughter would suffer the same fate as my

1  child, or maybe even worse.  I can see no hope for recidivism

2  in anyone who is willing to violate and sexually assault a

3  seven-year-old girl, in participation with her own father,

4  while he looks on and takes pictures.

5        It is unforgiveable.  And they are unredeemable

6  and cannot and will not be rehabilitated.  They should never

7  be allowed to rejoin society because they would present a

8  sure and certain danger to any child they encounter.

9        I ask for justice for my child, for my family, and

10  for myself.  I don't want my child to live in fear that she

11  will ever have to see these people again or feel that they

12  were not brought to justice.  I don't want her to feel that

13  she is unsafe in this world, that they could come back to try

14  to harm her or retaliate.

15        I ask that she be protected from harm, as well as

16  all children who might fall victims to these sick and

17  ruthless perpetrators.  I ask that you punish these criminals

18  to the full extent of the law.

19        THE COURT:  Thank you, ma'am.

20        Any other victim statements, Miss Thelwell, that

21  you are familiar with that you want me to hear at this time?

22        MS. THELWELL:  Not as to Miss Boselli, Your Honor.

23        THE COURT:  You had discussed restitution, so I'm

24  not certain what you want the Court to consider at this

25  juncture.  So if you would like to talk about that at this

 1   moment, just let me know what it is that you are referring

 2   to.

 3           MS. THELWELL:  Yes, Your Honor.  I just wanted to

 4   alert the Court that the plea agreement for both Miss Boselli

 5   and Mr. McDonald, they did agree to cover the restitution for

 6   the child victim in this case.  We do have a future estimated

 7   cost of therapy to be about $50,000.  I have discussed that

 8   with defense counsel.

 9           THE COURT:  I'm turning to the plea agreement, and

10   there is a forfeiture provision, as well, in the plea

11   agreement.  I imagine those assets are more a cell phone --

12           MS. THELWELL:  Yes, we would also be asking for

13   the final forfeiture order to be entered.

14           THE COURT:  Let's see.  I don't see anything with

15   respect to the $50,000, though.

16           MS. THELWELL:  The dollar amount was determined

17   recently.  So at the time of the plea agreement, we didn't

18   have an amount; but they had agreed to whatever -- well, they

19   had agreed to restitution for the child victim.

20           Since then I have obtained a dollar amount.  I

21   provided that to both Mr. Crawford and Mr. Beck.  Both are in

22   agreement.  The defendants are jointly and severally liable

23   for the restitution amount.

24           THE COURT:  With respect to Mr. Beck's client,

25   obviously, we will deal with that at that sentencing.

1           MS. THELWELL:  Of course.

2           THE COURT:  Mr. Crawford, do you have any

3   objections to the $50,000?

4           MR. CRAWFORD:  No, Your Honor.  We agree that was

5   appropriate under the facts of this case.

6           THE COURT:  So that is fine.  That will be ordered

7   as part of the judgment, $50,000 in restitution to be paid to

8   cover the expenses of therapy.

9           Is that separate and apart from the forfeiture?

10          MS. THELWELL:  Yes, Your Honor.

11          THE COURT:  All right.  I'm just trying to see.

12  Time-wise, it's ten to one.  I have not heard from you yet as

13  to your recommendation to the Court as to sentencing.  I'm

14  getting ready to move forward to that part of the hearing.

15          I'm just trying to see.  Time-wise, we probably

16  can take a short lunch break and we can move forward.  I'm

17  just trying to determine what's best for everybody.

18          So, Miss Thelwell, what are your thoughts on that?

19          MS. THELWELL:  I'll defer to Mr. Crawford and to

20  the Court.  I'm personally fine with proceeding, but I

21  understand it's been a very long morning.

22          MR. CRAWFORD:  Are you done?

23          THE COURT:  Mr. Crawford, what are your thoughts?

24          MR. CRAWFORD:  Well, depending on what else the

25  government is going to put on -- if they are done, I can tell

 1   the Court that we have got -- my client is going to make a

 2   statement and I'm going to make a brief statement, and then

 3   we are done.

 4          MS. THELWELL:  I'm just making my 3553(a) factor

 5   argument, Your Honor.

 6          THE COURT:  All right.  Let's move forward.  If I

 7   need a break before pronouncing sentence or feel that we need

 8   to handle it in a different fashion, I'll announce that at

 9   the appropriate time.  Let's move forward.

10          Miss Thelwell, do you know of any reason why this

11   Court should not now proceed with imposition of sentence?

12          MS. THELWELL:  Your Honor, the only -- and it's

13   what we have already discussed.  It's the government's

14   position that Miss Boselli and Mr. McDonald should be

15   sentenced together.  I understand --

16          THE COURT:  I'm just trying to see.  When did you

17   discuss that, that it ought to be at the same time?

18          MS. THELWELL:  Earlier this morning when I asked

19   Your Honor what today's expectations were with Miss Boselli,

20   you indicate you might be postponing sentencing.

21          THE COURT:  I normally do like to sentence them

22   together.  One of the challenges in this case has been trying

23   to get the sentences together.  As you know, I had

24   specifically set them at the same time; but because of the

25   compelling, I'll just say, personal circumstances on the

1   other case, I had no choice.

2           MS. THELWELL:  I understand, Your Honor.

3           THE COURT:  And because you had the victim's

4   mother coming from Orlando, you objected to continuance of

5   the sentencing for today, so I'm really between a rock and a

6   hard place here.  So I decided let's move forward and at

7   least we can hear from people who have made arrangements to

8   come in.  Absolutely, I always set sentencings for the same

9   time, but I can hear everything and then refrain from

10  actually pronouncing the sentence.

11          MS. THELWELL:  That would be the government's

12  position, Your Honor.

13          THE COURT:  I'll decide when I get there.

14          Is there a legal bar to sentence?

15          MS. THELWELL:  No, Your Honor.

16          THE COURT:  Okay.  So do you wish to make a

17  statement with respect to what an appropriate sentence for

18  Miss Boselli would be?

19          MS. THELWELL:  Yes, Your Honor.

20          THE COURT:  Okay.  I'll hear you.  And I want you

21  to also discuss for me, just very briefly, because I looked

22  at this, the case of the child's father, and I know that

23  defendant received a 5K motion from the government.  So his

24  sentence was reduced -- do you need to take a look at that?

25  Originally I think he was sentenced to -- I think it was 900

1    months, if my memory serves me correctly.  Nine hundred

2    months.

3           He received a 5K motion.  Nine hundred months is

4    75 years.  I don't know if originally he was looking at life

5    and with that 5K motion it got reduced down.

6           MS. THELWELL:  I would need a moment to look.

7           THE COURT:  Why don't you look at that, because I

8    always think it's appropriate to sentence the defendants

9    fairly, vis-à-vis one another.  Not that I necessarily do

10   what another judge has done, but I just like to know what

11   that is.

12          MS. THELWELL:  Your Honor, my colleague is

13   stepping out to look into that.  Would you prefer I continue

14   with the arguments?

15          THE COURT:  No, why don't you wait a minute.

16          Mr. Crawford?

17          MR. CRAWFORD:  Yes, Judge.  While we are waiting

18   for the prosecutor to check into that, could I address the

19   issue of perhaps delaying this sentencing until the -- or the

20   final judgment until later?  Could I give you our position on

21   that?

22          THE COURT:  Sure, of course.

23          MR. CRAWFORD:  We are concerned -- and have been,

24   as you know from previous motions -- of the effect of having

25   my client and Mr. RJ McDonald come back and forth from the

1   jail at the same time and being in the courtroom at the same

2   time, et cetera.  It is a traumatic event.  I've discussed it

3   with Miss McClain; and she recommended, if we could, to avoid

4   that.  So our position is that we would prefer --

5              THE COURT:  You've discussed it with who?

6              MR. CRAWFORD:  Valerie McClain.

7              THE COURT:  With Dr. McClain.

8              MR. CRAWFORD:  Right.  Dr. McClain is the one that

9   brought it to my attention and thought it was not necessarily

10  a good idea.  So it is our preference to go forward today.

11  We believe you know this case.  You know particularly what

12  you are going to hear from Mr. McDonald and his attorney and

13  that really there is not anything that's going to happen in

14  that sentencing that we believe is going to have any effect.

15  Now, if I'm wrong, we can always come back and correct it;

16  but we have no objection if you are ready to go forward

17  today.

18             THE COURT:  Thank you, Mr. Crawford.

19             Miss Thelwell, I didn't realize it was going to

20  take her that long.  Let's just move forward.

21             MS. THELWELL:  Yes, Your Honor.

22             Just to update the Court, my agent was able to

23  reach out to the case agent in Orlando for Mr. Esposito's

24  case.  According to the agent, the AUSA recommended a 5K.

25  The judge didn't think that Mr. Esposito did enough to

1   warrant a 5K, so he gave him what he believes, based on his

2   recollection, to be some sort of minimal credit for help

3   establishing probable cause to get into Mr. McDonald and

4   Miss Boselli's residence with the search warrant.

5           I believe AUSA Harris has stepped out to make

6   contact with the AUSA in the Orlando Division.  The last I

7   had talk to that AUSA, I was under the impression there was

8   not going to be a 5K, so that's why I had not looked into

9   that.

10          THE COURT:  I saw that one was filed, and I saw

11  that he was sentenced to -- I think it was 900 months.

12          MS. THELWELL:  He was sentenced to 900 months.

13          THE COURT:  Seventy-five years.

14          MS. THELWELL:  And he was facing life.

15          THE COURT:  So maybe he didn't get the full

16  benefit of the 5K, but somehow it was factored in in the

17  sentencing because he didn't get a life sentence.

18          THE PROBATION OFFICER:  Your Honor, I have the

19  sentencing documents for Mr. Esposito.  As far as I can tell,

20  the reason why he did not get life is because life was not

21  the stat max on the counts of conviction.

22          He had Counts Three and Four.  The stat max was 30

23  years each, and Count Six was 20 years.  So life was not on

24  the table in his sentencing, Your Honor.

25          THE COURT:  But it is here.

 1              THE PROBATION OFFICER:  Yes.

 2              THE COURT:  And the distinction is, Mr. Tremmel?

 3              THE PROBATION OFFICER:  Because of the charge of

 4    conviction.

 5              THE COURT:  So this case was charged differently

 6    than the case in Orlando.

 7              MS. THELWELL:  Correct.

 8              THE COURT:  And in the Tampa case, these

 9    defendants are looking at a maximum of life.  In the Orlando

10    case, in the way that one was charged, they weren't looking

11    at a maximum of life.  So that would explain it.  That's what

12    the difference appears to be, the way it was charged.

13              MS. THELWELL:  Yes, Your Honor.

14              THE COURT:  All right.  Go ahead, Miss Thelwell.

15    We are just going to move forward.  This is your opportunity

16    to make a statement to the Court with respect to what an

17    appropriate sentence for this defendant would be.

18              MS. THELWELL:  Yes, Your Honor.

19              I filed a sentencing memorandum that kind of

20    flushes out the United State's position.  We are seeking a

21    guideline sentence in this case; and as we have already

22    established, Miss Boselli's guidelines are life.

23              Specifically, because of the 3553(a) factors in

24    this case, first, looking at the nature of the circumstances

25    of the offense, as you've seen throughout all of the

documents that you've reviewed in preparation for today --

the PSR, the plea agreement, testimony from the case agent,

the exhibits that have been admitted that show photographs of

what occurred on July 19th and July 21st of 2016, as well as

statements made by the defendant to the agent on the night of

her arrest where she indicated her involvement -- it's clear

that this is by far one of the most despicable acts that a

grown individual can commit on a seven-year-old, innocent

child.

           Miss Boselli was very instrumental in allowing

this abuse to happen.  She indicates that she had been

previously sexually abused as a child.  So she herself

understands better than anyone else in that group what sexual

abuse can do to a person.

           THE COURT:  And, yet, you see people who have been

victimized as a child turn around and do that when they are

adults or teenagers or even children themselves.  They do it

to others.

           I could never understand how that is because it

seems to me, if you've suffered through that despicable

horror, how could you want somebody else to go through that?

But somehow they do.  So many people that I have seen in this

Court on charges of, for instance, child pornography or

enticing a minor for sex, that's what you'll see in their

presentence report, that they have been sexually abused as a

1   child.

2           I'm kind of as perplexed as you are; and I think,

3   even if I had a Ph.D. in psychology or an M.D. and were a

4   psychiatrist, I still wouldn't understand it.  But it's the

5   way it is.

6           MS. THELWELL:  And Miss Boselli knowing how much

7   that trauma in her teenage years -- or I guess the reports

8   are between the ages of nine and ongoing for up to five

9   years, the sexual abuse occurred.  At the age of 24, she

10  recognized that she needed to deal with those issues and

11  sought out Miss Nikki Daniels as a therapist.

12          THE COURT:  Right.  But I think she told a youth

13  minister when she was about 14 or 15, something in that

14  range.

15          MS. THELWELL:  Let me be clear.  I'm not

16  challenging her disclosure.  I'm talking about her efforts to

17  seek therapy, because we have heard testimony from her mother

18  that, obviously, her mother sought therapy through the state

19  after the disclosure.  After six months, Miss Boselli

20  decided -- and her mother listened -- that she didn't need

21  therapy, that she wasn't benefiting from it.

22          But now, as an adult at age 24, prior to this

23  incident, as early as May 2016 is when she had her intake

24  meeting with Miss Daniels and apparently sought her out

25  specifically because she was feeling that she had some sort

1    of trauma from this teenage sexual abuse and she was having

2    nightmares.

3            So the point that I'm trying to make is that as an

4    adult, at the age of 24, before this incident even occurred,

5    the defendant recognized the long-term effects of sexual

6    abuse on a minor.  But despite all of that, she found herself

7    participating in the most unimaginable acts with a

8    seven-year-old child.

9            And it wasn't a one-time thing.  From July 19th,

10   from the moment the child -- we have already gone through

11   this, Your Honor.  Dating back to the first video up until

12   the point when the child gets into Tampa, the defendant is

13   continuing to groom, I guess, the child and make the child

14   comfortable and lure her into this false sense of security.

15           They play in the backyard.  They are running

16   around to the point where they get dirty and they go and take

17   a shower.  They come back out.  She instigates naked

18   wrestling in a tent with the child.

19           THE COURT:  So the issue is how long this woman

20   should go to prison for.  That's the only issue.  Should she

21   go to prison for the rest of her life where she will never be

22   released from prison, or should she go to prison for a

23   certain number of years where she knows that at age -- I'll

24   say at age 60, she will have the chance to come out and

25   rejoin society?  That's really the only issue here.

1          MS. THELWELL:  I think when it comes to that, just

2    jumping ahead of it, to address Mr. Crawford's argument as

3    far as the 5H1.3 downward departure on whether or not it

4    applies, I don't believe that it applies under -- I don't

5    believe the Court can apply a 5H1.3 departure in this case or

6    even a departure under 5K2.13.

7          THE COURT:  What's 5K2.13?

8          MS. THELWELL:  That's diminished capacity,

9    Your Honor.  And I bring that up -- and I'm just going to

10   walk you through it because as I had mentioned earlier, 18

11   U.S.C. 3553(b)(2)(A) --

12         THE COURT:  Hold on.  Let me turn to that 5K2.13.

13         Okay.  Go ahead.  I've got it in front of me.

14         MS. THELWELL:  When you look at the Title 18,

15   3553(b)(2)(A), this is a very specific subsection dealing

16   with sentencing child sex crimes.  In that, it says, one, the

17   Court should be sentencing within the guidelines range; and,

18   also, the Court can or may depart if it finds that there is a

19   mitigating circumstance that has been affirmatively and

20   specifically identified as a permissible ground of departure

21   in the sentencing guidelines.

22         That language is important because it also appears

23   in the sentencing guidelines.  The Sentencing Commission has

24   made it very clear that when it comes to child sex crimes,

25   the Court is to look to departures under 5K2.0.  It has said

1    that, under 5K 2.0, these departures that are listed here --

2    and I'm looking at 5K2.0 subsection B, downward departures in

3    child crimes and sexual offenses.

4            It says, the grounds enumerated in this part of

5    Chapter 5 -- this part K of Chapter 5 are the sole grounds

6    that have been affirmatively and specifically identified as a

7    permissible ground of departure in these sentencing

8    guidelines and policy statements.

9            That language mirrors the language of Title 18,

10   Section 3553(b)(2)(A).  So it's the United State's position

11   that if the Court is going to be considering a departure

12   based on a defendant's mental health status, it has to come

13   from part K and not part H, as the defendant has so moved.

14           Looking through part K, the only thing that comes

15   close to dealing with mental health is 5K2.13, which is

16   diminished capacity.  And without even talking about what

17   qualifies as diminished capacity, the second paragraph in

18   5K2.13 specifically says that a court may not depart below

19   the guideline range in certain circumstances.

20           One of those circumstances is No. 4.  If the

21   defendant has been convicted of an offense under Chapter 71

22   109A, 110, or 117.

23           The defendant has been convicted of 18 U.S.C.

24   2422, Subsection B, which is enticement of a minor and falls

25   under Chapter 117.  Therefore, based on a strict reading of

1    the guidelines, this cannot be applied to the defendant.

2           That sentiment is further established -- and I had

3    cited it in *Irey*.  It's an Eleventh Circuit case.  But

4    specifically in that case -- and I believe the cite was at

5    1183.  I can read the full cite into the record for the

6    Court.  It is 612 F.3d. 1160.

7           In that section at Page 1183, it specifically

8    notes that in 2003 the Sentencing Commission made amendments

9    to further restrict the ability for courts to depart downward

10   in child sex cases; and it talks about the fact that the

11   guidelines have sharply limited -- and I'm quoting now -- the

12   permissible grounds for departure in cases of sexual abuse of

13   children, specifically disallowing departures based on

14   diminished capacity.

15          So I understand the defense's argument regarding

16   the defendant's mental health status, but it's not a proper

17   basis for departure.

18          Given the overwhelming evidence in this case that

19   shows that the defendant was not forced or coerced or

20   threatened to participate in these sexual acts, as she tries

21   to assert -- in fact, she was instrumental and pivotal in the

22   actual sexual abuse occurring -- those factors highly

23   outweigh whatever mental issues she may have been going

24   through.

25          I think we have heard that really it's just been

1  diagnosed as post-traumatic stress, I believe is the term,

2  and the Reactive Attachment Disorder, which, admittedly,

3  Dr. McClain has testified that didn't cause the defendant to

4  inflict these acts on the child victim.

5      The defendant must be held accountable for her

6  actions.  She needs to stop pointing the finger at her

7  husband, Mr. McDonald.  Admittedly, it's obvious that

8  Mr. McDonald has a more dominant personality in the

9  relationship.  The defendant in this case, Miss Boselli,

10 consciously decided to get into a relationship with

11 Mr. McDonald after she met him on a BDSM website.  So she

12 knew what she was getting herself into.

13     What is more striking is that the last date of the

14 sexual contact was July 21st.  On July 24th she married the

15 defendant.  On July 29th she went to Miss Daniels and talked

16 about how she was still upset about the fact that her husband

17 was sleeping with other women and didn't once disclose, oh,

18 by the way, I just sexually molested a seven-year-old child

19 for hours on a two-day period.

20     Miss Daniels testified that the defendant was her

21 typical self on July 29th.  She's remorseful because she got

22 caught.  She has been shamed in public.  She has put her

23 family to shame, and she's probably remorseful now because

24 she is recalling, you know, I was sexually abused as a child.

25 I shouldn't have done that to another child.

1        But the point of the matter is, she did.  Knowing

2  all of this upfront, she should have been the person -- out

3  of the three adults, she should have been that one person to

4  put a stop to it.  When she realized what was happening over

5  the chats, even if for one second if she believed it wasn't a

6  real child, the moment she saw that there was, in fact, a

7  real child on the other side of the camera, she should have

8  reported it to the police, but she didn't.

9        She allowed it to continue.  She continued sending

10 videos.  She continued communicating with the child over the

11 internet.  As soon as the child got to Tampa and she realized

12 it was real, she should have contacted the police, but she

13 didn't.  As soon as she saw the child in person at the zoo.

14 But she didn't.

15       There is no one to blame but herself.  She was

16 more than capable of telling her husband, Mr. McDonald, that

17 she did not want to engage in sexual activity with

18 Mr. Esposito and she had no problem engaging in sexual

19 activity with that child.

20       Your Honor, based on the severity of the offense

21 in this case and all of the other issues that I've

22 highlighted for the Court in the sentencing memorandum and

23 testimony that the Court has heard today, it's the United

24 State's position that the only appropriate, just, and fair

25 sentence in this case is for the defendant to be sentenced

1    within her guidelines, which is life.

2           THE COURT:  And it's also your position the Court

3    doesn't have the discretion to impose a downward departure or

4    variance?

5           MS. THELWELL:  Not under 5K2.13 and not under

6    5H1.3.

7           THE COURT:  Okay.  Thank you.

8           Mr. Crawford.

9           MR. CRAWFORD:  Your Honor, if my client could

10   address the Court?

11          THE COURT:  Yes, that would be fine.

12          THE DEFENDANT:  Sorry.

13          MR. CRAWFORD:  Take your time.

14          THE DEFENDANT:  Your Honor ... I don't know if I

15   can do this.

16          THE COURT:  Would she prefer to sit down?  She

17   doesn't need to stand in front of me.  She can sit if that's

18   easier.

19          THE DEFENDANT:  Your Honor, there are a few things

20   I would like to say in regard to my actions.  First of all, I

21   wish to make clear that I make no excuse for what I did.  I

22   choose to take responsibility for my part in this, and for

23   that I wish to sincerely apologize.

24          I cannot fully express how hard it is on them for

25   the pain I've caused.  As I said, I do not make excuses for

1    what I did.  However, I wish to express this is not an

2    activity in which I have ever chosen to do so on my own.

3            I'm not attracted to children and this is not an

4    act I wish to do or wish to ever do again.

5            THE COURT:  I want to be able to understand you.

6    You are speaking too quickly.  I know it's tough for you, but

7    I need to understand what you are saying.

8            THE DEFENDANT:  Yes, ma'am.  Okay.  Your Honor --

9            THE COURT:  You don't need to go back to the

10   beginning.  Just take up from where you left off.

11           THE DEFENDANT:  Okay.  I hate myself for what I've

12   done, and I want to make this right.  I accept my punishment,

13   however you may see fit.  I also wish to acknowledge that I

14   am psychologically damaged, having spent crucial years of my

15   early life in an orphanage, and I'm lacking in certain skill

16   areas emotionally.  I know that I need mental help; and

17   although I have already started the counseling process, I

18   know I need to continue it, and I strongly wish to.

19           There are many emotional and mental demons I need

20   to fight, and I'm willing to do the work even though I know

21   it won't be easy.

22           I also would like to apologize to the young girl

23   and her family for their hurt that I have done.  I want to

24   make this right.

25           Your Honor, I'm sorry for what I've done, and I

1    make no excuses, and I wish to get help.  Thank you.

2              MR. CRAWFORD:  Your Honor, if I could address the

3    Court briefly on what we believe is the appropriate sentence.

4              THE COURT:  Of course.

5              MR. CRAWFORD:  I don't think anyone is surprised

6    that when you take sickness and you put it together with

7    sickness you end up with sick behavior.

8              It is my position and our position in this case

9    that we have three defendants.  Jamie Esposito, the father,

10   who is basically pimping his daughter all over the country

11   and got sentenced to 75 years, and RJ McDonald, who

12   negotiated with him and set up things.

13             THE COURT:  Were there other setup meetings other

14   than the Tampa one, because I didn't see that when I was

15   reviewing the Orlando --

16             MR. CRAWFORD:  No, I don't believe they were

17   setups.  I know the case, I think, originated from California

18   because there was connections and things going on there.

19             THE COURT:  Well, that was somebody who was a

20   cooperator from California.  It doesn't mean that the girl

21   went off to California.  I didn't have that information at

22   all.

23             MR. CRAWFORD:  No, it's just our position that

24   Mr. Esposito was basically putting her out there and seeing

25   where it would lead.  It ended up leading to Tampa for this,

1    and my client, as she has admitted to her involvement.  So

2    there is no question there are three defendants, but it is

3    also our position that there are two victims.  The minor

4    child and Shauna Boselli because of what was going on at the

5    time.

6              It is how you are going to balance this dynamic

7    where the defendant is part defendant and part victim that

8    will determine how justice will be done in this case.

9              As this Court and I are well aware, demarcation

10   between the defendant and victim is often quite clear; but in

11   this case, not necessarily so.

12             We admit the seriousness of the offense, but just

13   focusing on the wound is not going to do justice.  For those

14   of us that have children in their late 20s and early 30s, we

15   are very familiar with J.K. Rowling's "Harry Potter" series.

16   The beauty of the "Harry Potter" series is they are books

17   that focus on the scarring.  The scar on Harry's head, not

18   the wounding or the killing that occurred that caused it.

19             So it is our position that if we just focus on the

20   facts that lead to the wound, then we will ignore the healing

21   that is represented by the scar.

22             The child has been wounded.  There is absolutely

23   no question about it.  What we are going to say -- or what

24   are we going to say when later on in her life she acts out

25   from her post-traumatic stress syndrome and does something

1    wrong?

2            As the Court has already well articulated, we see

3    over and over and over again individuals that are before you

4    charged with sex crimes that were sexually abused themselves.

5            THE COURT:  But what I don't see are those who

6    don't do it, who have suffered horrifically, but they don't

7    take it out on other people.  We don't see them because they

8    are not criminals.

9            MR. CRAWFORD:  That's true.

10           THE COURT:  I know plenty of them.  I know people

11   who are friends of mine who have told me about horrific

12   sexual abuse that they suffered at the hand of an uncle, for

13   instance.

14           MR. CRAWFORD:  I understand.

15           THE COURT:  And they are not defendants in

16   anybody's criminal court.

17           MR. CRAWFORD:  That is true.  One does not

18   automatically lead to the other.  But there is enough of a

19   connection that we see over and over again that, as hard as

20   it is for us to understand, we recognize there is some

21   connection between those that have been abused as a child

22   that end up abusing children.  And it is a reality that we

23   just don't understand at this point.

24           My point is that the victim in this case is Shauna

25   Boselli ten or sixteen years ago.  We have the same cycle,

1   the same wounding is going on.  The scars that J.K. Rowling

2   referred to in her novels were healing and hopeful and a

3   chance for new life.  Of course, there is another book of

4   books that talks about scars and how they are hopeful and

5   healing and give a new love of life.

6          The balance of the wounding and the scarring is

7   what you have to do as a judge.  My client has absolutely no

8   prior record, no prior indication she had any affection or

9   any intention to be involved with a child or children in any

10  way and made a horrible, horrible mistake that is going to

11  victimize that child for the rest of her life.  We understand

12  that.

13         Life is not appropriate.  Nobody died.  Ten years

14  is the minimum mandatory.  That's what the statute says.  It

15  is our position that that is sufficient in this case.

16         Let's focus on the scar.  Let's get some help.

17  Let's prepare and focus on life and what can make it right,

18  not just continue with this cycle downwards of victimization.

19         Thank you, Your Honor.

20         THE COURT:  All right.  I think what I'm going to

21  do, in all fairness to this defendant, is I'm going to wait

22  to pronounce sentence until when I sentence her husband, the

23  co-defendant.  I just think that's the fairest thing.  I want

24  to hear what comes out during that sentencing hearing.

25         I was very disappointed when the issues presented

1  themselves in a way that I didn't have much of a choice but

2  to continue that sentencing; but I just think, in all

3  fairness, I need to hear his story.  There is a lot of

4  finger-pointing, even with what came out today, Mr. Crawford.

5  A lot of finger-pointing from your side back to him.  I think

6  that when you have that kind of set of circumstances that

7  really the best thing to do is to sentence both defendants at

8  the same time.  I think that's just the way to proceed here.

9          So I'm going to set the sentencing now.  I think

10  we already said November the 21st.  That's the Tuesday before

11  Thanksgiving.

12          Have we heard back from Mr. Beck if that's a

13  problem for him at all, Miss Teasley?  Or has the government

14  heard whether that's an issue?

15          THE COURTROOM DEPUTY:  I haven't had a phone call

16  from him.

17          THE COURT:  Mr. Crawford, that's what I'm going to

18  do.  I can do it the 20th.  I have something at 10.

19          Yes, Mr. Crawford?

20          MR. CRAWFORD:  Judge, the 21st is fine with me.

21  I'll be out of town, hopefully, on the 20th.

22          THE COURT:  You'll be out of town on the 20th.

23          MR. CRAWFORD:  Yes, but I'll be available the

24  whole day the 21st.

25          THE COURT:  So what I will do is I'm going to set

1   Mr. McDonald's sentencing for the 21st, and I will pronounce

2   sentence for Miss Boselli on the 21st, after I've heard that

3   testimony and after I've heard those arguments.

4           I just that when you are looking at a life

5   sentence -- and I will tell you, I've sentenced several

6   people to life or at least a number of years where it's, in

7   essence, life.  It's a very significant event for a judge,

8   and it's the kind of thing that you just need to give

9   everyone the opportunity to be heard.

10          I just think that's the fairest thing to do, to

11  give everyone the opportunity to be heard and to make a

12  decision after having heard all of the testimony, all the

13  evidence.  I just think that is the appropriate way to

14  proceed.  So I will pronounce sentence after I've heard from

15  Mr. McDonald.

16          It's going to be on the 21st, sometime during that

17  day.  I'm glad you are available on the 21st, Mr. Crawford,

18  and that's just the way it is.  She may feel she's

19  traumatized by being around him.  She needs to be here in the

20  court, and I'm going to sentence them together on the 21st.

21          Anything else?

22          I'm sorry for your case agent.  I know it's

23  terrible.  I know that's a tough time, but I've had to cancel

24  a lot of vacations in my lifetime, and that's just the way it

25  is, as sorry as I am to have to do that.  I really am.  But

1    that's the day that I can do it.

2         I wish we had been able to go forward with both

3    sentencings today.  Mr. Beck put on the record what his

4    situation was.  I sealed it because I felt that it was not

5    appropriate that it be on the public record, given what it

6    was, that it involved his own personal set of circumstances,

7    and I sealed that record, and it was sufficient to warrant a

8    continuance.  I was very disappointed, as well.

9         MS. THELWELL:  I understand.  We will make the

10   21st work.  Thank you.

11        I do have one matter I would like to take up at

12   sidebar.

13        THE COURT:  Okay.

14        (*The following was held at sidebar:*)

15        THE COURT:  Go ahead.

16        MS. THELWELL:  So Miss Harris was able to make

17   contact with the prosecutor in Esposito.  He received the

18   two-level 5K under seal.  It was for assistance to give

19   probable cause for the search warrant at the residence.

20        THE COURT:  I see.

21        MS. THELWELL:  The 5K made the guidelines from --

22        THE COURT REPORTER:  Miss Thelwell, I cannot hear

23   you.

24        MS. THELWELL:  I'm sorry.  The Court gave him 75

25   years, which is 900 months, based on how he was charged with

1    the stat max being 80 years, not life like our defendants.

2              THE COURT:  That's exactly what we said on the

3    record when you were out.  It was a matter of how it was

4    charged, right.

5              MS. THELWELL:  Yes.

6              THE COURT:  Okay.  Thank you.

7              (*Sidebar ended.*)

8              THE COURT:  All right.  So that's that.  We are in

9    recess, and we are adjourned until November 21st at 9 a.m.

10             Thank you.

11             (Proceedings adjourned at 1:29 p.m. and reconvened

12   on Tuesday, November 21, 2017.)

13                            -  -  -

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT    )
                                )
MIDDLE DISTRICT OF FLORIDA      )


### REPORTER CERTIFICATE


        I, Scott N. Gamertsfelder, Official Court Reporter

for the United States District Court, Middle District of

Florida, do hereby certify that pursuant to Section 753,

Title 28, United States Code, that the foregoing is a true

and correct transcript from the stenographic notes taken by

the undersigned in the matter of *USA vs. SHAUNA MARYANN*

*BOSELLI*, Case No. 8:16-cr-517-T-33AEP (Pages 1 through 164)

and that the transcript page format is in conformance with

the regulations of the Judicial Conference of the United

States.



    /s/ *Scott N. Gamertsfelder,* RMR, FCRR

    *Official Court Reporter*

                                    Date: November 18, 2017