```
                    UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
                         TAMPA DIVISION



UNITED STATES OF AMERICA,      ) Tampa, Florida
                               )
                 Plaintiff,    ) No. 8:16-cr-517-T-33AEP
                               )
            vs.                ) November 21, 2017
                               )
RICHMOND J. MC DONALD and      ) 9:00 a.m.
SHAUNA MARYANN BOSELLI,        )
                               )
                 Defendants.   ) Courtroom 14B
_____)
```

**TRANSCRIPT OF SENTENCING HEARING**
BEFORE THE HONORABLE VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

*Official Court Reporter:*

*Scott Gamertsfelder, RMR, FCRR*
*801 North Florida Avenue*
*Tampa, Florida 33602*
*Telephone:  (813) 301-5898*

(*Proceedings reported by stenotype; Transcript produced by computer-aided transcription.*)

### <u>A P P E A R A N C E S</u>

**GOVERNMENT COUNSEL:**

    **Lisa M. Thelwell, Assistant U.S. Attorney**
    **Stacie Harris, Assistant U.S. Attorney**
    United States Attorney's Office
    400 North Tampa Street, Suite 3200
    Tampa, Florida 33602
    (813) 274-6000


**MC DONALD DEFENSE COUNSEL:**

    **Kevin T. Beck, Esq.**
    Law Office of Kevin T. Beck
    2153 First Avenue South
    St. Petersburg, Florida 33712
    (727) 204-3199

**BOSELLI DEFENSE COUNSEL:**

    **Stephen M. Crawford, Esq.**
    Law Office of Stephen M. Crawford
    600 South Magnolia Avenue, Suite 275
    Tampa, Florida 33606
    (813) 251-2273


                **ALSO PRESENT:**

                David Tremmel,
                Probation Officer

              - - -

## TABLE OF CONTENTS

### EXAMINATIONS

| GOVERNMENT | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MARGUERITE SCOTT | 25 | 33 | | |

| DEFENDANT | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| HEATHER HOLMES | 51 | 67 | 77 | |

### EXHIBITS

| DEFENDANT | PAGE | LINE |
|---|---|---|
| 1 through 4............. | 49 | 24 |

- - -

1                    **P R O C E E D I N G S**

2      November 21, 2017                              9:04 a.m.

3                          - - -

4              COURT SECURITY OFFICER:  All rise.

5              The United States District Court in and for the

6    Middle District of Florida is now in session.  The Honorable

7    Virginia M. Hernandez Covington presiding.

8              Please be seated.

9              THE COURT:  Good morning.

10             We are here for the sentencing in *United States*

11   *versus Richmond J. McDonald* and *Shauna Maryann Boselli*, Case

12   No. 8:16-cr-517-T-33AEP.

13             I'll begin by having counsel state their

14   appearances.  Who do we have for the government?

15             MS. THELWELL:  Good morning, Your Honor.  Lisa

16   Thelwell on behalf of the United States.

17             MS. HARRIS:  Stacie Harris on behalf of the United

18   States, Your Honor.

19             THE COURT:  Thank you.

20             And for the defendants?

21             MR. BECK:  Good morning, Your Honor.  Kevin Beck

22   on behalf of Richmond J. McDonald.

23             MR. CRAWFORD:  Good morning.  Stephen Crawford

24   representing Shauna Maryann Boselli, seated to my right.  I

25   would like to address the Court about our presence.

1            MR. BECK:  Your Honor, I have a matter that just

2    arose.  I would like to approach the bench, with the

3    government as well.

4            THE COURT:  Okay.

5            (*The following was held at sidebar with all*

6    *counsel present*:)

7            MR. BECK:  Your Honor, I reached out to my

8    psychologist this morning and asked her if she was near.  She

9    said, I thought it was the 29th.  She's going to jump on a

10   plane and get up here by 12:30.  Or willing to testify

11   telephonically if that's okay.  I advised the government.

12   They would like the opportunity to cross-examine her on the

13   report, if the Court would accept her testimony

14   telephonically.

15           THE COURT:  What a nightmare.  It's tough when

16   that happens, Mr. Beck.  I'm happy to do it.  It's not a

17   problem.  There are different apps where you can put the

18   person's face on the screen.  Do you want us to inquire on

19   that?

20           MR. BECK:  Okay.

21           THE COURT:  Do you know what area she's in?

22           MR. BECK:  Fort Lauderdale.

23           THE COURT:  I'll ask somebody in my office if they

24   can work on that.  I didn't bring my iPad with me.  But let

25   me ask.  Shameeka, can you step over here for a minute.

1              So his witness had a miscommunication on the date.

2    I did not bring my iPad, but I know there are apps where they

3    can testify and they can be seen visually and appear on the

4    screen.

5              Can you reach out to the IT people and see if they

6    can help me with that, because there is a way of doing it?

7    If not, then we will just do it by telephone.  But I know

8    that -- for Heaven's sake, these are technologies that have

9    been around for a number of years.  See what they can do.

10   Thank you very much.

11             Mr. Crawford, now that you are up here, what is

12   the issue?

13             MR. CRAWFORD:  Judge, you will recall that back on

14   October 18th I filed an in camera motion to have my client

15   sentenced at a different time than Mr. McDonald.  And I

16   think -- if I could, in Paragraph 2, I said the defendant has

17   retained the services of Forensic Psychologist Valerie

18   McClain.

19             It is Dr. McClain's position that to subject

20   Shauna Boselli to a sentencing hearing with her husband

21   Richmond J. McDonald would further the trauma she's

22   experienced from their relationship.

23             I go on in the third paragraph and say the

24   co-defendant, her husband, RJ McDonald --

25             THE COURT:  I've read that.  I disagree with her.

1  So she's going to need to sit there during the sentencing.

2  So for the request that you are going to make, I've already

3  denied it.  So she can sit there.  They are separated.  There

4  are lawyers in between.  They are not sitting next to each

5  other.  The request is denied.

6            Let's move on with the sentencing.

7            (*Sidebar ended.*)

8            THE COURT:  All right.  With respect to

9  Miss Boselli, this is a continuation of her sentencing.  We

10  heard testimony with respect to Miss Boselli, but I have not

11  sentenced Miss Boselli because I think that it is much more

12  appropriate to sentence co-defendants together.

13            You're not always able to do that; but in this

14  case, I most certainly am able to, and that's why I

15  specifically delayed her sentencing until today, so that I

16  could sentence her with Mr. McDonald.

17            Mr. McDonald's sentencing was originally scheduled

18  with Miss Boselli; but because of certain circumstances, one

19  of the parties requested that I continue the sentencing, and

20  because of the circumstances, I did do that with respect to

21  Mr. McDonald.

22            So what I think I'm going to do -- let me see.

23  Mr. Crawford, we have already gone through everything with

24  respect to your client.  She did allocute.  I will give her a

25  further opportunity to allocute a little bit later in the

1    proceedings and anything else that you would like me to cover.

2             MR. CRAWFORD:  No, Your Honor.  We believe we were

3    done the last time and don't have anything else to present at

4    this time.

5             THE COURT:  That's fine.  Very good.  Thank you,

6    Mr. Crawford.

7             So we will begin, then, with the government.

8             Actually, let me just see.  Mr. Beck, I think that

9    you had submitted some documents in camera.  Is that right,

10   Mr. Beck?

11            MR. BECK:  I did, Your Honor, because of the

12   HIPAA-related matters.

13            THE COURT:  Yes, I have seen those.

14            And has the government seen those documents?

15            MR. BECK:  I provided them with copies as well,

16   Your Honor.

17            THE COURT:  So we are ready to move forward, then.

18            Richmond Joseph McDonald, on June 20th, 2017, you

19   entered a plea of guilty to Count One of the Superseding

20   Indictment, charging you with enticement of a minor, in

21   violation of Title 18, United States Code, Sections 2422(b)

22   and (2).  The Court has previously accepted your guilty plea

23   and has adjudged you guilty of that offense.

24            We have now reached the stage in the proceedings

25   where it is my duty to address several questions to you and

1    your attorney and the counsel for the government.

2              I'll begin with Miss Thelwell.  Miss Thelwell,

3    have you had the opportunity to read the presentence report?

4              MS. THELWELL:  Yes, Your Honor.

5              THE COURT:  Do you have any objections as to the

6    factual accuracy of the report?

7              MS. THELWELL:  Yes, Your Honor.

8              THE COURT:  You do.  Okay.  I think that you had

9    noticed those earlier.  So, if you don't mind coming up to

10   the podium, I'm happy to hear you.

11             MS. THELWELL:  Yes, Your Honor.

12             I had an unresolved objection regarding the

13   description of the production images that were found on

14   co-conspirator Jamie Esposito's device, and that's outlined,

15   and it's attached to the addendum to the PSR, beginning at

16   page 134.

17             THE COURT:  Let me turn to that.

18             MS. THELWELL:  Page 28.

19             THE COURT:  Give me one second.  I have Page 28,

20   and it's your letter to Mr. Tremmel.

21             MS. THELWELL:  Yes, Your Honor.

22             THE COURT:  And, so, I see here that there are

23   several factual objections.  This is your opportunity to

24   explain those to me in a little bit more detail.

25             MS. THELWELL:  Yes, Your Honor.

1             The only objection that is still unresolved is in

2    my letter, Paragraph 3, which --

3             THE COURT:  That's to Paragraph 77?

4             MS. THELWELL:  Correct, Your Honor.

5             THE COURT:  And that says, "Please add the

6    following language describing the images and videos of the

7    child victim S.E. engaged in sexual activity with McDonald

8    and Boselli.  This information is included in the HSI report

9    of investigation No. 37, dated June 28th, 2017."

10            You then describe what the video is in paragraph

11   A, and in paragraph B you further describe another video.  In

12   paragraph C, it's an additional description of what took

13   place.  Same thing for paragraph D.  These are descriptions

14   of the activity that occurred.

15            MS. THELWELL:  Correct, Your Honor.

16            THE COURT:  Okay.  And, so, your objection is that

17   you want that information included in the presentence report.

18            MS. THELWELL:  Yes, Your Honor.

19            THE COURT:  All right.  Let me see what Mr. Beck

20   has to say.  Then I will turn to Mr. Tremmel.

21            So, Mr. Beck, what is your response to that?

22            MR. BECK:  It's my belief that the videos have

23   already been introduced into evidence.  The Court has access

24   or had the opportunity to review them.  Whether or not it's

25   necessary that that language be included in the PSR, I would

1    stand by Mr. Tremmel's position that there are no facts that

2    have been admitted that necessarily require that information

3    to be so contained.

4              THE COURT:  Okay.  Mr. Tremmel, what is your

5    position on that?  Why not include that information in the

6    presentence report?  Why should somebody have to watch that

7    video when the information has been included here?

8              THE PROBATION OFFICER:  Your Honor, our thought

9    was -- initial thought was because it wasn't addressed at all

10   in the plea agreement and it wasn't in the initial

11   presentence report, when the government objected to it, we

12   approached the defense and they objected to it being added.

13   So we felt like the most fair way to resolve the objection

14   would be to simply attach it for the Court's consideration

15   and reference it.

16             THE COURT:  Okay.  I think that's fair enough,

17   Mr. Tremmel, because I do think that it's appropriate to

18   include it.  I think that Miss Thelwell's point is well made.

19   Quite frankly, I don't think somebody should have to watch

20   that video to understand what took place here.  It's an

21   outline of it, and I think it's appropriate that it be

22   included.  So the government's objection is sustained, and

23   that is made part of the presentence report.

24             Any other objections?

25             MS. THELWELL:  Your Honor, not necessarily an

1    objection.  Just a note, and we can get there, but I did

2    notice that probation filed an amended PSR on Friday, which

3    is document 134.  Shortly after that -- and in that PSR,

4    there was a comment regarding the restitution and that the

5    dollar amount and the supporting documentation had not yet

6    been provided.

7            Shortly after that, the PSR was issued.  I did

8    receive the final documentation and provided it both to

9    probation and defense counsel.

10           It's my understanding defense counsel have agreed

11   to the dollar amount, which is $50,000, joint and several.

12   And I know that restitution will come at a later point, but I

13   wanted to highlight that for the Court because I believe it

14   was noted.

15           THE COURT:  Let me see.  Mr. Beck, any position on

16   that?  Or should we defer that until later on in the

17   proceedings?

18           MR. BECK:  No, Your Honor.  I think that the Court

19   and the government as well as the family of the victim should

20   be made aware that Mr. McDonald and his family are prepared

21   to do everything and anything they can to assist in her

22   recovery.  They are not going to object to any therapy, care,

23   treatment that the child may need, as they desire her to make

24   a full recovery or as much recovery as possible.

25           THE COURT:  No other objections from the

1 government with respect to the factual accuracy of the report

2 or objections to the probation officer's application of the

3 guidelines?

4          MS. THELWELL:  No, Your Honor.

5          THE COURT:  Okay.  Thank you, Miss Thelwell.

6          I'll now turn to Mr. Beck.  Mr. Beck, have you had

7 the opportunity to read and discuss with Mr. McDonald the

8 presentence report?

9          MR. BECK:  Yes, Your Honor.

10          THE COURT:  Do you have any objections as to the

11 factual accuracy of the report?

12          MR. BECK:  Only to the application of certain

13 enhancements.

14          THE COURT:  So we will do that as an objection to

15 the probation officer's application of the guidelines, then,

16 and I'll hear whatever objections you have.  I'll hear those

17 all at once.

18          MR. BECK:  Your Honor, I've had the opportunity to

19 review the transcripts from the Shauna Boselli sentencing,

20 and I understand that Mr. Crawford has made an objection

21 regarding the enhancement for the use of computers based on

22 *U.S. versus Jenkins*.

23          I had filed an objection to that enhancement as

24 well.  I'll rely upon the arguments that Mr. Crawford made.

25 I think they were appropriate and thorough.  I understand the

1    Court has denied that.

2              THE COURT:  Correct.

3              MR. BECK:  The only additional argument that I

4    would make is that it's my opinion that if, in fact, the

5    guidelines are simply a recommendation, then any of the

6    enhancements that they also propose should also be a

7    recommendation.

8              I don't think there is any question or any dispute

9    between the parties at this point in time that over

10   95 percent of all offenders for this type of conduct utilize

11   smartphones and computers in order to affect their intent.

12             As such, I think this Court has the same authority

13   to find that that guideline, despite the fact it's not been

14   removed from the guidelines, should not necessarily apply in

15   these instances, so I would make that argument.

16             THE COURT:  I appreciate it.  And whatever

17   objections you have are most certainly preserved for

18   appellate purposes.  But I disagree with you, and I overruled

19   Mr. Crawford's objections, and I overrule your objection as

20   well.

21             MR. BECK:  I understand.

22             Finally, Your Honor, there is an objection to what

23   I contend is redundant or compound enhancements.  Those are

24   based on paragraphs 88 and 91.

25             THE COURT:  Just give me one second to turn to

1    those so I can follow with you.  You said 88 and 91.

2         MR. BECK:  I objected to 90, but, in retrospect, I

3    don't think 90 is redundant because it actually alleges a

4    sexual act that is not a component of 88 and 91.

5         THE COURT:  So 88 is, "If a participant otherwise

6    unduly influences a minor to engage in prohibited sexual

7    conduct, increase by two levels."

8         MR. BECK:  Yes, Your Honor.

9         THE COURT:  That's the one you object to.  And 91.

10        MR. BECK:  I object because 91, Your Honor,

11   essentially encompasses the same conduct.  The government, in

12   their response to my objections, have argued, well, there are

13   circumstances where 91 would not necessarily apply because

14   it's possible that the victim could be 13 and the defendant

15   not 39 and, therefore, 91 would not apply.

16        But they have also cross-referenced Florida

17   Statute 800.04 and .05, which is the lewd and lascivious

18   statute.  It's my contention that in so doing they have

19   cross-referenced a strict liability statute whereby the age

20   or the consent of the victim is expressly not recognized as a

21   defense to the criminal activity.

22        As such, the idea that Mr. McDonald could have

23   coerced the victim into consenting to a sexual act, given her

24   ripe age, is an impossibility and certainly not consistent

25   with the Florida statute that's been cross-referenced.

1             Statute 800.04 describes expressly that consent of

2    the victim is not a defense.  It recognizes that a child

3    under the age of 16, or in the capital sexual battery

4    offense, which was not alleged, under the age of 12, simply

5    does not have the legal authority to consent.

6             If they don't have the legal authority to consent,

7    then there is no capacity for the defendant to attempt to

8    coerce them.  And there is no coercion that affects the

9    nature of the victim's role in the offense.  For that reason,

10   I believe that those two enhancements are redundant.

11            Clearly, 91, I believe, without looking at my

12   notes, is an eight-level enhancement.

13            THE COURT:  It is.

14            MR. BECK:  Eighty-eight is a two-level

15   enhancement.  We would ask the Court to find 88 and 91 to be

16   compound or redundant, recognizing the language of *Montose v.*

17   *Hernandez*, and grant our objection, eliminating

18   paragraph 88's enhancement referencing the coercion by the

19   defendant based upon the difference in ages.

20            THE COURT:  All right.  Let me ask the government

21   to respond.  Thank you, Mr. Beck.

22            MR. BECK:  Yes, Your Honor.

23            MS. THELWELL:  Your Honor, the defendants pled

24   guilty to enticement of a minor, which can be committed in

25   multiple ways.  One of the ways is inducement.

1          The defense counsel mentioned coercion multiple

2     times, but in this case it's clear there was also inducement

3     of the minor.

4          So taking that into consideration -- and I'll also

5     rely on my response I had provided that's attached to the PSR

6     in response to the defendant's objections.  I do believe that

7     whether or not the Florida statute for lewd and lascivious is

8     strict liability, based on age, is irrelevant to whether or

9     not the guidelines were correctly calculated in this

10    particular case.

11         The United States Sentencing Guideline

12    2G1.3(B)(ii)(b), which is the two-level enhancement because

13    the defendant unduly influenced the minor child to engage in

14    prohibited sexual conduct, clearly applies in this case

15    because there is a presumption, as indicated in the

16    application notes in the guidelines, when there is such a

17    huge age difference, it's presumed that the defendant unduly

18    influenced the minor victim in this case.

19         So by applying that two-level enhancement and also

20    applying the enhancement in paragraph 91, which is the

21    eight-level increase because the offense involved a minor who

22    had not yet attained the age of 12 years, they are both

23    applicable in this particular case.  And they are not double

24    counting for the reasons I've indicated in my response, as

25    well as defense counsel acknowledged that there are

1  circumstances where the two-level increase might apply and

2  the eight-level increase might not apply.

3          THE COURT:  All right.  Mr. Tremmel, anything to

4  add to that?

5          THE PROBATION OFFICER:  Nothing really, Your Honor.

6          THE COURT:  So you stand by that this was

7  correctly scored?

8          THE PROBATION OFFICER:  Yes, Your Honor.

9          THE COURT:  Okay.  And I agree.  I do see that

10  there are circumstances where it would be appropriate to just

11  have the two levels.  Other circumstances it would be

12  appropriate to have the eight-level enhancement, so I don't

13  think that it's redundant.  I don't think it's compound for

14  the reasons that the government said.  So that objection is

15  noted, but it's overruled.

16          Any other objections that you would like me to

17  consider, Mr. Beck?

18          MR. BECK:  I had included additional objections.

19  They do not affect the guidelines in any way.  So to the

20  extent that the Court wants to discuss them, we certainly

21  can.  I don't think they are necessarily relevant or critical

22  to the Court's decision-making process today.

23          THE COURT:  Okay.  Well, then, I'll move on.  They

24  are noted, and I have reviewed the addendum, and that's fine.

25  We will just move forward, then.

```
 1              The Court adopts the undisputed factual statements

 2   and guideline applications contained in the presentence

 3   report.  As to the controverted factual statements and

 4   guideline applications, the Court adopts the position of the

 5   probation office as stated in the addendum.  Therefore, the

 6   Court determines that the advisory guidelines are:

 7              Total Offense Level 43, Criminal History

 8   Category I, life imprisonment, five years to life supervised

 9   release, restitution is to be determined.

10              I think that, from what I recall earlier, there

11   was a discussion that it was $50,000 that had been discussed

12   by the parties, but we will get to that to verify that

13   information.

14              The fine is 50,000 to $250,000 and a $100 special

15   assessment.

16              Miss Thelwell, is there a representative of the

17   victim present in the courtroom or any other individuals who

18   would like to make a statement that you are aware of?

19              MS. THELWELL:  Yes, Your Honor.

20              THE COURT:  All right.  I'm happy to move forward,

21   then.

22              MS. THELWELL:  One moment, Your Honor.

23              THE COURT:  Sure.

24              MS. THELWELL:  Your Honor, may we approach

25   briefly?
```

1          THE COURT:  Sure.

2          (*The following was held at sidebar with all*

3  *counsel present*:)

4          MS. THELWELL:  We also have one of McDonald's

5  prior victim's mom present, and I was planning to -- I had

6  listed her as a witness.

7          THE COURT:  Is this the letter that I received,

8  Margie Scott?

9          MS. THELWELL:  Yes, yes.  We had planned to

10 introduce her in aggravation of 3553(a) factors.  I had

11 spoken to Mr. Beck about that yesterday, and he indicated he

12 would be objecting to anything regarding Georgia or any of

13 the offenses that happened in Georgia.

14          I'm just wondering how the Court would like to

15 proceed.

16          THE COURT:  Okay.  You can put your witness on and

17 he can object.  That's how I would like to proceed.

18          MS. THELWELL:  I just wanted to see how you would

19 like to proceed.

20          THE COURT:  This is the letter that she sent me.

21 Have you seen this?

22          MR. BECK:  I don't know if I have, but I'm fully

23 familiar with the circumstances.

24          THE COURT:  Okay.  So, in essence, what she says

25 is how her daughter has been impacted as a result of his

1    actions.  Okay.  Well, you can put on the witness, and he can

2    object, and I'll move forward.

3              MS. THELWELL:  Thank you.

4              (*Sidebar ended.*)

5              THE COURT:  Mr. Beck, on that matter that we were

6    previously discussing at sidebar, does that witness have an

7    iPhone, because I have an iPhone.  Can you find out if that

8    witness --

9              MR. BECK:  I've been messaging with her this

10   morning, and her messages indicate "Sent from my iPhone."

11             THE COURT:  Okay.  We both have iPhones, then, so

12   we should be able to bring her in on the screen.  If you can

13   let the IT folks know that we both have iPhones.

14             Mr. Beck, when would you like to do that?  Can you

15   give us a time?  Are we probably talking an hour from now?

16   Or you don't know?

17             MR. BECK:  She's standing by, so with that, I

18   think that I would like to address the Georgia circumstances

19   and then bring her in.

20             THE COURT:  Well, that's all right.  He just needs

21   to know a ballpark.

22             MR. BECK:  Maybe 11.

23             THE COURT:  That sounds fine.

24             Miss Thelwell, since there are victims here or

25   individuals who would like to make statements, I want to

1  start with them because these people have traveled here and

2  they have every right to be heard.  Then we will turn to

3  Mr. Beck's witness.  So I think we will do it in that order.

4         If you can, just tell our IT folks we don't know

5  exactly what time, but probably, more or less, an hour.

6  Maybe an hour from now he ought to be ready since it will

7  take them a little bit of time to do it.  Perfect.

8         So, Miss Thelwell, I'm happy to hear from your

9  witnesses at this time.  If they are going to give testimony,

10  we will need to swear them in, and they will need to take the

11  witness stand.  If they just want to make a statement, they

12  can stand and make the statement.  So you need to tell me

13  which it will be.

14         MS. THELWELL:  Your Honor, Miss Scott would like

15  to make a statement.

16         THE COURT:  Okay.  All right.  That's fine.

17  Miss Scott can come forward.

18         Mr. Beck, do you wish to object to that?

19         MR. BECK:  I do, Your Honor, based on relevancy.

20  It's uncharged conduct.  It's also conduct that has been

21  thoroughly litigated in Georgia and resulted in an acquittal

22  of one count and a reversal of the second count due to the

23  admission of inadmissible evidence and the subsequent

24  decision by the state of Georgia not to pursue charges

25  further given the fact they were no longer able to use the

1   inadmissible evidence.

2           So from the perspective that -- I understand the

3   nature of the testimony that is anticipated based upon the

4   sidebar.  I think that there is a difficulty in

5   cross-examining given the fact that this lady was not

6   present, as I understand it, and has no direct knowledge of

7   the offense.  Therefore, the nexus between the offense and

8   the injury is very, very dubious; and for that reason, I

9   would object.

10          THE COURT:  Well, these are things that I can

11  weigh and factor in.  After we hear from her, you are free to

12  make additional arguments to the Court, as is the government;

13  but I think I have every right to -- the Court has a right to

14  hear her, and she has a right to address the Court.  So based

15  on that, your objection is overruled.

16          I just don't know, Miss Thelwell, if it's better

17  for her to take the witness stand.  I don't know if it's best

18  for her to stand and address the Court.  I think she should

19  sit in the witness box and make her statement that way.  I

20  think that's better.

21          MS. THELWELL:  Yes, Your Honor.

22          THE COURT:  I am going to place her under oath.

23  So, if you can just call her, that would be fine.

24          MS. THELWELL:  The United States calls Miss

25  Marguerite Scott.

1          THE COURT:  Miss Scott, we will ask you to come

2   forward, please, and we are going to place you under oath if

3   you don't mind.  The courtroom deputy here will give you the

4   oath.

5          THE COURTROOM DEPUTY:  Please raise your right

6   hand.

7          Do you solemnly swear or affirm under penalty of

8   perjury that the testimony you shall give in this cause will

9   be the truth, the whole truth, and nothing but the truth?

10          THE WITNESS:  Yes, I do.

11          THE COURTROOM DEPUTY:  Please state your full

12   name.

13          THE WITNESS:  Marguerite Scott.

14          THE COURT:  Thank you, Miss Scott.

15          I know you have a statement with you, and you may

16   read your statement.  I think that the prosecutor is going to

17   ask you maybe some preliminary questions; but if you feel

18   that at any point you need to take a break or you need to

19   have a glass of water, please, by all means, we will do our

20   best to accommodate you.

21          So, Miss Thelwell, you may proceed.

22          MS. THELWELL:  Thank you.

23                    MARGUERITE SCOTT,

24   having been first duly sworn by the Courtroom Deputy,

25   testified as follows:

```
 1                    DIRECT EXAMINATION
 2   BY MS. THELWELL:
 3   Q.    Good morning, Miss Scott.
 4   A.    Good morning.
 5   Q.    Are you familiar with a man named Richmond McDonald?
 6   A.    Yes, I am.
 7   Q.    How are you familiar with that individual?
 8   A.    It was in June of 1998 that I went to Georgia with my
 9   12-year-old daughter, E███████ S████, to celebrate my niece
10   receiving her master's degree, and she introduced the family
11   to her boyfriend at the time, 21-year-old Richmond McDonald.
12            THE COURT:  Let me make certain I understand.
13   This was the niece's boyfriend?
14            THE WITNESS:  Yes, my niece, who was 27 at the
15   time.
16            THE COURT:  Okay.  Thank you.
17            Go ahead, Miss Thelwell.
18   BY MS. THELWELL:
19   Q.    If you were to see Mr. McDonald again, would you
20   recognize him?
21   A.    Absolutely.
22   Q.    Do you see him in the courtroom here today?
23   A.    Yes, I do.
24   Q.    Could you please identify him by pointing out an
25   article of clothing?
```

1  A.    The orange jumpsuit.

2           MR. BECK:  We would stipulate, Your Honor.

3           THE WITNESS:  Next to his attorney.

4           THE COURT:  The record will reflect she's

5  identified the defendant, Mr. McDonald.

6           MS. THELWELL:  Thank you.

7  BY MS. THELWELL:

8  Q.    Have you prepared a statement for today?

9  A.    Yes, ma'am.

10  Q.    Could you please read it to the Court?

11  A.    Yes, I will.  Thank you.

12           This was a letter that I had written and addressed

13  to Judge Covington.

14           I am writing to you with respect to the

15  above-referenced case so that I may provide you with my

16  victim impact statement which details the sexual assault and

17  emotional trauma inflicted upon my daughter in June 1998,

18  E█████████ S████ S████, age 12, and our family, by the

19  above-named defendant, Richmond Joseph McDonald, age 21 at

20  the time.

21           E████████ is my daughter.  My niece, L████ S████,

22  who is now married, and is L████ L███████, was receiving her

23  master's degree from Georgia College in Milledgeville,

24  Georgia.  E████████ and I drove from Orlando, Florida, with

25  plans to stay at L███'s house.  Shortly after our arrival,

1    we were introduced by L█████ to her new boyfriend of only a

2    few months, the defendant.

3            After the graduation ceremony, many of the family

4    gathered at the residence the defendant was leasing, and we

5    cooked out and visited.  The defendant's plotting went into

6    action soon after when he enticed E████████ to go on a bike

7    ride with him.  Along the way, he stopped and compliment

8    her --

9            MR. BECK:  Objection.  Hearsay.

10           THE COURT:  Overruled.

11           THE WITNESS:  -- stating he noticed she was

12   beginning to develop breasts.  E████████ did not divulge this

13   information for several months.

14           Later, after we ate, my niece L█████ told me she

15   and the defendant would both be staying at his residence

16   overnight and invited E████████ to come over, with the plans

17   so they would all watch scary movies on TV all night.  Not

18   knowing of the bike ride incident, I agreed, as L█████ thought

19   it would be okay.

20           It was there when the defendant began his next

21   calculated moves upon E████████.  Whenever L█████ was out of

22   the room or was seated where she could not readily be seen,

23   he began to subtly touch E████████ inappropriately and

24   seductively.  Seated on the same couch, the defendant reached

25   under her shirt and touched her bare breasts, and then he

1   pulled her shorts back to reach his fingers around her

2   vaginal area.  She later stated she felt frozen and afraid to

3   move or speak.

4          L████ eventually fell asleep, and it was then that

5   he revealed his erect penis to her, stating something to the

6   effect of, quote, look what you've done to me.  He then

7   placed his hand on the back of her head, trying to force her

8   head down on his exposed penis.

9          She moved back in a way, and he threatened her by

10  stating she must not tell anyone about it since it has to be

11  just their secret, or he would be in trouble.

12         I had spent the night at L████'s house along with

13  her oldest brother.  The next morning I drove to pick

14  E████████ up to return to Orlando.  She mentioned nothing of

15  these incidents during the ride home, but she shortly began

16  to confide in her sister over the next months.

17         Prior to meeting the defendant, E████████'s

18  12-year-old world revolved around the innocent, carefree life

19  of a young girl who loved playing with her pet cats,

20  listening to NSYNC and the Backstreet Boys and dreamed of

21  being on a Disney TV series.

22         Still, at the age of 12, when visiting a family

23  for what was to be a fun-filled celebration, the life she

24  knew was shattered by the manipulative, cunning mind and

25  self-gratifying evil actions of the defendant, who was age 21

1   at the time.

2           L███ and I spoke -- my niece L███ and I spoke

3   occasionally and visited with her relatives at a family

4   reunion in Virginia; and then several months passed since

5   June of 1998, the only time we had ever seen the defendant.

6   L███ called and said that she and the defendant wanted to

7   come to Orlando to visit us in the spring of 1999.  I agreed

8   only so I could confront him, which I did right away.

9           He very casually, unemotionally, but specifically

10  admitted to me what he had done to E███████.  He even

11  repeated it, in detail and upon my insistence, to L████, who

12  began to cry, and they argued loudly.  They left to return to

13  Milledgeville within the hour.

14          My knowledge now of most of what the defendant had

15  done to my daughter, I contacted the Milledgeville police,

16  made a report; and, in turn, the assistant district attorney

17  of Baldwin County, Dawn Baskin, soon met with us to prepare

18  the case against the defendant.

19          Soon thereafter E███████ expressed to a counselor

20  or teacher at her school that she wanted to kill herself.

21  She said she felt shame and confusion and could not

22  understand how her cousin L███ could still want to be in a

23  relationship with the defendant after she had heard the

24  truth.  I found and have a handwritten note written by

25  E███████ in her room stating the same.

1          The school's obligation was to report what they

2   had heard, and E███████ and I then were sent to counseling

3   ASAP.  We agreed to seek immediate therapy and decided to

4   attend the Arnold Palmer Hospital Center for Children and

5   Families Sexual Trauma Recovery Center in Orlando, Florida.

6          They offered an excellent program for both

7   children and parents, and E███████ and I attended every week

8   for nearly one year.

9          After that phase of therapy concluded, the

10  counselor recommended that E███████ see a private

11  psychologist for continued therapy.  We were put in touch

12  with a Dr. David Parker in Winter Park, Florida, where

13  E███████ was his patient for the next several months, until

14  he was confident that she was regaining self-esteem and

15  confidence and would not attempt to hurt herself.

16          During this period of time, E███████ still

17  attended school; but since I worked full time and did not

18  want her to be alone at home after school, her science

19  teacher, Mrs. Brodrick, volunteered to take her home with her

20  after school every day, and I would pick her up after work,

21  and this continued for several more months.

22          The trial was held in Milledgeville, Georgia, over

23  six days in October 1999, where E███████ and I both took the

24  stand, and at one point the Court taking a recess due to

25  E███████ crying under her testimony, where the defendant was

1   found guilty, and the sentencing in January 2000 proved very

2   difficult for E███████ and her older sister and I, seeing

3   the defendant there and listening to the graphic accounts

4   given by some professionals who had evaluated him, and this

5   entailed some of his sexual preferences.  Extremely graphic.

6           But E███████ had grown stronger by this time,

7   having had professional counseling, surrounded by the

8   unending love of her immediate family and the support from

9   her teachers.  And she was on her way as a survivor.

10          Even today, over 19 years later, E███████ and her

11  sister and I can still vividly recall and, at times, sense

12  the pain of the loss of precious innocence and trust, which

13  resulted from the heinous assault committed by the defendant,

14  the defendant who has proved nothing more than a merciless

15  and immorally bankrupt individual, void of remorse for his

16  reprehensible actions upon an innocent and defenseless child.

17          Thank you.

18  BY MS. THELWELL:

19  Q.    Miss Scott, do you know whether or not your daughter

20  was given an opportunity to come today to speak?

21  A.    She was given an opportunity.  She is married and lives

22  in New York and -- well, due to the financial circumstances,

23  since we were informed that she would not be compensated for

24  a plane ticket, or whatever, it was extremely difficult,

25  which is why as her mother I'm representing the family.

1    Q.    You are aware that in Georgia your case was overturned

2    on appeal?

3    A.    Yes.

4    Q.    Do you know why your daughter did not testify for a

5    second trial?

6    A.    There was not a second trial to my knowledge because I

7    don't think that it was pursued after that -- after that it

8    was overturned.

9          It was overturned because the law at the time

10   had -- from my understanding, had just come down.  There had

11   been a case where what the prosecution had done was show

12   websites that the defendant frequented and websites such as

13   Young and Nasty, showing pictures of young girls being burned

14   by cigarettes and sexually assaulted and that sort of thing.

15         The pictures at the time in 1999, during the

16   trial, they were not just of E█████████, but they were shown

17   at the time to show the nature of the defendant's sexual

18   perversions and preferences.

19   Q.    All of these years later, do you know whether or not

20   your daughter is still traumatized by the event that took

21   place when she was 12 years old?

22   A.    Absolutely.  She is now a mother of two.  Her oldest

23   child is a five-year-old girl, and this has affected her to

24   this day with the amount of protection and fear -- I think

25   you would say fear, of letting her daughter, whether it's to

1  spend the night, or she's just very, very cautious around any

2  other people that normally would be trusted.

3  Q.    Thank you.

4          MS. THELWELL:  No further questions.

5          THE WITNESS:  Thank you.

6          THE COURT:  Mr. Beck, do you wish to

7  cross-examine?

8                    CROSS-EXAMINATION

9  BY MR. BECK:

10 Q.    Miss Scott, first I want to begin by saying I respect

11 your support and protection for your child.

12 A.    Thank you.

13 Q.    You were a witness in the trial in Baldwin County,

14 Georgia; is that correct?

15 A.    Yes.  It was in Milledgeville, Baldwin County, yes,

16 sir.

17 Q.    Were you afforded the opportunity to observe the trial

18 or were you sequestered during the testimony?

19 A.    I was sequestered.  I was on the stand, as was my

20 daughter.  We were there for six days, yes.

21 Q.    I understand.

22          Are you familiar -- you've told the Court that you

23 are aware that the Georgia appellate court reversed the

24 conviction.  There were actually two counts of which

25 Mr. McDonald was acquitted of.  One being the attempt to --

1   attempted aggravated sexual battery, child battery, child

2   sexual battery, and then convicted of the first count, which

3   was not an aggravated count; is that correct?

4   A.    I don't know.  I cannot answer the technicalities of

5   what exactly the appeal was, but I -- I mean, this is public

6   information.  It's available.

7   Q.    And in preparation for that trial, did you have an

8   opportunity to meet with the prosecutors and talk about

9   certain evidence that might necessarily be presented?

10  A.    Well, I spoke at length with Dawn Baskin, as well as

11  Frederick Bright, an assistant district attorney.

12  Q.    Dawn Baskin was assistant DA?

13  A.    Yes, she was.

14  Q.    And were you aware that there was a series of e-mails

15  that was introduced at trial, a conversation or dialogue

16  between your daughter E█████ and Richmond McDonald?

17  A.    Yes, I was.

18  Q.    And those e-mails were to have occurred after the event?

19  A.    Yes.

20  Q.    Related to your niece's graduation, correct?

21  A.    Yes.

22  Q.    And are you familiar with the content of those e-mails?

23  A.    There were, to my knowledge, only a couple of e-mails

24  and -- given that my daughter was 12 years old and you have

25  someone acting very seductively -- inappropriately, but

1    seductively and complimenting her, I -- I know also for a

2    fact that it is quite common that things can be -- a

3    manipulative person can turn something into a false romantic

4    notion for a child, and she -- I do know that he tried to do

5    that.

6                One of the e-mails, though, was simply entitled

7    "He was scared and thrilled.  Scared and thrilled."  Those

8    were the words, and those were Dawn Baskin's final words in

9    her closing arguments.

10   Q.    Now, I suspect or imagine that you didn't have an

11   opportunity to actually read the appellate decision that

12   addressed the nature of those e-mails?

13   A.    I don't know how to answer that question because I

14   certainly would have prepared for this answer if I knew

15   something that happened 18 years ago --

16                I have a great deal of paperwork in my file from

17   this; but whatever the appeal was on the technicality of the

18   fact that they showed outrageous websites that the defendant

19   frequented, not to mention what we found out later that were

20   in the Milledgeville newspapers when he was staying at his

21   grandmother's house in Savannah, quote, the motherlode of

22   pornography that was there in his room with all kinds of

23   videos, too -- however, if something is overturned on a

24   technicality, that doesn't negate the fact of what happened.

25   Q.    However, you would agree that the state of Georgia had

1    the opportunity to retry the case and chose not to?

2    A.    Well, I don't know that it is quite that cut and dry.

3    I think that they did not want to put E████ back on the

4    stand and draw this out further.  I don't know.  I don't

5    know.  That doesn't mean it didn't happen.

6    Q.    Again, I don't want to offend, but you did not witness

7    these incidents and don't have any direct knowledge of any of

8    the conduct that you are describing this morning?  You didn't

9    witness the event in the McDonald apartment?

10   A.    No.  We would be at a very different trial if that were

11   the case.

12   Q.    L████ was present, your niece?

13   A.    She was asleep or out of -- in the courtroom, the

14   defense and the prosecution, they had set up an entire

15   replica of what the living room looked like, where the chairs

16   were placed.

17              And so, clearly, if someone wants to do something

18   behind someone's back literally, subtly, and especially after

19   that person falls asleep, the other person, my niece, it's

20   quite possible.

21   Q.    Now, this question is probably inappropriate just

22   because it's legal in nature, but are you familiar with the

23   term tacit admission?

24   A.    I'm sorry?

25   Q.    Are you familiar with the term tacit admission?

1  A.    No, I'm not.

2  Q.    Okay.  Let me try to put it in perspective.

3         Tacit admission sometimes occurs when an

4  individual is accused of something and they fail to deny it.

5  Does that make sense to you?

6         If I accused you of stealing from the 7-Eleven and

7  you didn't deny that you did that, that may be deemed a tacit

8  admission.  You get the point?

9  A.    Yes.

10  Q.    Okay.  Was there an e-mail where Mr. McDonald wrote

11  your daughter and advised that he felt bad because he was an

12  adult, even though nothing happened?

13  A.    I'm certainly not aware of that.  Even if it's

14  produced, he -- he also told my niece in front of me, in my

15  house, in the Spring of 1999 -- he admitted -- quite calmly,

16  unemotionally, he admitted what he did of touching her bare

17  breasts and reaching under her pants and putting his fingers

18  in her vagina and putting his hand -- he admitted it to

19  L███.

20         And by the time they got back to Milledgeville and

21  L███ called me on the phone the next day, it was a different

22  story.  She was crying when she was at my house.  She was

23  crying.  She was yelling.  She called her little neighbor

24  Ashley, who was also a young girl in Milledgeville.  This was

25  real.  It happened.  And I called her mother the moment they

1   pulled out of the driveway.

2           My mistake was not calling 9-1-1 at the time and

3   have an Orlando policeman come and record it.  I didn't do

4   that; but his manner of even influencing my niece, who was

5   six years his elder, she didn't want -- this is pretty

6   textbook.

7           She did not want to believe what she heard had

8   happened.  She did not want to believe what she had heard.

9   And not only that, I heard it.  Kelly Lewandowski, who also

10  spent six days -- my daughter's school friend from Glenridge

11  Middle School, she and her mother were sequestered for six

12  days because Kelly was in E█████'s room when L████ and the

13  defendant showed up there that spring in 1999, and she heard

14  the arguing.

15          She heard the crying, and she also witnessed --

16  and she testified, and this should be a matter of record,

17  which if I knew that I needed to prove this, I could

18  certainly have contacted Dawn Baskin for more paperwork

19  evidence -- that he had handed her a note stating -- or a

20  business card or something with his e-mail address.  And any

21  way you look at it, you have a 21-year-old man and a

22  12-year-old child.

23  Q.   How many trials have you been involved with with your

24  daughter involving allegations of sexual abuse?  Just the one

25  with Mr. McDonald?  Just the trial with Mr. McDonald?  That's

1  the only trial that you've been involved with?

2  A.    The only trial?

3  Q.    Yes, ma'am.

4  A.    Yes, the only trial.  Yes.

5  Q.    At the time this trial occurred, isn't it true that

6  your daughter had alleged sexual misconduct by at least one

7  other man?

8  A.    No other -- no other man.  There was a baby-sitter who,

9  in Houston, when she was about three years old, was later

10 charged with having touched some of the children on her watch

11 inappropriately.  And I don't know how a three-year-old -- a

12 three-year-old -- and other children had said the same thing.

13 A three-year-old.  Not a man.  A lady.

14         MR. BECK:  Your Honor, at this time, if I may, I

15 would like to introduce four separate exhibits.

16         THE COURT:  Okay.

17         MR. BECK:  The exhibits include Defendant's

18 Exhibit No. 1, which is the order from the Baldwin Superior

19 Court for Baldwin County that dismisses the case against

20 Richmond McDonald for lack of prosecution, essentially.

21         Second is the actual opinion from the Georgia

22 Court of Appeals that describes both the nature of the

23 evidence, the nature of the pornography, the dubious nature

24 of the question of whether or not it's possible that that

25 pornography could have occurred as a result of nonsolicited

1    e-mails, banners, and the like.

2           I would also like to introduce as Defendant's

3    Exhibit No. 3 a copy of E██████ S██████ S███'s testimony

4    at trial solely for the purpose of establishing that she did

5    recognize and authenticate the e-mails that were introduced

6    at trial and the nature of the e-mails that were presented at

7    trial.

8           THE COURT:  Okay.  That would be fine.

9           MR. BECK:  I have no further questions.  May I

10   approach, Your Honor?

11          THE COURT:  Yes, you may.

12          (Documents tendered.)

13          MR. BECK:  Your Honor, I'm providing the phone

14   number for the psychologist.

15          THE COURT:  Okay.

16          MS. THELWELL:  I don't have any further questions,

17   Your Honor.

18          THE COURT:  All right.  Thank you.

19          Anything else, Mr. Beck?

20          MR. BECK:  Not from this witness, no.

21          THE COURT:  Thank you for having come in today.

22          THE WITNESS:  I wanted to say one other thing if I

23   may.

24          THE COURT:  Of course.  Go ahead.

25          THE WITNESS:  Any attempt to discredit what I have

1   said or what my daughter said in Milledgeville or trying to

2   say something about when she was two or three years old --

3   there was no trial.  I mean, that's preposterous.

4          I clearly did not take off work for six days and

5   be in the state of Georgia for a trial, did not go to the

6   Arnold Palmer Sexual Trauma Healing Centers every single week

7   for nearly a year, nor take my daughter to the psychologist

8   for months after that or have the science teacher take her

9   home for some fabricated thing that didn't happen.

10         It happened.  It happened.  It was real.  And had

11  I known that I needed to defend myself and my daughter from

12  19 years ago, I could bring the suicide note.  I could bring

13  other things, if we needed to do that; but it's real, and it

14  happened.  I swear.  Thank you.

15         THE COURT:  Thank you very much.

16         Miss Thelwell.

17         MS. THELWELL:  Yes.  Miss Tracie Esposito.

18         THE COURT:  Miss Esposito.

19         MS. THELWELL:  Your Honor, may she approach the

20  podium?

21         THE COURT:  Yes, she may.  Miss Esposito, you may

22  make your statement at this time.

23         MS. ESPOSITO:  Your Honor, as you know, I was able

24  to read my impact statement at the Boselli sentencing.  I

25  appreciate the opportunity to present it again so that all

1  parties, including both defendants, can hear it.

2          THE COURT:  Yes, ma'am.

3          MS. ESPOSITO:  I am Tracie Esposito, the child

4  victim's mother.  Prior to these hearings, I have never met

5  the defendants in this case, but their pictures are forever

6  burned in my memory.

7          I see their mugshots when I try to go to sleep at

8  night, and they haunt me.  I can only imagine what mental

9  images my daughter has of these people.  Memories that she

10  can't forget.  The impacts of the trauma and the fallout from

11  the discovery of sexual abuse and assault have been so

12  invasive and omnipresent in all of our lives.  It's like a

13  bomb went off in our world, and we are still dealing with the

14  shockwaves.

15          I can only imagine what my daughter had suffered

16  with, unable to come out and tell what had happened to her,

17  suffering alone with her secret, scared and confused.

18          Who could do this to an innocent and defenseless

19  child?  Evil, low-life monsters who prey upon the weak, with

20  no regard for the lives they destroy.  My daughter is a

21  loving, peaceful, and compassionate child.  She is

22  extraordinarily kind and caring.  She loves animals.  She

23  always had a vibrant energy, joyfulness, and a laugh that was

24  infectious.  She was a girl who loved softball, skating,

25  reading, playing with friends.  She especially loved going to

1    the beach.

2           At seven years old, she was assaulted by the

3    defendants and her father.  These depraved predators preyed

4    upon her innocence and robbed her of it.  They violated her

5    in the most foul and disgusting ways.  Three grown adults.

6    She was seven.  They have traumatized her and scarred her for

7    life.  Damage that is irreparable.

8           It is not just shameless, heartless, or

9    reprehensible.  What they have done is unthinkable, horrific,

10   utterly inhumane, and sickening.  It is absolutely

11   unforgivable.

12          At seven years old, she had to undergo testing for

13   STDs.  She had to be physically examined and relentlessly

14   questioned.  Everything that was familiar to her -- her home,

15   her family, her school, her friends, her community -- are all

16   gone from her world now.  She was ripped from her life and

17   from me.  She was displaced from her home and school twice in

18   the last year.

19          She can have no contact with any of her friends or

20   teachers from the past.  She expresses to me all the time her

21   sadness that she can never see her friends again.  She can

22   never return to the life she had, the friends she knew, or

23   the only home she had ever known.

24          She is frequently frightened and anxious, afraid

25   to be alone and insecure.  She is fearful and distrusting of

1  men.  She is fearful of couples.  In public, I see her

2  reactions, and I see how uncomfortable she is around men.

3  She won't sit next to or stand near strangers.  She is

4  intensely anxious in crowds and in public.  She cannot go out

5  into public places without feeling fearful, self-conscious,

6  and unsafe.  She clings to me, and it breaks my heart to see

7  her so fragile.  She's afraid to be alone and can't bear to

8  be alone in any room by herself.

9          In therapy, she is being treated for low

10  self-esteem and anxiety.  How can she or I ever trust anyone

11  again?  How can I teach her to love and trust in someone when

12  trust is irrevocably broken for us?  How can I teach her that

13  this world is a safe place?

14          It's been almost a year, and there is not a day

15  that goes by that I am not thinking of this every moment of

16  every day.  My daughter is frequently angry, irritable,

17  distressed.  She is withdrawn, contrary, argumentative, and

18  sad.

19          She has trouble fitting in at school and making

20  friends.  She feels different and alone.  She shows signs of

21  anxiety and depression.  Nighttime is the worst.  She fears

22  to go asleep alone.  She avoids bedtime.  She can't fall

23  asleep.  She can't stay asleep.  She awakens with nightmares

24  that she is too afraid to talk about.

25          She is socially withdrawn, has fallen behind in

1  school, and has an inability to focus on schoolwork and pay

2  attention.  She says she is always thinking about what

3  happened.  Grieving.  She is plagued by intrusive thoughts

4  and has difficulty with even basic tasks.  Life's everyday

5  stresses send her into a tailspin, a meltdown of distress and

6  sobbing.

7  The impacts of this sexual assault committed upon

8  my daughter have been devastating and profoundly damaging.

9  It has pervaded every aspect of our lives.  My family is

10  heartbroken, lives shattered.  We are all filled with shock,

11  disgust, and despair.  We continue to grieve and struggle to

12  find healing.

13  Even a year out, it feels like that healing has

14  barely begun.  We have both been in specialized counseling

15  for almost a year and will continue with therapy indefinitely.

16  It will always be a part of our lives.

17  As years progress and milestones and stages of

18  life change for her, she will have new needs for therapy to

19  try and sort out how to cope with the impacts of the abuse

20  and to lead a safe and healthy life.

21  For my family, dealing with Homeland Security,

22  Child Protective Services, juvenile court systems, federal

23  court, Children's Home Society, Children's Advocacy Center,

24  guardian ad litem investigators, attorneys, doctors,

25  counselors, psychologists, interrogations, interviews,

1   medical evals, psych evals, home visits, therapy, court

2   dates, it has been so stressful and frustrating and

3   absolutely exhausting.

4          This past year has left us all emotionally and

5   physically drained.  For my daughter, it's also confusing and

6   scary.  She doesn't understand.  She feels threatened and

7   afraid by every new person that enters the equation, and it

8   takes her a long time to build trust.

9          I myself have suffered with traumatic stress,

10  depression, insomnia, as well as debilitating anxiety and

11  panic attacks.  I am haunted by recurring nightmares of the

12  horrific trauma that my daughter has suffered.  I had to take

13  a leave of absence from work, and I continue to take

14  intermittent leave to deal with all of the aftermath,

15  appointments, court dates, therapy.

16         I myself have been in private therapy for almost a

17  year and, now, also group and individual therapy weekly,

18  along with S███.  I struggle to cope now as a single parent

19  to a troubled child.  I myself often feel alone, isolated,

20  unable to reach out to friends for support and protection of

21  our privacy.  I also had to break off contact with friends,

22  former co-workers, teachers, people in our community.  I had

23  to purge any and all belongings of my daughter's father and

24  move to a new home to start a new life for my daughter and

25  me.

1          It's been an exhausting process, and it's painful

2     knowing that that past that she left behind no longer has

3     meaning or value in our lives.

4          Like all of these last years of our family's life

5     together were just gone, wiped out, erased.  All the happy

6     memories, everything that we had, just gone.  I can't even

7     drive past that side of town without intense anxiety or

8     breaking down into tears.

9          For the rest of my life I will bear the guilt that

10    I was not there to stop this, that I didn't know or suspect

11    the depths of the despicable evil that he could be capable of

12    or that he would find others like the defendants as sick and

13    as depraved as himself, who were all too willing to take part

14    in violating a young, innocent girl for their own sick

15    pleasure and selfish gratification.

16         I'm deeply concerned, if these people were allowed

17    to be freed, that someone else's daughter would suffer the

18    same fate as mine, or maybe even worse.

19         I can see no hope for recidivism [sic] in anyone

20    who is willing to violate and sexually assault a

21    seven-year-old girl, in participation with her own father,

22    while he looks on and takes pictures.  There is no

23    conscience, no remaining humanity in these actions.  It is

24    unforgivable, and they are unredeemable and cannot and will

25    not be rehabilitated.  They should never be allowed to rejoin

1  society because they would present a sure and certain danger

2  to any children that they encounter.

3          I ask for justice for my daughter, for my family,

4  and for myself.  I don't want my daughter to live in fear

5  that she will ever have to see these people again, that she

6  can know she is safe from them and that they will never be

7  able to harm her or retaliate or harm any other children.

8          I ask that my daughter be protected from harm, as

9  well as other children who might fall victim to these sick

10 and ruthless predators.  I ask that you punish these

11 criminals to the fullest extent of the law.

12          THE COURT:  Thank you.

13          MS. ESPOSITO:  Thank you, Your Honor.

14          THE COURT:  Miss Thelwell.

15          MS. THELWELL:  Your Honor, I don't have any other

16 witnesses at this time that I would like to present.  I just

17 have 3553(a) argument.

18          THE COURT:  All right.  I think this is -- we did

19 have the witness appearing by video.  So let me just see, do

20 we have Mr. Harrison here?

21          THE COURTROOM DEPUTY:  He will be up shortly.

22          THE COURT:  We will be in recess for five minutes

23 or so while we see if our IT person can help us out.  We will

24 be in recess for five minutes.

25          (Recess taken from 10:25 a.m. to 10:33 a.m.)

1              COURT SECURITY OFFICER:  All rise.

2              This Honorable Court is now in session.

3              THE COURT:  I don't think I technically received

4    your exhibits earlier, Mr. Beck.

5              Any objection to the Defendant's exhibits?

6              MS. THELWELL:  No, Your Honor.

7              THE COURT:  Defendant's Exhibits 1 through 3 --

8              MR. BECK:  There should have been four.

9              THE COURT:  I have 1, 2, and 3.  They are marked

10   that way.

11             MR. BECK:  It's 1, 2, 3, 4.  The order; the

12   appellate decision; there is the testimony from the trial,

13   fairly thick; and there is a packet of e-mails that were

14   introduced as exhibits at trial.

15             THE COURT:  No, I have the order, I have the

16   appellate decision, and I have the testimony.  I don't have

17   Exhibit 4.

18             THE COURTROOM DEPUTY:  Here's a copy, Judge.

19             THE COURT:  I have it now.  Defendant's 1, 2, 3,

20   and 4 received into evidence.

21             There is no objection to that, Miss Thelwell?

22             MS. THELWELL:  No, Your Honor.

23             THE COURT:  They are received.

24             (*Defendant Exhibits 1 through 4 received in*

25   *evidence*.)

1          THE COURTROOM DEPUTY:  Your Honor, Mr. Harrison is

2     on his way.

3          THE COURT:  Thank you.  Your witness, does she

4     know that as soon as we have Mr. Harrison here she will be

5     put on?  Call her so the same thing doesn't happen.

6          Brian, we need you to do this for us, please.

7          MR. HARRISON:  To let you know, it's probably

8     going to take me 10 or 15 minutes.

9          THE COURT:  I didn't realize it would be an

10    additional 15 minutes.  So it's going to be an additional

11    fifteen minutes?

12         MR. HARRISON:  Right.  We need to test the

13    connection.

14         THE COURT:  Let's go ahead.  However long it's

15    going to take, it's going to take.

16         (Discussion off the record.)

17         THE COURT:  Okay.

18         MR. BECK:  Dr. Holmes, first things first.  You

19    are not driving right now, are you?

20         DR. HOLMES:  I am not driving.  I promise.

21         MR. BECK:  Very good.

22         MS. THELWELL:  Your Honor, may the witness be

23    sworn in?

24         THE COURT:  That would be fine.  So we are going

25    to need to swear you in.

1          THE COURTROOM DEPUTY:  Please raise your right

2    hand.

3          Do you solemnly swear or affirm under penalty of

4    perjury that the testimony you shall give in this cause will

5    be the truth, the whole truth, and nothing but the truth?

6          THE WITNESS:  I do.

7          THE COURTROOM DEPUTY:  Please state your name for

8    the record and spell you last name.

9          THE WITNESS:  Heather Holmes, H-o-l-m-e-s.

10         THE COURT:  You may proceed, Mr. Beck.

11                    HEATHER HOLMES,

12   having been first duly sworn by the Courtroom Deputy,

13   testified as follows via video conference:

14                   DIRECT EXAMINATION

15   BY MR. BECK:

16   Q.   Doctor, can you see and hear me?

17   A.   I can.

18   Q.   Very good.  If at any time we lose a connection, please

19   nod or let me know in some manner.

20         Would you please tell the Court a little bit about

21   your background and training as a forensic psychologist.

22   A.   Sure.  I received my undergraduate degree from Marshall

23   University with a major in English Writing and Psychology.  I

24   then obtained a master's degree from Loyola College of

25   Maryland in psychology, and a doctoral degree from George

1    Washington University in psychology.

2              As part and parcel to receiving your doctoral

3    degree, you need to do a one-year full-time internship, which

4    I did as a psychologist, with the Florida Department of

5    Corrections, with our state prison system here in Florida.

6              Afterwards you are required, for licensure in the

7    state of Florida, to do a one-year full-time post-doctoral

8    residency.  I completed that with Dr. Leonard Haber and Dr.

9    Gustavo Fonte, and that was in the private practice doing

10   evaluations for preadjudicated individuals.  There were a few

11   civil cases, but it was mostly for criminal context.

12             Since that time, I have been working in private

13   practice, sometimes with a private therapy caseload; but

14   basically since 2005, conducting evaluations for forensic

15   purposes.  Again, mostly for criminal court.

16   Q.    And real quickly, when did you earn your doctorate

17   degree from George Washington?

18   A.    Let me think.  I believe it was the end -- the middle

19   of 2002.  May 2002.

20   Q.    Have you testified as an expert in state and federal

21   courts?

22   A.    Yes.  Several times.

23   Q.    Have you ever been rejected as an expert forensic

24   psychologist in an attempt to testify?

25   A.    No.

```
 1              MR. BECK:  Your Honor, at this time, based upon

 2    the testimony of Dr. Holmes, I would submit her as an expert

 3    in the field of forensic psychology.

 4              MS. THELWELL:  No objection.

 5              THE COURT:  All right.  That's fine.  She's so

 6    designated, and she may proceed.

 7    BY MR. BECK:

 8    Q.    Dr. Holmes, were you retained to conduct a forensic

 9    evaluation on Richmond McDonald?

10    A.    Yes, I was.

11    Q.    What was your understanding of the circumstances

12    related to your retention?

13              (Video conference connection lost.)

14              THE COURT:  I'm sorry.  The IT person left.  I'm

15    trying to get him back up here to see if he can --

16              MR. BECK:  It says it's reconnecting.  I don't

17    know if it will come back.

18              Hi, Doctor.  We lost you for a second.

19              THE WITNESS:  That's okay.

20    BY MR. BECK:

21    Q.    What was your understanding of your having been

22    retained to do a forensic psychological exam on Mr. McDonald?

23    A.    Well, it was to determine whether or not there was

24    anything pertinent for the Court to be aware of prior to

25    sentencing either regarding treatment recommendations, any
```

1   sort of diagnostic information, or anything, again, that

2   would be of importance for the Court to take into

3   consideration during sentencing.

4   Q.    Did you, in fact, conduct a forensic evaluation in

5   regards to Mr. McDonald?

6   A.    Yes.

7   Q.    And, briefly, what type of evaluation did you conduct?

8   A.    Well, I did what's standard in the practice, which is a

9   clinical interview and mental status exam.  That's,

10  basically, to get as much background information and history

11  as you can regarding an individual, from them, as well as to

12  review any pertinent documentation that was provided

13  regarding any mental health history or substance abuse

14  history and any previous treatment.  Then it included

15  collateral information, such as interviews from anybody that

16  would have any more information regarding the defendant.

17          So in this case, it was an -- I'm sorry, it was an

18  interview of his mother and his maternal grandfather; and,

19  again, there is also testing conducted.

20  Q.    How frequently or how often did you, in fact, meet with

21  Mr. McDonald?

22  A.    Let me see.  I want to say three or four times.  Let me

23  pull up the report.

24  Q.    Do you recall where those meetings occurred?

25  A.    Yes.  They were all at Citrus County Detention Center.

1  Q.   And did you also then meet with Mr. McDonald's mother

2  and maternal grandfather in an attempt to develop background

3  information, historical, psychological information regarding

4  Mr. McDonald?

5  A.   Yes.

6  Q.   And you did conduct certain tests as part of your

7  evaluation?

8  A.   Yes, I did.

9  Q.   Okay.  Would you describe for the Court the testing and

10 procedures that you used in your efforts to evaluate

11 Mr. McDonald.

12 A.   Certainly.  First of all, there were psychological and

13 psychiatric reports that were provided by your office via his

14 mother of various evaluations that were conducted throughout

15 his childhood.  So those were reviewed, and I also gave him

16 the Millon Clinical Multiaxial Inventory, which is the MCMI.

17 It's comparable, a little bit, to the MMPI, but it gives you

18 personality stuff as well.  His validity scales were in the

19 acceptable range, so there was no malingering testing needed

20 to be done at that point.

21 Q.   Now, what types of things were you necessarily

22 evaluating for?

23 A.   Well, early on, in meeting with him the first few

24 times, it was very noteworthy that he was depressed.

25 Obviously that can be attributed to the situation, given what

1    he's facing.  However, in speaking to his mother, there was

2    some family history that came up, as well as some

3    descriptions of behavior she had seen since he was quite

4    young that indicated there might be some elevated mood, which

5    is the opposite of depression.

6              Even though every time I saw him there was

7    noteworthy depression, there is also a history in the family

8    where there seems to be bipolar disorder, and then her

9    descriptions of him both growing up and recently as having

10   elevated moods.

11             So, really, I was giving him testing to see if

12   things that he was reporting and things that his mother were

13   describing were showing up on testing in terms of both ends

14   of the mood spectrum, both depression and mania.

15   Q.    Did they, in fact, appear?

16   A.    Yes.

17   Q.    Now, what type of things did you learn from

18   Mr. McDonald's mother and maternal grandfather that you

19   thought was pertinent to your evaluation and diagnosis?

20   A.    Well, his maternal grandmother attempted suicide after

21   her children were born; but she was still quite young, and

22   she was hospitalized for several months, after which, when

23   this came back, there was always a description of an elevated

24   mood.  There was very little sleep.  She went on to become a

25   Registered Nurse.  She worked nights, but didn't sleep during

1    the day.   There was volatility.

2             THE COURT:   I need to tell her to slow down.

3             MR. BECK:   I'm sorry.

4             THE COURT:   Let me give her an instruction.   There

5    is a court reporter taking down what you are saying because

6    we are in a courtroom.   If you speak quickly, it's very hard

7    to accurately take down what you are saying, so you need to

8    slow down.

9             THE WITNESS:   I'm sorry.   I will slow down.

10            THE COURT:   Thank you.

11   BY MR. BECK:

12   Q.   I'm sorry.   If you would, repeat what you were able to

13   identify as a result of both your testing and your

14   communication conversations with his family members.

15   A.   Certainly.   His maternal grandmother attempted suicide

16   when she was young, but she already had children.   So she was

17   hospitalized.   I mean, I don't know at the time if that was

18   around in terms of the terminology, but the equivalent of a

19   Baker Act, and she was in the hospital for several months.

20            Afterwards and throughout her lifespan, both her

21   ex-husband and her daughter described her as having an

22   elevated mood.   Sometimes irritable, sometimes euphoric, very

23   little sleep.   She was a Registered Nurse who worked nights,

24   but then would not sleep much during the day, if at all.

25            She was always filling her son and daughter's day

1  with several activities, to which the children were

2  exhausted, and she would keep going.  Then there were some

3  verbal outbursts from her, as well; and all of these things

4  are kind of indicative of mania.

5  Q.    How is that important or relevant to your evaluation of

6  Richmond McDonald?

7  A.    Well, it's one of the most inheritable mental illnesses

8  that we have.  So usually in first-degree relatives, there is

9  a much higher incidence of bipolar disorder.  If you have a

10  parent or grandparent, aunt, uncle, somebody with a disorder,

11  there is a much higher proclivity for you to develop it

12  yourself.

13         So knowing what we know about the heavy genetic

14  component of this disorder, as well as some of the

15  descriptions that I had received, particularly with sleep

16  patterns and mood from both Mr. McDonald and his mom, as well

17  as the psychiatric reports throughout his childhood noting

18  that he had an elevated mood, believed it was attention

19  deficit or hyperactivity disorder, but the descriptions in

20  looking back seem more part and parcel to abutting mania.

21  Q.    Is there a historical basis that might describe why his

22  psychologists/psychiatrists, as a child, did not diagnose him

23  with bipolar disorder?

24  A.    Well, the typical onset of bipolar disorder is late

25  adolescence to early adulthood, and that's kind of been what

1    the psychological and psychiatric community is used to.

2    However, about twenty years ago, maybe 25 -- I have to think

3    back -- there was a phenomenal amount of research conducted

4    to look at childhood bipolar disorder, to look at these

5    children we have that have an elevated mood in irritability

6    as well as in euphoria who later go on to develop and be

7    diagnosed as bipolar.

8            So we now are aware that you can develop this in

9    childhood.  In fact, I believe the United States has a five

10   times greater incidence than certain European counterparts,

11   particularly in Scandinavia in terms of childhood bipolar

12   disorder.

13           At the time he would have been evaluated, his

14   elevated mood would have been attributable at the time based

15   on the research and knowledge, rightfully so, to ADHD, when

16   the reality is he was also experiencing depression.  So he

17   was diagnosed back then with ADHD and depression.  When we

18   look back historically, knowing what we know now about the

19   research and about this disorder, it's much more likely he

20   suffered from bipolar disorder.

21   Q.   And in your professional opinion, does his childhood --

22   the diagnosis that you have described as likely having been

23   suffering from bipolar disorder as a child affect your

24   opinion as to his conduct in this particular case?

25   A.   Certainly there would be a contribution.  Written in

1  the DSM-5 is -- as well as the preceding DSMs, one of the

2  hallmark symptoms of mania is the seeking out of

3  extraordinarily pleasurable activities, but usually those are

4  activities that are full of risk, usually activities that are

5  with poor judgment.

6         It is fairly common when someone is manic to see

7  hypersexualization.  And albeit not all the time in a deviant

8  fashion, there usually is a component to it when someone is

9  in a manic phase to having a much higher --

10        (Videoconference connection lost.)

11 Q.   Doctor, we are breaking up a little bit.  I'm going to

12 ask you to repeat what you just testified to.

13 A.   Sure.  In the DSM-5 as well as in the preceding edition

14 of the Diagnostic and Statistical Manual, one of the hallmark

15 symptoms of --

16        (Videoconference connection lost.)

17 A.   -- mania is the seeking out of very pleasurable

18 activities.  Second, even sexual activities are even listed

19 in the DSM, as well as drugs or very pleasurable activities

20 that are also risk-taking in nature.  So certainly the

21 elevated sex drive and the multitude of interests that

22 Mr. McDonald has would have some basis in his mental illness.

23 Q.   Does your diagnosis absolve him of his conduct in this

24 matter?

25 A.   Absolutely not.

1   Q.    Would you expound on that, please.

2   A.    I mean, certainly this is an intelligent man.  There is

3   a contributing factor regarding his mental illness to his

4   conduct, but not exculpatory and certainly not in an excusing

5   fashion, but more in an explanation for how overtly sexual

6   his life had become.

7            Obviously, somebody who's got bipolar disorder

8   doesn't necessarily have an attraction to children or to

9   anybody of inappropriate age.  I don't want to mislead the

10  Court and say this is an explanation for behavior, but it

11  certainly does have a contribution to his desire for seeking

12  out a tremendous amount of risk-taking and overly sexualized

13  behavior.

14           Diagnostically, I gave him impulse control

15  disorder of a sexual addiction because it's not just the

16  victim in this case.  There was a very heavy sex drive

17  between his adult -- him and his wife and then his

18  girlfriend.  So there is a high level of sexual gratification

19  that was sought out by him, and I think there was a

20  contribution in the mania portion of his disorder.

21  Q.    Now, do you have an opinion as to the present state of

22  Mr. McDonald's psyche, psychological health in regards to

23  whether he, in your opinion, would be safe to be released at

24  this time, absent certain conditions?

25  A.    No, I would never argue for him to be released at this

1  time.  What I would say is that there are things that could

2  be put into place that would be extraordinarily helpful to

3  getting him on the right track.  And I believe in the report

4  I listed, first and foremost, the number one treatment for

5  bipolar disorder, because it's a chemical imbalance in the

6  brain, just as diabetes is a chemical imbalance in the

7  pancreas, it takes medication.

8        So with the right medication, which he's never

9  been on, I think that would target some of the impulsivity,

10  some of the thrill seeking, and it would certainly balance

11  things out with both depression and mania.  So certainly

12  number one would be that.  Number two would be the Sex

13  Offender Treatment Program, which I also wrote about in the

14  report.

15  Q.   In your opinion, is he an individual who is capable of

16  rehabilitation -- excuse me.

17        (Videoconference connection lost.)

18        MR. BECK:  We may be calling you back.

19        THE COURT:  Part of the problem is she's not on

20  wifi.  That's what Brian told us.  If she was on wifi, we

21  wouldn't have these issues.  I asked him to stay in the

22  courtroom and the courtroom deputy has reached out to him.

23        (Brief pause.)

24        THE COURT:  Okay.  Brian is in the courtroom.

25  Brian, can you help us with that?

1          MR. HARRISON:  If she is on a carrier, it will not

2   do so well, but you will get that pause.  She really needs to

3   be on a wifi source of some sort.

4          MR. BECK:  Is there any potential that you can go

5   to a wifi component as opposed to your carrier, Dr. Holmes?

6          THE WITNESS:  It's actually on wifi because I'm

7   outside the house.

8          MR. BECK:  That is a concern.

9          THE COURT:  She says she is on wifi.

10          MR. BECK:  Can you describe your signal?  The

11   courtroom IT is curious.  Do you have a strong wifi signal?

12          THE WITNESS:  Yes.

13          MR. BECK:  I don't think this is going to go a

14   great deal longer, Your Honor.  I will just move forward.

15          THE COURT:  Thank you.

16   BY MR. BECK:

17   Q.   Dr. Holmes, as a part of your interviews of

18   Mr. McDonald, did you learn of incidents where he had been

19   victimized as a child, molested sexually?

20   A.   Yes, there were a few incidents.  One when he was four

21   years old and in preschool where another child pulled him

22   into the closet and fondled him.  There is an incident where

23   he was quite uncomfortable with an older girl that was the

24   daughter of a woman baby-sitting him that engaged in sex play

25   with him.  Then when he was 16, he was forcibly sodomized by

1   another member of his high school wrestling team.

2   Q.    Now, based upon your training and experience, does that

3   victimization necessarily result in him becoming more

4   susceptible to abhorrent behavior, criminal conduct?

5   A.    I mean, in a general sense, anytime somebody has been

6   victimized or abused as a child it can be -- they are more at

7   risk for substance abuse, more at risk for criminal behavior.

8   But as far as sexual abuse leading to sexually abhorrent

9   behavior in and of itself, no.

10  Q.    And as he described these incidents to you, did he

11  appear to be -- what was his mechanism for delivering this

12  information?  Was he forthright?  Was he reserved?  How did

13  he describe these events?

14  A.    He was a little reserved, which is why I saw him

15  multiple times.  It was very difficult sometimes to get

16  personal information out of him.  He had a little bit of a

17  difficult time speaking about his own victimization, as well

18  as saying anything negative about his maternal grandmother.

19  That was very difficult for him, and it took some time for

20  him to feel comfortable enough to speak openly about those.

21  Q.    In your opinion, was he attempting to develop excuses

22  for his conduct through the recent reporting of this abuse?

23  A.    No.

24  Q.    Finally, I just want to finish by asking you what your

25  final diagnosis evaluation was and what kind of

1    recommendations you would make to the Court as to how this

2    Court might both protect the community and also provide an

3    opportunity for Mr. McDonald to move forward and possibly

4    rejoin society.

5    A.    Well, first and foremost, the number one diagnosis is

6    bipolar disorder.  Like I said, as a child he was diagnosed

7    with ADHD because of this elevated activity and difficulty

8    with sleep, as well as depression, and he was given two

9    different medications for that.

10          What we know now, I do believe he had childhood

11   bipolar disorder and was never correctly treated for it; but,

12   again, it's because of newness in research and certainly not

13   to any problem or difficulty with the practitioners his

14   mother sought out.  So bipolar disorder would be number one.

15          He also has impulse control disorder of a sexual

16   nature.  We don't have a coded diagnosis for sexual addiction

17   in the DSM, so it gets coded as impulse disorder, sexual.

18   There is an overuse of opiates, painkillers that he was using

19   prior to the incident.  So certainly that's in remission

20   because he's in a correctional setting, as well as some

21   alcohol abuse.

22          So I think given all of that, the best thing --

23   I'm sorry, I neglected to put pedophilia.

24          The best thing for Mr. McDonald in terms of

25   treatment would be psychotropic medication after he meets

1  with a psychiatrist, as well as participation in what the

2  Bureau of Prisons has, their Sex Offender Treatment Program,

3  which is a program that is certainly very comprehensive, as

4  well as any substance abuse treatment that the bureau offers.

5  So I think all of those need to be in place.  And given his

6  intellectual capacities and pairing that with the appropriate

7  medication, he certainly has the insight and ability to do

8  well in that Sex Offender Treatment Program.

9           I had listed at least two facilities that I know

10  that have those programs within the bureau.  So certainly

11  that if and when he's released, there would need to be

12  continuation of medications, in my opinion, with the Court's

13  oversight, as well as continuation of outpatient sex offender

14  treatment once and if he's released.

15  Q.    In that setting, do you believe that he could

16  successfully avoid recidivism?

17  A.    Certainly.  I mean, the minute the medication issue is

18  straightened out, it would absolutely help his sex drive and

19  it would slow things down to where he would be able to

20  meaningfully weigh consequences of actions.

21           It would improve his sleep, so he's not getting

22  two, three hours, maybe four hours of sleep at night.  It

23  would balance him out to where he would be able to obtain or

24  achieve a better sleep pattern, which, of course, lends to

25  better decision-making.

1          MR. BECK:  Thank you, Your Honor.  I tender the

2    witness.

3          THE COURT:  Thank you very much.  Let's see if

4    there is any cross-examination.

5          MS. THELWELL:  Yes, Your Honor.

6          THE COURT:  You may proceed, Miss Thelwell.

7                    CROSS-EXAMINATION

8    BY MS. THELWELL:

9    Q.    Good morning, Doctor.

10   A.    Good morning.

11   Q.    Can you hear me just fine?

12   A.    I can.  Can you hear me okay?

13   Q.    Yes.

14   A.    Okay.  Perfect.

15   Q.    You had explained that you were retained by defense

16   counsel to meet with Mr. McDonald; is that correct?

17   A.    Yes, ma'am.

18   Q.    And were you retained with a fee?

19   A.    I gave him my hourly rate, which is $200 an hour, and

20   submitted a bill.

21   Q.    And what was your total of your bill?

22   A.    I apologize.  I have somebody else who does billing,

23   but I want to say it was in the neighborhood of 4,000.

24   Q.    And that does not include today's testimony; is that

25   correct?

1   A.    No.

2   Q.    There will be a separate bill issued for your time

3   spent this morning?

4   A.    Yes.  Although, since I messed up my court days, I feel

5   terrible submitting it.

6   Q.    But you are likely going to collect for the time you

7   spent with us this morning?

8   A.    Yes.

9   Q.    When you met with Mr. McDonald, you explained to him

10  that you were meeting with him for the purposes of

11  sentencing; is that correct?

12  A.    Yes.  I explained to him and I think -- I hope I

13  delineated in front of the report, I always explain to them

14  how the information is going to be utilized.  There is a

15  chance that their attorney will not find anything useful and

16  not turn it over, but there is a chance that it would be, and

17  it would be submitted both to your office and to the Court.

18  So, yes, he was aware.

19  Q.    And he understood that; is that correct?

20  A.    Yes, absolutely.

21  Q.    In preparing for your ultimate diagnosis of the

22  defendant, did you review any of the police reports in this

23  case?

24  A.    I believe I did, but you would have to give me a second.

25  Q.    Why don't you tell us what facts or what documents you

1  reviewed regarding the facts of this case.

2  A.    I believe that there was a police report that was

3  reviewed, but there was not a ton of information.  In other

4  words, I didn't review a PSI, if one had been conducted.  The

5  majority of information that I reviewed had to do with

6  previous psychiatric and psychological reports that had been

7  submitted by his mother.

8  Q.    So is it safe to say, then, that you did not review the

9  plea agreement that lays out the facts of the case; is that

10 correct?

11 A.    No, I did not.

12 Q.    You indicated earlier that you had reviewed some

13 psychological reports that were provided by the defendant's

14 mother.

15 A.    Correct.

16 Q.    How many psychological evaluations did you review?

17 A.    There were three.

18 Q.    And do you have -- can you tell us which ones those

19 were?

20 A.    Give me one second.  I have them listed.  They are very

21 old.  They were done and date back to when he was a young

22 child.  Two were done by the same practitioner.  I'm sorry,

23 I'm having a hard time pulling them up.

24       Two were done by the same practitioner and one was

25 done by a different practitioner.  One was conducted in

1   Georgia when he was in high school and the other two were

2   earlier, when he was down here in Florida, prior to their

3   family's relocation.

4   Q.    And in those reports, at any point in time, were there

5   any statements made by the defendant indicating that he had

6   been previously sexually abused?

7   A.    No.

8   Q.    And in those reports, they diagnosed the defendant with

9   ADHD; is that correct?

10  A.    Yes.  And depression.

11  Q.    The depression diagnosis came in his teenage years; is

12  that correct?

13  A.    Yes, it came later.

14  Q.    And he was provided medication, is that correct, for

15  both the ADHD and for the depression?

16  A.    Yes, he was.

17  Q.    Are you aware of the defendant's prior criminal

18  history?

19  A.    Yes, I am.

20  Q.    What do you know about his prior criminal history?

21  A.    There was a case in Georgia where there was also a

22  young victim.  He was -- I forget what the sentence was, but

23  he was adjudicated guilty, sentenced to prison, and after

24  some time there was an appeal in which he was then released.

25  Q.    Did you --

1   A.    I'm sorry.  My understanding is the appeal had to do

2   with more procedural issues as opposed to guilt or innocence.

3   Q.    Correct.

4         Did you review any of the underlying presentence

5   reports for that particular case?

6   A.    No, I did not.

7   Q.    Are you aware that there was a psychosexual risk

8   evaluation that was conducted in that case?

9   A.    No, I wasn't.

10  Q.    So you have not had an opportunity to review that

11  report?

12  A.    No.

13  Q.    Are you aware of any other sexual deviant activities of

14  the defendant on any other victim apart from the Georgia

15  12-year-old child victim?

16  A.    No.  If I was, I would be under mandatory reporting.

17  Q.    Well, I guess my question is:  Are you aware of any

18  other instances in the past, specifically -- let me rephrase.

19        Are you aware of any victim with the initials

20  L.A.S. from the Georgia area accusing Richmond McDonald of

21  sexual and physical abuse?

22  A.    If that is the victim for the crime in which he was

23  sentenced to prison, then I'm aware of it.  If it's a

24  different victim, then I'm not.

25  Q.    It's a different victim.

1   A.     Then I'm not.

2   Q.     The victim in the case that was ultimately appealed and

3   overturned, is that the only sexual abuse victim that you are

4   aware of?

5   A.     Yes.

6   Q.    If you were told that there were other individuals who

7   have been sexually and physically abused by the defendant,

8   would that in any way alter some of your findings today?

9   A.     No.  I mean, I've diagnosed him with pedophilia.  I'm

10  certainly not recommending -- I believe defense counsel asked

11  if I think he would be able to be released today, which my

12  answer was no.  So, no, I recognize there is going to be a

13  period of incarceration, probably somewhat lengthy.

14  Honestly, it falls within the purview of the diagnosis that I

15  gave him.

16  Q.     I think you mentioned earlier that bipolar disorder and

17  pedophilia are not necessarily -- or bipolar doesn't

18  necessarily cause pedophilia.  I believe that's how you --

19  A.     Absolutely not.  Absolutely not.  It does not.

20  Q.     So even if the defendant is provided the treatment

21  recommended to deal with the chemical imbalance caused by

22  bipolar disorder, he will still suffer from pedophilia; is

23  that correct?

24  A.     Yes, which is why I recommended the STOP program that

25  the bureau provides.

1   Q.    And you indicated in your evaluation -- yes, I have

2   your evaluation in front of me.  On the last page you

3   indicated -- I'm looking at the last page, the second

4   paragraph.  It begins with "although."

5         You indicated that to your knowledge there is no

6   medication that will be able to change or alter what

7   Mr. McDonald finds attractive; is that correct?

8   A.    That is correct.

9   Q.    In your evaluation, Mr. McDonald indicated to you that

10  he was sexually interested in minor children; is that correct?

11  A.    There was admission.  We didn't describe -- discuss the

12  instant offense in any detail.  He had phenomenal concern

13  about his wife.  There was discussion about the previous

14  incident in Georgia and certainly he has a wealth of

15  interest.  So, yes, he did admit somewhat to this; but given

16  his history, it would automatically give him the diagnosis,

17  whether he admitted to it or not, because he's taking a plea

18  in this case and was adjudicated guilty in a previous case.

19  Q.    And touching back, just because you mentioned it,

20  regarding the Georgia case, you said that you had spoken to

21  the defendant about that; is that correct?

22  A.    Yes.

23  Q.    At any point in your conversations with him, did he try

24  to deny culpability or deny guilt in that specific instance?

25  A.    In the conversation, he attempted to mediate it and put

1   it in the context.  So flat-out denying, no.  But, yes, he

2   did try to say it wasn't as it had seemed.  So, yes.

3   Q.    Could you expand on that a little further?  What do you

4   mean?

5   A.    He describes there was an exchange of -- and I

6   apologize.  I can't remember if it was candy or gum, and it

7   was mistaken.  But, yes, she was attractive, but it was

8   honestly not unusual from what you see with individuals that

9   engage in this behavior.  There is a minimization, a little

10  bit of responsibility.

11  Q.    Okay.  Then, also in that same paragraph, the second

12  paragraph on page -- the last page of your evaluation, you

13  indicated that the defendant's -- or at least the way you've

14  written it is Mr. McDonald's actions leave no question that

15  at least a portion of his fantasies and desires involve minor

16  children; is that correct?

17  A.    Yes, that's correct.  I see it.

18  Q.    I did have another question for you.

19            On Page 3 of your report you discuss in the second

20  paragraph physical abuse that Mr. McDonald had reported to

21  you by his grandmother.

22  A.    Yes.

23  Q.    In your reviewing the documents and the psychological

24  evaluations from his prior reports, was any of that

25  information also contained in those old psychological

1  reports?

2  A.    No.  In fact, actually, I had a hard time getting this

3  out of him, so I wasn't surprised he didn't report it before.

4  Q.    As to the paragraph after that when he discusses -- or

5  you discuss that he disclosed prior sexual abuse --

6  A.    Yes.

7  Q.    -- earlier, during our cross-examination, you testified

8  that that information was not in the prior psychological

9  reports, correct?

10  A.    I didn't see it in there, no.

11  Q.    And you had an opportunity to speak with Mr. McDonald's

12  mother; is that correct?

13  A.    Yes.

14  Q.    Did she disclose to you that he had suffered from

15  sexual abuse?

16  A.    No, but I didn't ask her.  He had said that he never

17  told her; and given that they have a relationship, I did not

18  ask her that.

19  Q.    So Mr. McDonald told you that he had never told his

20  mother this?

21  A.    He had told nobody.

22  Q.    Just so I make sure I understand, are you saying that

23  Mr. McDonald told you that his first disclosure was to you?

24  A.    I didn't ask.  I don't know if he had told anybody

25  else.  I think he had said he had told a previous

1    relationship.  Not his wife, but somebody he was involved

2    with for about eleven years.

3    Q.    So there is nothing to corroborate his statements other

4    than -- there is nothing to corroborate what he said to you?

5    A.    Only thing that lends him credibility in this is the

6    fact that when he did do testing, there was no attempt on his

7    part to exaggerate or minimize any difficulties or mental

8    illness or anything.

9             So there is a generalization in terms of, I guess

10   you could say, some forthright reporting on his part.  But,

11   no, there is no documentation or records of anything prior

12   that I could review that would lend credibility to what he

13   said about that.

14   Q.    And there is nothing that says there was an attempt on

15   his part to minimize or malinger.  It's just his answers were

16   within a normal, acceptable range; is that correct?

17   A.    Well, that's what the test is designed to pick up.

18   Within the acceptable range.  What places you regarding the

19   validity scales in the acceptable range is the fact that you

20   are not either denying normal things that everyday folk go

21   through, like being angry at certain situations, nor is he

22   attempting to exaggerate or lend a spotlight on any mental

23   illness or problems or deficiencies.  So it examines

24   particularly that test-taking behavior.

25   Q.    One moment, please.

```
 1  A.     Sure.
 2             MS. THELWELL:  Thank you so much for your time.  I
 3  don't have any further questions.
 4             THE WITNESS:  Sure.  My pleasure.
 5             THE COURT:  Mr. Beck, anything else?
 6             MR. BECK:  Briefly, Your Honor.
 7                      REDIRECT EXAMINATION
 8  BY MR. BECK:
 9  Q.     Dr. Holmes, when we discussed presenting your testimony
10  and the authorship of your report, we were aware that this
11  was not going to be a pretty picture; is that correct?
12  A.     Yes.  I think I was pretty forthright with you.
13  Q.     And it was your desire, as well as mine, to present to
14  the Court your findings, your evaluation, your analysis as
15  candidly and forthright as you possibly could; is that
16  correct?
17  A.     Yes.  Yes.
18  Q.     And in doing so, a description of the pedophilia, the
19  description of the potential minimization of certain events,
20  you knew to be, from a legal perspective or a culpability
21  perspective, potentially damaging to Mr. McDonald.
22  A.     Yes.
23  Q.     And, yet, is it not a fact that in this instance,
24  despite what you have learned, what you found, what you have
25  discovered through your conversations with Mr. McDonald, your
```

1   testing of Mr. McDonald, your conversations with his family

2   members, that he is an individual who could be, given the

3   proper circumstances -- that being proper medication, as well

4   as proper therapy and counseling -- could become and could

5   reasonably become an individual who would not recidivate?

6   A.    Yes.  If everything is put into place, he certainly has

7   that potential.

8   Q.    And those circumstances are available in the Bureau of

9   Prisons, based upon your experience and the efforts you've

10  made to learn of what is available to potential inmates?

11  A.    Yes.  The bureau has really good treatment programs for

12  this kind of offender.  Absolutely.

13  Q.    And would the passing of time also potentially affect

14  his likelihood of recidivism?

15  A.    In general, the passing of time, no.  However, because

16  there is a portion of this that is impulsive and related to

17  bad decision-making regarding his chemical imbalance, the

18  longer that he is stable on medication, then the passage of

19  time would contribute to a better likelihood of him being

20  able to control the behavior.

21  Q.    And, in fact, in so doing, could he live freely within

22  society without being a threat to the community?

23  A.    Correct.  Although, I did request that the Court on the

24  back end make sure that the medication is still -- whatever a

25  psychiatrist at that time decides is appropriate, that the

1    Court oversee his continuation of psychiatric treatment.

2    Q.    That would be a condition of supervised release or

3    probation that would continue to monitor his conduct, monitor

4    his medications, and protect the community.

5    A.    Yes.

6              MR. BECK:  Thank you.  Nothing further, Your Honor.

7              THE COURT:  All right.  Thank you, Mr. Beck.

8              Anything else, Miss Thelwell?

9              MS. THELWELL:  No, Your Honor.

10             THE COURT:  Okay.  Thank you.  We are finished.

11   Thank you for appearing by video.

12             THE WITNESS:  Thank you.

13             THE COURT:  All right.  Thank you, Mr. Harrison,

14   for your help.  We appreciate it.

15             All right.  Let's see, we had taken that out of

16   order so that we could do that witness at that time.

17             MR. BECK:  Thank you.

18             THE COURT:  So, Miss Thelwell, I'm going to come

19   back to you, then, and I think where we had left off was what

20   your position was on your recommendation for the sentence

21   that the Court needs to impose.  So I think that's where -- I

22   think that's where we were.  I think you said that you were

23   going to read to me or let me know your 3553 factors.

24             MS. THELWELL:  Your Honor, before I continue, I do

25   have a question.  I don't know if Mr. Beck's plans have

1    changed.  He indicated that he would like to present

2    Mr. McDonald's mother as a part of his argument.

3           THE COURT:  But doesn't that -- normally I turn to

4    the government first and then let them do that then.  I'm

5    asking you.  You need to tell me now your position so that he

6    can address it.  So go ahead.

7           MS. THELWELL:  Yes, Your Honor.  I'll make my

8    arguments.  And that's only as to Mr. McDonald; is that

9    correct?

10          THE COURT:  Right, because we already finished

11   with Miss Boselli.  I'm going to give her the opportunity to

12   make that argument again, but it's as to Mr. McDonald.

13          MS. THELWELL:  Yes, Your Honor.

14          THE COURT:  I will see if she has anything to add.

15   And you had asked for a life sentence for Miss Boselli, if I

16   remember correctly.

17          MS. THELWELL:  That's correct, Your Honor.

18          Your Honor, as it relates to Mr. McDonald, the

19   United States is also seeking a life sentence.

20          Those are within his guidelines.  In this

21   particular case, the defendant, although he was originally

22   charged in a four-count indictment with enticement of a

23   minor, which he has pled guilty to, he was also charged with

24   production of child pornography, receipt of child

25   pornography, and possession of child pornography.  All of

1   those underlying facts of those charges should also be taken

2   into consideration when considering the ultimate sentence in

3   this case.

4         THE COURT:  Let me ask you a question.

5         I went back to Mr. Esposito's case.  I know that

6   we had talked about this during Miss Boselli's sentence, but

7   I pulled up those figures again.  Mr. Esposito was sentenced

8   to 960 months in prison, or 75 years.  His two charges were

9   on production of child pornography and child pornography, so

10  he received consecutive sentences of 360 months on

11  Counts Three and Four and 180 months on Count Six.

12  Apparently the other counts were also dismissed, just as you

13  had done.

14        I know this case has been charged differently.  I

15  understand that, but this is what the violation is.  In terms

16  of being fair, while I'm not bound by what another judge

17  did -- we are independent judges and we each exercise our

18  independent discretion.  When I have somebody who's been

19  sentenced by another judge, I always like to see what that

20  judge did just in an effort to be consistent, to try to

21  sentence similarly situated defendants similarly.

22        Again, I'm not bound to it.  I understand that.

23  So Judge Antone -- and I was just reviewing that again.

24  There were a couple of interesting points that came out.  One

25  thing I don't quite understand -- and maybe I can ask the

1    probation officer.  That was also a Level 43, Criminal

2    History Category I, and somehow that was different on the

3    charts here.  It shows a life sentence, Mr. Tremmel; but in

4    that defendant's case, it said 960 months.

5            Do you know why that would have been?

6            THE PROBATION OFFICER:  Your Honor, this is kind

7    of off the top of my head, but because of the statutory

8    maximums of the other case, Mr. Esposito, the guidelines

9    allow for an enabling of a stacking of the statutory

10   maximums.  But I don't believe any of those offenses had

11   statutory maximum of life.  In this case there is.

12           THE COURT:  I see.  Well, I mean, the guidelines

13   say life.  It doesn't say that's the maximum.  That's what I

14   had a little bit of trouble understanding.  It doesn't say

15   maximum life.  It says life.  So following the guidelines for

16   both of these defendants, it's a life sentence.  Anything

17   other than that, it is a departure or variance from the

18   guidelines, right?

19           THE PROBATION OFFICER:  That's correct, Your Honor.

20           THE COURT:  That wasn't the case with

21   Mr. Esposito.  It's almost an academic exercise, because

22   unless you are under the age of 20, when you are talking

23   about 75 years in prison, it's basically a life sentence.

24   But I didn't quite understand, even with your explanation,

25   why on one it's life and on the other one it was 960 months.

1        THE PROBATION OFFICER:  It's my understanding,

2  Your Honor, because of the statutory maximum in this case, it

3  allows for life.  In other words, the guidelines recommend

4  life, so it can be life.  In Mr. Esposito's case, if he

5  scored life, there is no provision statutorily for him to be

6  sentenced to life, so to --

7        THE COURT:  Okay.  That's fine.

8        All right.  Miss Thelwell, so I also looked to

9  see -- and I reviewed the transcript of the sentencing.

10  Mr. Esposito was sexually abusing his daughter, according to

11  what came out during the sentencing, 18 to 24 months before

12  this interaction with these two defendants and was, I think,

13  regularly sexually abusing her maybe one to two times a

14  month, I think is what they said in the sentencing hearing.

15        I just ask you that in terms of coming up with a

16  sentence how should that be factored in, because most

17  certainly what these defendants did is horrible.  There is no

18  other way of putting it.  It's sickening.  It truly is.  It's

19  truly sickening.  But what Mr. Esposito did, there are just

20  no words for that.  Just no words.

21        Anyway, I would like to hear what you have to say

22  about that.  Again, Mr. Esposito got 75 years.

23        MS. THELWELL:  Which is life for him.

24        THE COURT:  That's what I'm saying.  In a way it's

25  an academic exercise; but it's also important that if I'm

1    going to give these defendants life, which is what you are

2    asking for, that I be able to justify that when the father of

3    this child, for 18 to 24 months before this happened, was

4    having sex with her -- well, was having some type of sexual

5    activity with her for 18 to 24 months and did this to his own

6    daughter.

7           I mean, I just can't -- who can even fathom that.

8    But he did.  And he also had his own history.  If you read

9    what his own psychologist or expert testified to, he had his

10   own set of issues growing up.

11          MS. THELWELL:  Well, I think when it comes to

12   Richmond McDonald, Your Honor, as we have heard throughout

13   the morning and as stated in the sentencing memorandum,

14   Mr. McDonald is a predator.

15          THE COURT:  Right.  So, my question to you is,

16   when the father of the child was sentenced to 75 years, the

17   father of the child was having sex with her, sexual activity

18   with her one to two times a month for 18 to 24 months before

19   this happened.  The father is the one who advertised his

20   daughter for this type of activity, and he got 75 years, and

21   you are asking for life.  I just need for you to -- really,

22   my question is very simple.  Justify that in light of what

23   Mr. Esposito did.

24          MS. THELWELL:  Your Honor, I understand what you

25   are saying; and I think being focused on the number 75 is

1  where some of the frustration and the difficulty comes from

2  because the fact of the matter is, the way Mr. Esposito was

3  charged, he could not actually have life written on his PSR,

4  but the sentence that he got because of his age is, in fact,

5  a life sentence.

6          Had he been charged differently -- and I was not

7  involved in the charging decisions that that prosecutor made.

8  I can't say that every single prosecutor would have made that

9  same charging decision.

10         THE COURT:  Those are all technical.  These are

11  all technical.  I'm trying to be very pragmatic here.

12         Yes, you charge something one way, the sentence is

13  going to be X.  You charge it another way, it will be X plus

14  10.  I understand that.  These are charging decisions, but

15  this is a pragmatic issue.  Don't focus on that.

16         Focus on this is what we have.  We have this man

17  who's been sentenced for 75 years.  I'm not bound by what

18  Judge Antone did.  I'm my own person, but tell me why -- why

19  it's appropriate or fair for these two people to be sent to

20  prison for the rest of their lives, which is what you are

21  asking for, when Mr. Esposito, for what he did -- and I don't

22  need to repeat it for the third time, but horrible things he

23  did and got 75 years.

24         MS. THELWELL:  I understand.  So what I'm going to

25  do is just go through my 3553(a) arguments because I think

1    that will address the Court's question.

2              THE COURT:  Okay.

3              MS. THELWELL:  Before I begin that, I do want to

4    just highlight as a point of reference that both the

5    defendants signed a plea agreement in this case where the

6    United States is bound to ask for a guideline sentence based

7    on the plea agreement that they signed, and their guidelines

8    are life.  So that aside, as it relates to --

9              THE COURT:  Do they get something for having pled

10   guilty?  Because had they gone to trial, they would have

11   gotten life.  And as you know, even though you have strong

12   evidence against somebody, on any given day, you get 12

13   people there (indicating), and you can't predict with

14   absolute certainty what they are going to do.  On any given

15   day.  Even if there is overwhelming evidence, sometimes you

16   get a jury that just sees it differently.  But these people

17   pled guilty.  Do they get something for that?

18             MS. THELWELL:  Of course they did.  They already

19   did.  Mr. McDonald got three counts dismissed.

20             THE COURT:  Life versus life, though.  Again, I'm

21   giving you a pragmatic answer here -- or it's really a

22   pragmatic question.  Life is life is life, whether it's ten

23   counts or one count.

24             MS. THELWELL:  I understand, Your Honor.

25             As it relates to the nature and circumstances of

1    the offense, as the Court well knows, the facts of this case

2    are beyond egregious, beyond repulsive.  The fact the

3    defendant went online, on a website known to house child

4    predators and individuals interested in engaging in sexually

5    explicit conduct with children, he made contact with the

6    child's father and the two formed a relationship.

7               He brought his wife into that situation.  And as I

8    presented at Miss Boselli's sentencing hearing -- again, I

9    will repeat it for the benefit of Mr. McDonald -- there were

10   multiple videos found on Mr. Esposito's device showing both

11   defendants in this case clearly making videos and targeted

12   toward the child to be playful, entice her, lure her, and

13   basically seek to gain her assent really to engage in

14   sexually explicit conduct when she travels to Tampa.

15              Once the child got here, during Mr. Esposito's

16   proffer with agents, he explained that Mr. McDonald's

17   behavior was extremely peculiar, given the circumstances,

18   obviously.

19              Not only did he -- obviously, both of them took

20   the child around the zoo, entertained her at the zoo.  They

21   also -- Mr. McDonald specifically purchased ice cream for

22   her, provided her with multiple gifts while at his house to

23   the point that when they left Tampa, Mr. Esposito stated that

24   they had left with a bag full of toys.

25              Specifically, Mr. McDonald -- and it's in the

1    complaint.  It's in the plea agreement.  It's in the PSR.

2    There is a section of the chats that were recovered.

3    Mr. McDonald specifically said that he was so excited that he

4    wanted to be a godfather or an uncle of sorts to this child.

5          He told Mr. Esposito before he left Tampa --

6    before Mr. Esposito left Tampa, that he would love to engage

7    in that type of activity again.  He would like to meet with

8    her again.  He would be willing to drive to Orlando to engage

9    in that type of activity.

10         Now, that's just a snapshot of what we know of

11   what happened over those two days between the defendant and

12   the child victim -- or the defendants in this case and the

13   child victim.

14         Coupling what we know about the facts of this case

15   and looking to the defendant's past and specifically in the

16   PSR when it talks about his other criminal history, paragraph

17   107 and paragraph 108, which we heard a little bit about

18   today from Miss Marguerite Scott, we know that the defendant

19   has had a history of preying on children, and it began as

20   early as 21.  At least that's what's documented because the

21   child victim in that case was brave and spoke up.

22         Based on the facts in that case, the defendant was

23   bold enough to engage in sexual activity with a 12-year-old

24   who was the cousin of his then girlfriend, while his then

25   girlfriend was in the same apartment.

1          Now, a younger Richmond McDonald I guess was a

2   little bit more -- I don't even know how to phrase it; but in

3   that case, he decided that he wanted to go to trial, which

4   was his right.  But in reviewing the underlying -- the PSR

5   and the underlying documents, it's clear that he never fully

6   accepted responsibility for that case.

7          It was clear today when we heard from Dr. Holmes;

8   and when that case came up in their conversations, she made

9   note that he tried to mitigate in a way or explain some of

10  the circumstances instead of just accepting, yes, I sexually

11  abused a 12-year-old when I was 21 years old, without any

12  additional explanation, because, as Miss Scott said, there is

13  no explanation that's needed.  He's 21 -- or he was 21 and he

14  was having inappropriate conversations and contact with a

15  child.

16         As outlined in my sentencing memorandum, Your

17  Honor, that's where the defendant -- I would say that that

18  case and the way that it was handled to the point that,

19  unfortunately, there was a change in the law -- Your Honor

20  has the case in front of her, and the case was ultimately

21  overturned and sent down to be retried.

22         Now, because the defendant necessarily escaped

23  that conviction, he became emboldened; and it was clear from

24  the moment that the judge in that case granted the defendant

25  a motion -- well, they had filed a motion for appeal bond and

1    they granted it, and that was back in March of 2000.

2             On March 8th, 2000, the Court granted an appeal

3    bond; and in that time, while you would think the defendant

4    would be on his best behavior, there were allegations that we

5    know now.  He continued to have sexually and physically

6    abusive relationships and contact with young women.

7             Now, admittedly, those two other women that are

8    identified in our sentencing memorandum are not -- were not

9    minors at the time.  It's extremely disturbing because when

10   you look at the timeline, Your Honor --

11            THE COURT:  What paragraph is that?  What should I

12   look to?

13            MS. THELWELL:  Yes, Your Honor.  If you look at

14   document 110, beginning on Page 10 of 23.

15            THE COURT:  Give me one second.

16            Okay.  I'm on Page 10 of 23.

17            MS. THELWELL:  In this section, I highlight for

18   the Court the history and characteristics of the defendant,

19   and I break it down in the chronological order and by victim.

20            So in Paragraph 1A, that's discussing Miss Margie

21   Scott's daughter, the 12-year-old victim who was sexually

22   assaulted by the defendant.

23            While out on his appeal bond on that case, if you

24   look over to Page 12, section 1B --

25            THE COURT:  Right.  That is L.A.S.

1           MS. THELWELL:  Yes.  We discussed victim L.A.S.

2    She reported in September of 2000 and she actually went in

3    and made a report and ended up writing a notarized letter to

4    the parole board when she found out that Richmond McDonald

5    was out on some sort of bond because she felt so strongly

6    that he was violent and dangerous to the community and did

7    not deserve to be out.

8           In that letter, which was attached to the

9    sentencing memorandum as Exhibit B -- well, as Exhibit C, is

10   the notarized letter.  She details in her handwritten

11   four-page letter about physical and sexual abuse she suffered

12   at the hands of the defendant.

13          One thing that stood out in that letter and that

14   stood out to the prosecutor on Miss Margie Scott's case was

15   that the defendant at one point -- sometime in June of 2000,

16   they had gone to a restaurant.  Miss L.A.S. and the defendant

17   had gone to a Japanese restaurant, and according to L.A.S.,

18   the defendant noticed two younger children, females, little

19   girls, and told her that he wanted to see L.A.S., quote --

20   and I put them in quotes because that's literally the quotes

21   that she had in her letter, as Your Honor will see from

22   Exhibit C, at Page 3 of Exhibit C.  He wanted to see her

23   "lick their pussies.  He know how" -- quote -- "tight they

24   must be."  And it was, quote, "Their purity that made him

25   want them."

1           These are statements that the defendant is making

2    while he's out on appeal bond for abusing -- sexually abusing

3    a 12-year-old and clearly indicate that he has a desire and

4    interest in sexually abusing young minor children.

5           Your Honor, because of Miss L.A.S.'s report to law

6    enforcement and her notarized letter and the fact that the

7    defendant still had his open case -- he was pending appeal

8    and had to report and was being monitored by the court

9    system -- a search warrant was authorized for the place that

10   he was staying with his -- I think it was his grandmother at

11   the time.  And when they executed the search warrant, not

12   only did they find pornographic material, but that also led

13   them to victim D.H., which is in paragraph 1C, beginning at

14   document 110, Page 13.

15          As it relates to victim D.H., she admits -- and

16   Your Honor, all of these -- as a side note, all of these

17   victims were interviewed by Agent Botterbusch.  Agent

18   Botterbusch traveled to various locations and conducted

19   interviews with these women who are still to this day visibly

20   upset when discussing the trauma that had happened to them.

21          D.H. admitted that she and the defendant met while

22   in high school and began a dating relationship.  Sexual,

23   also, in nature.  The reason why law enforcement went to her

24   is because they found a tape, sex tape, and she appeared to

25   be a minor in that tape.  However, she confirmed that to her

1    knowledge she was above age at the time the tape was made.

2              THE COURT:  Which victim is this?

3              MS. THELWELL:  This is victim D.H.

4              THE COURT:  Because they were in -- they dated in

5    high school and during junior college, so she must have been

6    over 18 at that time.

7              MS. THELWELL:  Correct.  They dated -- she says

8    she was 18-and-a-half when this sex tape happened, and she

9    stands by that statement to this day

10             Either way, she is the victim of the invasion of

11   privacy count because of that sex tape that is listed in the

12   PSR.

13             THE COURT:  Well, she also says that he raped her,

14   sodomized her, held a knife to her ribs, anally raped her.

15             MS. THELWELL:  Yes, Your Honor.

16             While that is important -- another reason why that

17   is so important, you start to see a pattern of the

18   defendant's behavior.  This is what D.H. is telling law

19   enforcement.  And in looking back to L.A.S. and reviewing her

20   letter, she says the exact same thing.  He held her at

21   knifepoint, he raped her, anally sodomized her, urinated in

22   her mouth, and the list goes on.

23             THE COURT:  As you say that -- let me switch to

24   another subject, and that's Miss Boselli.  Mr. Crawford is

25   here.  Miss Boselli is here.

1            Part of Mr. Crawford's pitch to me when we had our

2  sentencing the other day was that she, Miss Boselli, was also

3  a victim of Mr. McDonald.

4            So when we have Miss Boselli's sentencing, that's

5  something that you need to address, in light of these people

6  who are clearly victims and in light of their statements to

7  you or to the case agent.

8            MS. THELWELL:  Okay.  I'm making a note, Your Honor.

9            THE COURT:  All right.  Go ahead.  Continue with

10  Mr. McDonald here.

11           I mean, I have to say, to a great extent I agree

12  with you.  To a great extent.  I think that he is a very

13  dangerous individual who needs to go to prison for a very

14  long period of time.  It's just what that amount is.

15           Anything else?  Because I want to give Mr. Beck

16  some time.  I've read your memos.  I don't know if I need

17  really anything else that you are able to provide to me

18  unless you have anything else that you would like to say in

19  closing.

20           MS. THELWELL:  Your Honor, just in closing, as

21  seen by the defendant's pattern of sexual deviance and

22  activity, the only reasonable sentence in this case -- and I

23  understand what Dr. Holmes has said about the defendant being

24  misdiagnosed because maybe now the studies are reporting

25  something different, however, she was very clear that being

1  bipolar does not necessarily cause pedophilia, that being

2  treated for bipolar is not necessarily going to eliminate the

3  defendant's urges.

4          The defendant has a demonstrated pattern of sexual

5  interest in children.  And I know that Your Honor has read

6  the memo.  I just want to put on the record that he was in

7  possession of over 1300 child pornographic images, videos,

8  both with infants, young children, prepubescent, bondage, and

9  so that just shows really what's going on behind this facade

10 that Mr. McDonald is presenting today.

11         THE COURT:  And had that been pled to, that in and

12 of itself would have been a minimum mandatory, I think, of

13 ten years in prison.  The possession of the child

14 pornography.  No?

15         Mr. Tremmel, what is it, the possession of child

16 pornography?  Isn't that normally about ten years?  Or maybe

17 it's five years.

18         THE PROBATION OFFICER:  I would have to look at

19 the statute, Your Honor, but there is a mandatory minimum.

20         THE COURT:  It's a mandatory minimum.  I thought

21 it was ten years.  Maybe it's five years.

22         MS. THELWELL:  Correct, Your Honor.  So there is a

23 ten-year mandatory minimum.  There is a 20-year maximum on a

24 charge like that alone because he didn't have a prior

25 conviction.

 1              THE COURT:  So what I'm saying is, if we were just

 2    here on that, which we are not, obviously, but just on that,

 3    this last infraction that you just mentioned, he would have

 4    been looking at a ten-year mandatory minimum.

 5              MS. THELWELL:  But he's a hands-on offender.

 6              THE COURT:  I understand.  I'm just saying, just

 7    for that alone, he would have been looking at ten years.

 8              MS. THELWELL:  Yes, Your Honor.

 9              If I could have one moment?  I just want to make

10    sure I hit everything.

11              THE COURT:  Sure.

12              MS. THELWELL:  If I could have a moment just to

13    confer.

14              THE COURT:  Sure.

15              MS. THELWELL:  Your Honor, just to go back to how

16    we started the conversation, you asked me to kind of explain

17    the sentencing regarding Mr. Esposito and how that kind of

18    ties into the defendants here.

19              THE COURT:  Right.  So Mr. Esposito, who received

20    75 years in prison -- why it's fair and appropriate to

21    sentence these two defendants to life when Mr. Esposito

22    received 75 years.

23              MS. THELWELL:  Correct, Your Honor.

24              As we know, based on Mr. Esposito's charges, he

25    could have received a maximum of 80 years; but as the Court

1    knows, there was a 5K in that case, so he got 75 years based

2    on his charges.  Mr. Esposito appeared at the time, based on

3    the information that we have, a danger only to his child.

4          The defendant, on the other hand, is a danger to

5    everyone.  He went online and met Mr. Esposito, engaged in

6    this conversation, and tried to form somewhat of a

7    friendship.  And even after the instance, there were chats

8    recovered dating back to September of 2016.  The search

9    warrant in this case was issued -- or executed in November of

10   2016 where the defendant is still talking to Mr. Esposito.

11   Checking in.

12         It's clear that if Mr. McDonald were given another

13   opportunity, he would not only abuse the child victim in this

14   case, but he would find other child victims to abuse.  So, in

15   that case, Mr. Esposito received the most that he could

16   potentially get, given his charge and his 5K.  And that's

17   exactly what we are asking the Court to do here, is to give

18   these two defendants the most that they could possibly

19   receive under their guidelines and the fact that these two

20   are a danger to the community as a whole and not just one

21   discrete victim.

22         THE COURT:  Thank you, Miss Thelwell.

23         I'll now hear from Mr. Beck.  Mr. Beck, do you

24   know of any reason why this Court should not now proceed with

25   imposition of sentence?

1          MR. BECK:  Couple of reasons, Your Honor.  First

2   of all, I would like to respond to some of the arguments the

3   government just made in regard to 3553, and I have witnesses.

4          THE COURT:  I'll give you the chance to give me

5   the 3553 factors, but what legal bar is there to proceeding

6   with sentence at this time?

7          MR. BECK:  I do have the desire to present Angela

8   McDonald and possibly also Richmond McDonald prior to

9   going --

10          THE COURT:  Of course you can present that.  I

11   just want to know if there is a legal bar.  I want to explore

12   that with you.

13          MR. BECK:  Only in my desire to argue.

14          THE COURT:  And this is your opportunity to make a

15   statement, present any information in mitigation of the

16   sentence.

17          And, Mr. McDonald, you have the right to address

18   the Court directly.  You don't have to, but I want to make

19   certain that you understand that you have that right.

20          Do you understand that, Mr. McDonald?

21          THE DEFENDANT:  Yes, ma'am.

22          THE COURT:  Okay.  Go ahead now, Mr. Beck.

23          MR. BECK:  The Court has touched on something this

24   morning and afternoon that's been a curiosity to myself and

25   Mr. Crawford for quite some time now.

1            The nature of the sentence that Mr. Esposito

2      received wasn't life.  However, he certainly could have

3      received life if the government had not dismissed the

4      enticement charge against him.  And just exactly why that

5      occurred certainly is not attributable to this division, but

6      it's curious.

7            The other thing I would like to talk about from a

8      factual perspective is the supplements to the PSR with the

9      various Exhibits A through G that have been presented to the

10     Court as clear and convincing evidence of the dangerousness

11     of my client Richmond McDonald.

12           The Court is aware of the circumstances

13     surrounding the case that was litigated and is aware of the

14     fact that Mr. McDonald risked a trial.

15           THE COURT:  You mean the Georgia case.

16           MR. BECK:  In the Georgia case.  The case was

17     actually litigated.  And, in fact, he ultimately was

18     acquitted of one count.  The conviction was reversed on the

19     other count, and the state opted not to pursue the charges,

20     despite the nature of the testimony that was apparently

21     available to the state and based upon the descriptions and

22     testimony we received today.

23           It's interesting.  The L.A.S. situation actually

24     involved a letter to the Georgia Board of Pardons and Parole

25     by L.A.S.  To my knowledge, L.A.S. has not been identified.

1    The initials are all we have ever received.  But that then

2    resulted in the same prosecutor, who had been responsible for

3    the prosecution of the trial case, being made aware of the

4    circumstances or at least the allegations of L.A.S.

5           I think that had we had the opportunity to pursue

6    something other than the descriptions that had been presented

7    today, that being the idea that Special Agent Botterbusch has

8    talked to these people, these women, and they have repeated

9    the story.

10          I think that Miss Angela McDonald will tell the

11   Court that, in fact, yes, her son was on bond, pending

12   appeal, and that he had actually reported to the probation

13   department that day and that the likelihood that he could

14   have, in fact, kidnapped and done to L.A.S. what she

15   described was, from a chronological perspective, an

16   impossibility.

17          I would submit that's why the state of Georgia,

18   despite the fact they had the same prosecutor who had already

19   attempted to convict Mr. McDonald once, opted not to go

20   forward on very, very horrific allegations.

21          THE COURT:  You know, I'm reading this appellate

22   decision.  Here's the second paragraph, and it had to do with

23   the state attempting to admit and the court admitting

24   evidence that was inadmissible.

25          Here's what it says.  "Because we conclude that

1   the trial court admitted pornographic materials unconnected

2   with the crimes with which McDonald was charged, in violation

3   of the rules set out in *Simpson*, we reverse."

4          Why the state didn't retry it, I don't know.  I

5   don't know.

6          MR. BECK:  I don't know either.  And given the

7   fact that you have the same prosecutor and potentially the

8   same investigator investigating the L.A.S. matter and opted

9   not to go forward there is equally curious.

10         Given the fact that there was, under Exhibit F, an

11  arrest warrant, but arising out of allegations of additional

12  sexual abuse with adult women and the showing of the video

13  that's described by D.H. -- and interestingly, there is no

14  documentation that I've seen or I've received in regards to

15  D.H. -- no attempts for an arrest warrant, search warrant,

16  anything to supplement or to corroborate what's being

17  described today.

18         The Exhibits F and G, again, are descriptions of

19  activities between Richmond McDonald and two adult women.  I

20  believe that the transcripts from the preliminary hearing

21  result in one of the women reversing her testimony and

22  acknowledging that, in fact, there had been consensual

23  contact, that she had, in fact, removed her blouse and

24  allowed Mr. McDonald to touch her breasts, and I can provide

25  that to the Court.

1          Essentially, I have the utmost respect for

2   Mrs. Scott -- Miss Scott, utmost respect for Miss Esposito

3   and their efforts to protect their children.  Nobody would

4   expect anything less.  Nobody would expect them not to be

5   offended, disturbed, angered by both what they have endured

6   and what they have observed in their children.

7          This Court has opined that Richmond McDonald is

8   dangerous; and, in fact, we presented testimony of a highly

9   qualified forensic psychologist who very candidly said that,

10  yes, Mr. McDonald is not an individual that should be

11  released today.

12         He requires treatment, he requires medication, and

13  he requires monitoring.  By doing so, what we have attempted

14  to do is to give this Court all of the information.  We

15  haven't attempted to shade the information.  We haven't

16  attempted to apologize for behavior and conduct that we know

17  occurred.

18         But we are at a significant disadvantage when

19  asked to defend information that wasn't pursued legally and

20  wasn't presented in a non-hearsay fashion.

21         THE COURT:  Let me ask you something.

22         MR. BECK:  Yes, Your Honor.

23         THE COURT:  Mr. Beck, there was one interesting

24  thing that Miss Thelwell said, and that was that your client

25  pled guilty and pled guilty knowing that he was going to get

1    a guideline sentence or that there was going to be a

2    guideline sentence available, and the guideline sentence is

3    life.

4            So that's why she feels that it's appropriate to

5    ask for a life sentence.  I mean, the questions that I asked

6    her are the questions that I've asked myself in trying to

7    come up with an appropriate sentence.

8            I'll just tell you, very candidly, there are only

9    two reasons that I've been able to determine as to why a

10   lifetime sentence might not be warranted.  One is the fact

11   that he pled, and I think you ought to get something for

12   pleading guilty.  No. 2, that Mr. Esposito got 75 years in

13   prison.

14           Those are the only two reasons I can identify.

15   There is no other reason, Mr. Beck, because I think that he

16   is what I said earlier.  A dangerous person.  He needs to be

17   punished.  We need to protect society.  Those are the two

18   things -- the two primary factors that I look at as a judge.

19   He needs to be punished.  I do need to protect society.  What

20   more vulnerable individuals do we have in society but our

21   children?

22           Those are really the only reasons I can

23   potentially identify.  The one with Mr. Esposito, and your

24   client has some very troubling factors in his background.

25   It's the factors that we are focusing on right now.  I mean,

1    it's really frightening, Mr. Beck.

2         MR. BECK:  I can tell the Court -- no, I

3    understand.  I can tell the Court that I have a personal

4    basis to understand that concern.  That being said, our

5    goal -- my goal in working with Mr. McDonald and his mother

6    and his grandfather and his friends is to help the Court to

7    understand there is more to him than what's being described.

8         There is an intellect, but there is also a side of

9    Richmond McDonald -- and I provided a newspaper article,

10   letter to the editor, describing his selflessness where he,

11   as a college student, left his group after seeing a young

12   lady collapse in a busy street and went and gathered her up

13   in his arms and took her to the sidewalk where she was safe.

14        His instructor describes in that letter to the

15   editor the heroism of his conduct.

16        I wish I could provide the Court with some kind of

17   assurance beyond that which I attempted to present through

18   Dr. Holmes, that being that we don't have any idea what would

19   have occurred had this bipolar disorder been diagnosed and

20   treated at an earlier age, any more than we know what the

21   future holds for the young child in this particular case.

22        We hope that proper diagnosis and proper treatment

23   and proper counseling will afford -- and I think I can say

24   her name because her mother did -- afford S████ the

25   opportunity to recover, to live a full life.  And I can again

1    say from personal experience that it's possible.

2            It's not easy.  It takes a commitment of everybody

3    involved, and it's a hard commitment, but it's possible.  I

4    believe that same hope applies to Mr. McDonald.  Fortunately,

5    Mr. McDonald has something that we sometimes miss or lack in

6    the people that we represent.  He actually has a family that

7    loves him and cares about him.

8            He's got a mother that by the time he was four or

9    five years old recognized that there is something wrong; and

10   instead of waiting for him to grow out of it, instead of

11   trying to ignore the conduct, she took him for help and took

12   him back for help and took him back for help.

13           He is not broken as a result of negligent abuse.

14   He has a chemical disorder in his brain that is not

15   responsible for the conduct, but certainly contributed to it,

16   and is capable of being addressed.

17           He did attempt to cooperate with the government.

18   I'll tell the Court that as well.  And I do think that's

19   appropriate.  I won't soft-sell the idea of his plea.  He

20   knew that he was likely going to score life at the time he

21   entered his plea.

22           But together, we hoped that this opportunity to

23   help the Court to understand and appreciate who Richmond

24   McDonald is -- and I hope his mother helps this Court a

25   little bit -- will also help the Court to understand that, A,

1   his conduct was significantly different than Mr. Esposito,

2   but, B, that he's an individual that's capable of

3   rehabilitation.  We want that opportunity for him.

4        There was no question in our mind he was going to

5   be punished.  There was no question in our mind that he was

6   going to receive a significant sentence.  When I talked to

7   Miss Thelwell the other day, she asked what I was going to

8   ask for.  I told her what I hoped for.  I told her 240

9   months.  So she said, are you going to ask for 120?  I said

10  no.

11       THE COURT:  Mr. Esposito's lawyer I think asked

12  for 400-and-something months in prison.

13       MR. BECK:  I understand.

14       I think a sentence of 20 years, with the proper

15  counseling and treatment and then overview upon release, is

16  an adequate punishment and adequate mechanism to ensure the

17  safety of, in fact, our most vulnerable citizens.

18       That's what I'm going to ask for, Your Honor,

19  because I do believe that the fact we now understand a

20  significant component of his behavior and recognize we can

21  treat it, is the key.

22       THE COURT:  But there are a lot of people who have

23  bipolar disease who aren't predators on children.

24       MR. BECK:  Again --

25       THE COURT:  I mean, they may do -- they may have

1    other issues, but that's not what we want.

2            MR. BECK:  No.  That was described by Dr. Holmes.

3    But I'm afraid that part of our decision-making process is

4    very much the influence of the allegations arising out of

5    Georgia, and those are just impossible to defend.

6            It's interesting to me that the government

7    apparently had an opportunity to bring L████ and/or

8    E███████, but opted not to because of the expense.

9            THE COURT:  I'm not so certain I would want to

10   relive it.  That's why some people don't file charges.

11           MR. BECK:  That's one of the reasons we did not go

12   to trial.

13           THE COURT:  Do you really want to stand up here in

14   front of all these people and talk about it?

15           MR. BECK:  Well, we think we also have

16   opportunities for cross-examination; but that being said,

17   it's also in the reasons we did not go to trial was because

18   of our concern for S█████.

19           THE COURT:  And I'll tell you, I really am down

20   to, do you get something for pleading guilty.  That's really,

21   in my mind, what I'm down to.

22           MR. BECK:  I understand.

23           I would like to present the mother when I have an

24   opportunity.

25           THE COURT:  That would be fine.

1          MR. CRAWFORD:  Your Honor, we need to take a quick

2    break if we could.

3          THE COURT:  Sure.  How long?  It's 12:30.  I don't

4    know if we need like a 10-minute break, 15-minute break, a

5    half an hour break.

6          MR. CRAWFORD:  We need five.

7          THE COURT:  How much longer do you think that you

8    will need, Mr. Beck?

9          MR. BECK:  I think the testimony of Miss McDonald

10   will probably last ten minutes, if that; and if Mr. McDonald

11   decides to allocute, probably very, very brief five-minute

12   allocution.

13         THE COURT:  Why don't we take about, then, a

14   10-minute recess.  So it's almost 12:30.  We will come back

15   at twenty to one.  Thank you.

16         (Recess taken from 12:25 p.m. to 12:38 p.m.)

17         COURT SECURITY OFFICER:  All rise.

18         This Honorable Court is now in session.

19         THE COURT:  All right.

20         MR. BECK:  Miss McDonald would like to address the

21   Court, Your Honor.

22         THE COURT:  Okay.  That will be fine.  If she's

23   just going to stand there and be making a statement, she

24   doesn't need to be placed under oath.

25         MS. MC DONALD:  Your Honor, I am sorry to be

1    introduced to you under these circumstances.  This event has

2    affected many and changed their lives forever.  The most

3    egregious being the child.  I pray every day that her mother

4    has the strength and gets her the help to heal the wounds

5    emotionally inflicted upon her by her father.  Then, to add

6    injury to insult, the ones that my son and daughter-in-law

7    added.

8           I know my life has changed forever, as I'm sure

9    many others.  The sadness that I feel is beyond words.  I

10   pray every day on this matter.  I feel that I must leave it

11   in God's hands and yours, for I have no answers.  I love my

12   son very much.  More than I can describe.

13          Richmond has had a long history of problems,

14   emotional, psychological, and physical.  They all have been

15   documented.  His diagnosis changed as he grew older and new

16   mechanisms put in place to help him over his handicaps and to

17   become a functioning, productive individual; medications to

18   help depression, medication to help him from being

19   distracted, along with board games to teach him to focus;

20   exercise and modification in his classrooms.

21          In the 7th grade, his grandfather -- my

22   step-father, his step-grandfather, passed away.  He was very

23   close to him.  Richmond fell emotionally into an abyss.  He

24   failed the 8th grade three times.  We were in counseling at

25   Highlands.  He was getting medications for depression, and I

1    was educating myself on the new diagnosis and recognized that

2    we were in a failure syndrome.

3          I managed to go to the school superintendent and

4    get Richmond an administrative promotion.  At the end of the

5    9th grade he was 50 percent functional.  He had to take an

6    English class in summer school and was promoted to the 10th

7    grade.  His GPA was a low D.  He managed with counseling and

8    medication modifications to not only graduate, but excel and

9    win a scholarship to Georgia Military College, which he

10   continued to keep on the dean's and president's list.

11         What I'm trying to explain is that Richmond does

12   respond to therapy and medications.  I am not ready to give

13   up on him, and I hope that you and society won't either.

14         I ask the Court three things.  One, please place

15   my son where he will be safe; two, where he can get the help

16   he needs; and, three, I ask the very same for my

17   daughter-in-law, even though I never got to know her.

18         Thank you for your time.  Unless you have any

19   questions, Your Honor, I'll go sit down.

20         THE COURT:  All right.  Thank you.

21         Mr. McDonald, do you wish to address the Court

22   directly?  As I said, I'm going to impose sentence at the

23   same time on both defendants, and I will give Miss Boselli

24   and her lawyer another chance to say something else, and I

25   also wanted to hear from Miss Thelwell with respect to that

1    issue that Mr. Crawford had raised previously.

2              Mr. Beck, does your client wish to allocute?

3              MR. BECK:  I think when he gathers himself, he

4    would like to, Your Honor.

5              THE COURT:  Okay.  Take a moment there,

6    Mr. McDonald.  He can stay seated if that's easier.  He

7    doesn't need to stand.  He just needs to speak into the

8    microphone.

9              MR. BECK:  Thank you, Your Honor.

10             DEFENDANT MC DONALD:  Your Honor, and the Court,

11   thank you for the chance to address my conduct and behavior

12   to which probably can only be described as inexcusable and

13   shameful.

14             I was given the opportunity before, during, and

15   well after to do the right thing.  And I failed.  I owe the

16   deepest apology to the victim, that -- I can't find the right

17   words.

18             The unknown amount of damage still, it is even

19   more sorrowful.  So I owe her the sincerest, deepest apology

20   that I can try to put into words.  Also, I would like to

21   apologize to my family and friends, particularly my mother

22   and grandmother, who is no longer with us.

23             In case my mother keeps trying to take

24   responsibility that some of this was her fault, I want her to

25   know that none of this was her fault.  None of it.  I also

1  would like to apologize to my wife.  I should have been a

2  better husband.  I love you, and I'm sorry I failed you.

3          I would like to apologize to this Court again.  I

4  apologize to this Court and society.  I failed to live up to

5  the standards a human being should.  I'm only left with hope,

6  and hope is something to look forward to.  And that with

7  treatment and therapy for things that I didn't even realize I

8  needed, I just -- I just hope at some point I could count on

9  the opportunity for us to rejoin society at some point and

10 ... and not be thrown away.  I apologize.  I'm sorry.

11         Thank you.

12         THE COURT:  All right.  Thank you, Mr. McDonald.

13         Mr. Beck, is there anything else?

14         MR. BECK:  Nothing further, Your Honor.

15         THE COURT:  Thank you, Mr. Beck.

16         Miss Thelwell, I will let you address that issue

17 that I raised earlier with respect to Miss Boselli.  Then,

18 Mr. Crawford, I'll let you say whatever you would like to say

19 in response.  And if Miss Boselli would like to say anything

20 else, that's fine, too.

21         Her case is more challenging to me, Miss Thelwell,

22 than Mr. McDonald's.  For Mr. McDonald, it's really,

23 ultimately, a life sentence.  Whether it's 75 years or life,

24 it's going to be the rest of his life in prison, and that's

25 where he deserves to be, even taking into consideration the

1  factors that his lawyer mentioned.

2          I always found his relatively easy to resolve,

3  even though, of course, when you impose a life sentence, you

4  don't do it lightly.  You think about it a lot.  You don't do

5  it lightly, but it's a much easier decision.

6          Hers is little bit more challenging.  I looked

7  again at the pictures that you've introduced the other day,

8  and there is no doubt she was part and parcel of the

9  seduction.  I mean, several are particularly disturbing.  The

10 one of her with the ice cream.  You can see the things that

11 she did.  And that's Exhibit 10.  The things she did to try

12 to lure this child in, to make her feel comfortable, and then

13 like predators do, pounce on her.

14         I just don't know if she's as culpable as

15 Mr. McDonald is and to what extent she deserves any leniency

16 because she felt she was under his spell.  Personally, I

17 think she deserves a very hefty sentence.  Does she deserve

18 to get out at age 60?  Does she deserve to get out at age 70?

19 Or does she deserve never to get out of prison?  Particularly

20 when the child's father got -- I'm going to go back to it --

21 the 75 years.

22         MS. THELWELL:  Your Honor, just for the record,

23 the child's father was in his mid-30s at the time of

24 sentencing.

25         THE COURT:  These are all academic questions, but

1    they are still issues that I have to look at and resolve.

2            MS. THELWELL:  I understand, Your Honor.

3            I just want to start by going back to some of the

4    evidence that you just recounted that was present at

5    Miss Boselli's sentencing back on the 3rd.

6            I apologize.  I don't remember if her PSR has been

7    amended to include the description of the child pornographic

8    images and videos; but I do know that it contained, just like

9    how we saw today, very detailed -- and it was in the addendum

10   to her PSR, that explains images and video, and there were

11   multiple involving -- more images and videos of sexual

12   activity with Miss Boselli and the child victim than I had

13   with Mr. McDonald.

14           Miss Boselli is captured on multiple images, in

15   videos, engaging in sexual activity with the child.  And,

16   Your Honor, the stills of those images are actually contained

17   in the yellow folder that Your Honor has in that white

18   binder.

19           That yellow folder is part of Government Exhibit

20   50, which is a CD of a compilation of all those production

21   images.  And, Your Honor, I urge the Court, if not taking a

22   look at those images, reading every single description of

23   those images and videos will remove any doubt from the

24   Court's mind as to whether or not Miss Boselli is a true

25   victim in this case.

1          THE COURT:  I'm just going to ask you this

2     question, and I think maybe Mr. Crawford wouldn't put it

3     exactly the way I'm going to put it to you, but it's the way

4     I would put it.

5          Sometimes I see some women who don't stand up to

6     men when they should and they are abused themselves and they

7     just don't have the inner strength or the self-esteem.  I

8     don't know why they don't, but I know they don't, and I see

9     them in this courtroom periodically where, instead of walking

10    out and going to a women's center, they just tolerate it.

11    And sometimes it's wealthy, educated women.  Sometimes it's

12    women who have an 8th grade education and don't have any

13    money.  I don't know why they don't have that inner strength,

14    but they just don't.

15         I think that is, in essence, part of

16    Mr. Crawford's argument.  I stopped him in mid-sentence when

17    he called her a girl, too.  Like the little girl.  She's not

18    a girl.  She's an adult.  She's responsible for all of her

19    actions.

20         But, in essence, his argument is that she was a

21    victim, too.  Now, I don't think she was a victim at all.  I

22    think that she is an adult who has every ability and capacity

23    to stand up for herself.  But I think it's something that

24    needs to be addressed in terms of the sentence to be imposed.

25         MS. THELWELL:  I understand, Your Honor.  I can

1  agree with that statement that there are some women who are

2  incapable or, for whatever the situation is in that moment,

3  unable to stand up for themselves.

4       The issue with Miss Boselli is, when looking

5  through those images, she is acting on her own.  She is

6  repeatedly sexually abusing the child over a two-day period.

7  And at some point -- as you indicated, she's an adult.  She

8  has to take responsibility for her actions.

9       At some point, regardless of whatever her

10 relationship was with her husband, Mr. McDonald, she decided,

11 I'm going to marry this man.  When does she decide to do

12 that?  Days after the sexual abuse occurred she decided to

13 legally bind herself to this individual.

14      At some point, she's no longer -- I understand

15 Your Honor doesn't view her as a victim.  At some point her

16 behavior crossed -- I'm sorry, Your Honor.

17      THE COURT:  I was going to say, you know, victim

18 can mean different things.  She's not a victim in this case.

19 Maybe she was a victim at some point earlier.

20      The testimony that her mother gave, I think you

21 recall, she talked about how she was victimized by her -- I

22 think it was an uncle or step-uncle or grand-uncle.  So at

23 one point she most certainly was a victim.  She was a victim

24 of her circumstances, of having been placed in an orphanage,

25 adopted by a couple who hoped to give her a loving home.  And

```
 1   much to the mother's distress, here this uncle victimized
 2   this poor child.  And I have no doubt that has a very
 3   profound impact on somebody.  Some people are able to
 4   overcome it; some people are not.  So I don't doubt at some
 5   point in her life she was a victim.
 6            Is she a victim in this case, equated to our
 7   children?  Of course not.
 8            MS. THELWELL:  No.  And at some point her behavior
 9   crosses the line to where she sits here just like
10   Mr. McDonald.  She's a predator.  It's obvious from the
11   government's exhibits and from the facts that have been
12   admitted into this case, she knew -- and the Court has
13   already found she was not a minor participant.  She knew her
14   role was to make the victim comfortable, befriend her.  She
15   instigated the sexual activity at the house on July 19th by
16   taking the child, naked, into the tent.
17            THE COURT:  Well, if I recall what Mr. Crawford
18   said, or at least implied, she was doing these things to
19   satisfy or to please Mr. McDonald.
20            MS. THELWELL:  I understand that's what
21   Mr. Crawford said, but there has been no actual evidence
22   submitted to the Court to support Mr. Crawford's statement
23   that she was doing this to please her husband.
24            From what I can see in the evidence that's been
25   submitted to the Court, Miss Boselli did not have a
```

1  hesitation in engaging in sexual activity with this child,

2  despite her own prior victimization.  She said -- and this

3  came out during her sentencing.  Agent Botterbusch testified

4  that during her post-*Miranda* statement, the defendant said at

5  one point that Mr. McDonald wanted to pass her off to

6  Mr. Esposito, and she stood her ground at that moment and

7  said no.

8          So she's capable of saying no to things she does

9  not want to do.  In this case, she had multiple opportunities

10 to stop exploiting this child, but she decided that's not

11 what she wanted to do in that moment.  Now, here she is,

12 caught in her sin, sitting here, and it's time that -- she

13 has to face the realities of what she did.  And I feel like

14 I'm starting to repeat myself, so I'm going to sit down

15 shortly.

16          THE COURT:  That's all right.

17          MS. THELWELL:  But Miss Boselli, the defendant --

18 both of the defendants in this case are child predators, and

19 the only victim in this case is the seven-year-old child

20 victim.

21          Your Honor, the United States would ask that both

22 of the defendants be sentenced in accordance with their

23 guidelines, based on the arguments presented over a two-day

24 period, and all of the supporting documentation that's been

25 provided to the Court.

1          THE COURT:  Thank you, Miss Thelwell.

2          So, Mr. Crawford, my question to you is this:  The

3     guidelines call for a lifetime sentence.  That's what the

4     guidelines call for for what your client pled guilty to,

5     correct?

6          MR. CRAWFORD:  Correct.

7          THE COURT:  The Court has the discretion to vary

8     downward or to depart downward under appropriate

9     circumstances, and I utilize that discretion when

10    appropriate.

11         So why is it appropriate in this case to depart

12    downward or vary downward?

13         MR. CRAWFORD:  Judge, we believe you have

14    identified two on behalf of the co-defendant, and we believe

15    there's two more.

16         THE COURT:  So, one, that she's pled guilty.

17         MR. CRAWFORD:  Correct.  So acceptance of

18    responsibility.

19         THE COURT:  And, No. 2, that Mr. Esposito received

20    75 years.

21         MR. CRAWFORD:  Correct.

22         THE COURT:  What else?

23         MR. CRAWFORD:  Our additional argument would be

24    not that she is necessarily a victim the way the young lady

25    is in this particular case in the charged misconduct, but

1    that she has been victimized throughout her life.

2           THE COURT:  Do you know that all defendants,

3    including Mr. Esposito, said the same thing?  They are all

4    victims of child abuse.  They all are.

5           MR. CRAWFORD:  I understand.  Not all people's

6    experiences in childhood are created equal.  It's our

7    position that Miss Boselli is unique because she went from a

8    year in the hospital, with no contact, to an orphanage for

9    five years, to being adopted and brought to a different

10   country and then molested by her great-uncle for five years

11   and then into a dominant/submissive relationship that

12   involved a collar when they got married, that it has just

13   been that type of victimization throughout her life.

14           Does that make her a victim in --

15           THE COURT:  Mr. Esposito's -- I don't know if you

16   can read it like I did because it's sealed, but I went online

17   and I looked at it.  It's really troubling.  Really troubling.

18           MR. CRAWFORD:  Judge, I have no knowledge of that,

19   and I would assume that the judge in Orlando factored that in

20   with the particular sentence.

21           Though, as you've already articulated, my

22   goodness, my client wasn't the one out shopping her daughter

23   to the rest of the country for sexual liaisons.  There is a

24   big difference between what Mr. Esposito did and what

25   Miss Boselli did.

1           This is my client's only criminal offense.  It's

2    horrible.  We have agreed with that.  We have accepted

3    responsibility.  The question is why.  Why does someone

4    that's as bright -- and even though she had some rough times

5    in her life -- we understand that -- end up in this

6    situation?

7           Like you, I have labored in the criminal justice

8    system for a number of years, and battered wife syndrome

9    still amazes me.  I agree with you.  We see very bright, very

10   intelligent, very successful women -- most of the time

11   women -- that stay with men that you wonder why, and that's

12   what we have got here.

13          Does it excuse her conduct?  No, not at all.  But

14   it is a mitigating factor that we would ask you to consider

15   as you balance what's appropriate for each one of the

16   characters.

17          Thank you, Your Honor.

18          THE COURT:  All right.  Thank you.

19          Anything else that you would like to say,

20   Miss Boselli?

21          DEFENDANT BOSELLI:  No, ma'am.

22          THE COURT:  Anything else from anybody?

23          (No responses.)

24          THE COURT:  All right.  Just give me about five

25   minutes.  I'm going to sit here.  I want to gather my

1    thoughts before I impose sentence.  So we will take a

2    five-minute recess, but I'm not leaving, and we will resume

3    in five minutes.

4              (Recess taken from 1:02 p.m. to 1:05 p.m.)

5              THE COURT:  I'm ready to proceed.

6              The Court has asked each defendant why judgment

7    should not now be pronounced, and after hearing the

8    defendants' response, the Court has found no cause to the

9    contrary.  The parties have made statements in their behalf

10   or have waived the opportunity to do so, and the Court has

11   reviewed the presentence report and the advisory guidelines.

12             Pursuant to Title 18, United States Code, Sections

13   3551 and 3553, it is the judgment of the Court that the

14   Defendant Richmond Joseph McDonald is hereby committed to the

15   custody of the Bureau of Prisons to be in prison for a term

16   of life.

17             Shauna Maryann Boselli is hereby committed to the

18   custody of the Bureau of Prisons to be in prison for a term

19   of 40 years.

20             For each of you:  If you are released from

21   imprisonment, you shall serve a life term of supervised

22   release.  While on supervised release, you shall comply with

23   the standard conditions adopted by the Court in the Middle

24   District of Florida.  In addition, you shall comply with the

25   following special conditions:

1          You shall participate in a substance abuse

2     program -- that's as for Mr. McDonald -- outpatient and/or

3     inpatient and follow the probation officer's instructions

4     regarding the implementation of this Court directive.

5          Further, you shall contribute to the cost of these

6     services, not to exceed an amount determined reasonable by

7     the probation office's sliding scale for substance abuse

8     treatment services.  During and upon the completion of this

9     program, you are directed to submit to random drug testing.

10          As to both of you:  You shall participate in a

11    mental health program specializing in sexual offender

12    treatment and submit to polygraph testing for treatment and

13    monitoring purposes.  You shall follow the probation

14    officer's instructions regarding the implementation of this

15    Court directive.  Further, you shall contribute to the cost

16    of such treatment and/or polygraphs, not to exceed an amount

17    determined reasonable by the probation officer based on

18    ability to pay or availability of third-party payment and in

19    conformance with the probation office's sliding scale for

20    treatment services.

21          You shall register with the state sexual offender

22    registration agency in any state where you reside, visit, or

23    are employed, carry on a vocation or are a student, as

24    directed by the probation officer.  The probation officer

25    shall provide state officials with all information required

1   under the Florida sexual predator and sexual offender

2   notification and registration statutes and/or the Sex

3   Offender Registration and Notification Act and may direct the

4   defendant to report to these agencies personally for required

5   additional processing, such as photographing, fingerprinting,

6   and DNA collection.

7          You shall have no direct contact with minors under

8   the age of 18 without the written approval of the probation

9   officer and shall refrain from entering into any area where

10  children frequently congregate, including schools, day-care

11  centers, theme parks, playgrounds, et cetera.

12         You are prohibited from possessing or subscribing

13  to or viewing any images, video, magazines, literature, or

14  other materials depicting children in the nude and/or in

15  sexually explicit positions.

16         Without prior written approval of the probation

17  officer, you are prohibited from either possessing or using a

18  computer, including a smart phone, a handheld computer

19  device, a gaming console, or electronic device capable of

20  connecting to an online service or internet service provider.

21         This prohibition includes a computer at a public

22  library, an internet café, or place of employment or an

23  educational facility.

24         Also, you are prohibited from possessing an

25  electronic data storage medium, including a flash drive,

1   compact disk and a floppy disk, or using any data encryption

2   technique or program.  If approved to possess or use a

3   device, you must permit routine inspection of the device,

4   including the hard drive or any other electronic data storage

5   medium, to confirm adherence to this condition.

6          The United States probation officer must conduct

7   the inspection in a manner no more intrusive than necessary

8   to ensure the compliance with this condition.  If this

9   condition might affect a third party, including your

10  employer, you must inform the third party of this

11  restriction, including the computer inspection provision.

12         You shall submit to a search of your person,

13  residence, place of business, storage units under your

14  control, computer or vehicle, conduct by the United States

15  probation officer at a reasonable time and in a reasonable

16  manner, based upon reasonable suspicion of contraband or

17  evidence of a violation of a condition of release.

18         You shall inform any other residents that the

19  premises may be subject to a search pursuant to this

20  condition.  Failure to submit to a search may be grounds for

21  a revocation.

22         The defendant having been convicted of a

23  qualifying felony shall cooperate in the collection of DNA as

24  directed by the probation officer.  The mandatory drug

25  testing requirements of the Violent Crime Control Act are

1    imposed.   The Court orders the defendant to submit to random

2    drug testing, not to exceed 104 tests per year.

3              You shall pay restitution in the amount of $50,000

4    to the child victim.   This restitution obligation shall be

5    payable to the Clerk, United States District Court, for

6    distribution to the victim.   This restitution will be paid

7    jointly and severally with -- well, Shauna Maryann Boselli

8    with Richmond Joseph McDonald and Richmond Joseph McDonald

9    with Shauna Maryann Boselli.

10             While in Bureau of Prison's custody you shall,

11   one, pay at least $25 quarterly if you have a non-UNICOR job

12   or, two, pay at least 50 percent of your monthly earnings if

13   you have a UNICOR job.

14             If you are released from custody, your financial

15   circumstances will be evaluated and the Court may establish a

16   new payment schedule accordingly.

17             At any time during the course of post-release

18   supervision, the victim, the government, or the defendant may

19   notify the Court of a material change in the defendant's

20   ability to pay and the Court may adjust the payment schedule

21   accordingly.

22             The Court finds that the defendant does not have

23   the ability to pay interest, and the Court waives the

24   interest requirement for the restitution.   Based on the

25   financial status of the defendant, the Court waives

1    imposition of a fine.

2              Are there any forfeiture matters to consider,

3    Miss Thelwell?

4              MS. THELWELL:  Yes, Your Honor.  I believe

5    preliminary motions were filed.

6              THE COURT:  I think a preliminary order of

7    forfeiture was filed.  Are there any third parties who may be

8    filing claims?  Because then they have the right to file a

9    claim.

10             MS. THELWELL:  No, Your Honor, not to my

11   knowledge.

12             THE COURT:  Okay.  I think I said for

13   Miss Boselli, but let me just double-check.  With respect to

14   Miss Boselli and for Mr. McDonald, how about the drug

15   testing?  Mr. McDonald is going to be in prison unless his

16   sentence is overturned on appeal, but I don't remember if

17   I -- I think what you have here, Mr. Tremmel -- let me just

18   go back and turn to that.

19             They are directed to submit to random drug

20   testing, is what I have for Mr. McDonald, and he's ordered to

21   submit to random drug testing, not to exceed 104 tests per

22   year.  I think that's also true for -- I think for

23   Miss Boselli you said the mandatory drug testing requirements

24   are waived; however, she's ordered to submit to random drug

25   testing, not to exceed 104 tests per year.

1          THE PROBATION OFFICER:  That's what's recommended,

2    Your Honor.

3          THE COURT:  That's what is ordered for her if I

4    didn't say it clearly before.

5          Back to the forfeiture, then.  Did you say there

6    may be some third parties that may have claims to the

7    property?

8          MS. THELWELL:  No, Your Honor.

9          THE COURT:  Even the house?  There is no mortgage,

10   no taxes, no real estate taxes?  That's a third-party claim.

11         MS. THELWELL:  I understand.  My understanding is,

12   as it relates to the house, that matter was already taken

13   care of.

14         MR. BECK:  There is a mortgage on the house.

15   There would be potentially a separate party who is

16   responsible for the mortgage, but the deed was -- but she

17   deeded the property out of her name.  That would be

18   Christina, the prior girlfriend.  I think she has been in

19   contact with the U.S. Attorney's Office and does not intend

20   to make a claim, but I think there is an existing mortgage on the

21   house.

22         THE COURT:  I will not make it a final order of

23   forfeiture today.  It's final as to these defendants, as to

24   Mr. McDonald and Miss Boselli, but you are going to need to

25   get back to me as to those third parties no later than 30

1    days.

2              MS. THELWELL:  Yes, Your Honor.

3              THE COURT:  Okay.  It is further ordered that the

4    defendant shall pay to the United States a special assessment

5    of $100, which shall be due immediately.  I'm not imposing

6    the special assessment pursuant to 18 U.S.C. Section 3014.

7              So I have different reasons for why I imposed the

8    sentence on Mr. McDonald versus Miss Boselli.  I'm going to

9    begin with Mr. McDonald.

10             Mr. McDonald, I've imposed a lifetime sentence on

11   two other defendants.  One was a drug defendant where the

12   government filed a mandatory enhancement during the trial and

13   I had no choice, no authority, and I imposed a life sentence.

14             I also imposed what ended up being a life sentence

15   for somebody else who went to trial in Jacksonville because

16   the years were such that it was well over a hundred years,

17   and the guidelines were not advisory when I did that, so I

18   had no discretion but to impose a lifetime sentence.

19             Today the guidelines are advisory.  I clearly had

20   the discretion to depart downward.  I will tell you the

21   reason why I did not.  When I had to balance everything out

22   here, balance what was right for you versus balancing what's

23   right for society, what weighed heaviest on me was the fear

24   that one day you would be released from prison and would do

25   this to somebody else.

1        I just couldn't live with myself and do that.

2   Even though by nature I'm a forgiving person and it's hard

3   for me to not factor that in when I sentence somebody, I am

4   so concerned about the children that you have done this to.

5   Not just this little girl, but the other little girls or the

6   other young women.

7        I know that you have some internal demons that you

8   have had to struggle with.  Nobody denies that.  Nobody

9   denies how unfortunate it is that when you were a little boy

10  somebody didn't recognize the mental health challenges that

11  you had and got you the appropriate medical care.  Even

12  though your mother loves you very much and she did what she

13  could, psychiatric medicine wasn't as advanced 20 years ago

14  as it is today.

15       But ultimately the legal answer is, there was no

16  reason to vary downward or depart downward.  When I looked

17  into my heart and into my soul, as I do every time I sentence

18  somebody, it's really what I looked at.  I just couldn't live

19  with myself if this ever happened to anybody else.

20       That was the overwhelming factor here.  Even

21  though I very much wanted to reward you for pleading guilty,

22  I felt -- I feel very strongly there should be rewards for

23  that, but I just couldn't do it here.

24       Miss Boselli, your case has been a challenge to me

25  from the get-go.  I needed to think about your sentence some

1   more when your initial hearing came up, and I wanted to

2   sentence you together with your co-defendant.  I think it's

3   the fairest way to proceed.

4           I really struggled with your sentence.  Part of me

5   felt that you deserved a life sentence.  I mean, you really

6   do on a lot of levels, but you don't have the criminal

7   history that Mr. McDonald has.  Mr. McDonald is a predator

8   and will be a predator the rest of his life.

9           I can't say that about you.  You are a predator,

10  but I'm not certain that it merits a lifetime sentence.  I

11  think that it merits a substantial sentence, which I most

12  certainly have given you.  You'll be older than I am when you

13  are released from prison, so it's a substantial sentence.

14          But I felt that for the factors that I identified

15  earlier, that is, you don't have the criminal history he has,

16  Mr. Esposito, whose conduct was much worse than yours,

17  received 75 years.

18          I think that to a certain extent, while you were

19  able to stand up to Mr. McDonald when you didn't want to

20  engage in certain activities, I believe that to a certain

21  extent you might have been under his dominion.  But when I

22  factor all that in there, including protecting the public,

23  which is first and foremost to me in these cases, I felt that

24  the sentence I imposed would give you a significant time of

25  punishment, a significant period of incarceration, a

1  significant ability to undergo counseling and treatment, and

2  punish you, but still give you the hope that someday you

3  would be released from prison.  I factored all that in.

4        I tried very hard to do the right thing by

5  everybody, and that's ultimately the conclusion that I came

6  to.  But I can assure you.  I thought about this quite a bit,

7  and I believe for both of you that it's a fair and

8  appropriate sentence.

9        The Court has accepted the plea agreement for both

10  of you because it is satisfied that the agreement adequately

11  reflects the seriousness of the actual offense behavior and

12  that accepting the plea agreement will not undermine the

13  statutory purposes of sentencing.

14        The Court having pronounced sentence, does counsel

15  for the defendant or government have any objections to the

16  sentence or to the manner in which the Court pronounced

17  sentence other than what's been previously stated for the

18  record?  Miss Thelwell?

19        MS. THELWELL:  No objection, Your Honor.

20        THE COURT:  Thank you, Miss Thelwell.

21        Mr. Beck?

22        MR. BECK:  One thing I would like to address with

23  regards to the restitution, Your Honor, in Orlando they put

24  off the restitution award for a period of time, until the

25  amount could actually be determined and so on.

1           I don't know that there is any particular reason

2   why Mr. Esposito should not likely also be required to pay

3   restitution in the amount of $50,000, and I don't know why it

4   shouldn't be joint and several there as well.

5           THE COURT:  Jointly and severally with

6   Mr. Esposito?

7           MR. BECK:  Correct, Your Honor.

8           THE COURT:  What do you say to that, Miss Thelwell?

9           MS. THELWELL:  One moment, Your Honor.  I

10  apologize.

11          THE COURT:  Sure.

12          (*Brief pause.*)

13          THE COURT:  I think I neglected on Mr. McDonald to

14  dismiss Counts Two through Four of the Superseding

15  Indictment.  I don't think that was true for Miss Boselli.  I

16  think she was just charged in Count One.

17          Is that right, Miss Thelwell?

18          MS. THELWELL:  Correct, Your Honor.

19          THE COURT:  So I'm going to -- let's see, the

20  underlying indictment as to both of them, right?  Or, no,

21  just as to Mr. McDonald.

22          MS. THELWELL:  Correct.

23          THE COURT:  So the underlying indictment as to

24  Mr. McDonald is dismissed.  Counts Two through Four of the

25  Superseding Indictment as to Mr. McDonald is dismissed.  As

1    to Miss Boselli, there is no need to do that.

2          Okay.  Thank you.  So should he -- I don't know if

3    I have the authority to do that.

4          MS. THELWELL:  That's one concern, Your Honor; and

5    on top of that, Mr. Esposito is in a different position.  I

6    mean, obviously he may have more of an obligation given the

7    fact of his familial relationship with the child victim.  It

8    is my assumption, but I don't know to be certain, that all of

9    the counts that he was ultimately sentenced for only related

10   to the child victim.  But that's the government's position,

11   Your Honor.

12         THE COURT:  Okay.  I'm not going to do that,

13   Mr. Beck.  It does make sense, but I don't think that I, on

14   my own, could do it.  I think it's something -- I just don't

15   know.  I'm just hesitant to do it because I don't know if I

16   have the authority to do it or not.

17         Do you know, Mr. Tremmel?  Do you have any

18   position on that, on whether the Court has the authority to

19   do that?

20         THE PROBATION OFFICER:  Your Honor, I know in the

21   case of Mr. Esposito that the clock started ticking on the 90

22   days, provided by statute 3364(b)(5).  Ninety days from

23   sentencing, if it's not determined, it just lapses and there

24   is no restitution for Mr. Esposito.

25         THE COURT:  When does the 90 days run?

1          THE PROBATION OFFICER:  I think he was sentenced

2  in August sometime.  End of August.

3          THE COURT:  It's coming up now in November

4  sometime.  I mean, I had that up a minute ago.

5          Let's see.  He was sentenced on August 25th.

6  Around November 24th.  It's scheduled to run any day now, the

7  90 days, on Mr. Esposito.  I'll tell you what, I'll leave it

8  as it is for now.  I am not going to make it jointly and

9  severally; but if you want me to do that, you need to do

10  something before it lapses on Mr. Esposito, all right?

11          I don't know if I asked you.  Did you have any

12  objection to the sentence, Mr. Crawford?

13          MR. CRAWFORD:  No, ma'am.

14          THE COURT:  I'll get to recommendations in a

15  moment.

16          The defendant is hereby remanded to the custody of

17  the United States Marshal to await designation by the Bureau

18  of Prisons.

19          To the extent permitted by your plea agreement,

20  you have the right of appeal from the judgment and sentence

21  within 14 days from this date.  Failure to appeal within the

22  14-day period shall be a waiver of your right to appeal.  The

23  government may file an appeal from the sentence.

24          You are also advised that you are entitled to

25  assistance of counsel in taking an appeal; and, if you are

1   unable to afford a lawyer, one will be provided for you.  If

2   you are unable to afford the filing fee, the Clerk of the

3   Court will be directed to accept the Notice of Appeal without

4   such fee.

5           Where would you like me to recommend that your

6   client be housed, Mr. Beck?

7           MR. BECK:  Well, I've been reviewing some of the

8   BOP materials in regards to possible facilities.

9   Interestingly, the most recent information I received did not

10  put Butner on that particular list; however, I do think that

11  the Court's recommendation that Mr. McDonald be imprisoned in

12  a facility that has the STOP program would be appropriate.

13          THE COURT:  What kind of program?

14          MR. BECK:  STOP, S-T-O-P.  I may have some

15  materials that I can share with the Court.

16          THE COURT:  Okay.  Any objection to that from the

17  government?

18          MS. THELWELL:  No, Your Honor.

19          THE COURT:  So I'm going to recommend that he be

20  housed in a facility that has the STOP program.

21          All right.  Anything else in terms of location?

22  Your main concern is the STOP program.  Would he like to

23  participate in the UNICOR program?  Anything else that you

24  can think of?

25          MR. BECK:  I think he would like to have it

1  available to him if he decides from to go that direction.

2  He's got some time to think about it.

3           THE COURT:  Okay.  I will defer to the Bureau of

4  Prisons, then --

5           MR. BECK:  Thank you, Your Honor.

6           THE COURT:  -- as to whatever vocational or

7  educational opportunities while he's being evaluated are

8  appropriate.

9           How about your client, Mr. Crawford?

10          MR. CRAWFORD:  Your Honor, we would request a

11  location as opposed to a particular facility.  The location

12  would be Arizona.

13          THE COURT:  In Arizona.  I recommend that the

14  defendant be housed in Arizona.  Any particular part of

15  Arizona or just Arizona?

16          MR. CRAWFORD:  No, ma'am.  There is just a few

17  facilities that have female; but they do have the type of

18  programs we are looking for, and that's why we are requesting

19  there.

20          THE COURT:  Any other recommendations for her?

21          MR. CRAWFORD:  No, ma'am.

22          THE COURT:  Then I will also defer to the Bureau

23  of Prisons.

24          Well, I will just tell you, this was very

25  challenging on a lot of levels.  But whatever we have gone

1   through here, including those of you who are present today in

2   the courtroom, can't compare with what the child victim in

3   this case and other children have from through.  It's just

4   heart-wrenching.

5           Thank you, everybody, for your participation.

6           MS. THELWELL:  Your Honor, may we approach briefly

7   on one point?

8           THE COURT:  Yes.

9           (*The following was held at sidebar*:)

10          MS. THELWELL:  Several of the victims have been

11  mentioned.  Miss Margie Scott did the full name and the

12  victim's mom said the victim's name.  If we could have the

13  record redacted with the initials of those children.

14          THE COURT:  I don't know if there are any

15  reporters here.  There was last time.  Let me see.

16          (*Sidebar paused.*)

17          THE COURT:  Are there any reporters or news media

18  here?

19          (*No responses.*)

20          (*Sidebar resumed as follows*:)

21          THE COURT:  Because children cannot be identified

22  and should not be identified by name, the child victims or

23  victims of sexual assaults.  All right.  In the transcript,

24  we will identify them by initials or we will black it out.

25          MS. THELWELL:  Thank you.

1          (*Sidebar ended.*)

2          THE COURT:  Thank you.  We are in recess.

3          (Proceedings concluded at 1:31 p.m.)

4                          - - -

```
UNITED STATES DISTRICT COURT   )
                               )
MIDDLE DISTRICT OF FLORIDA     )
```

## REPORTER CERTIFICATE


        I, Scott N. Gamertsfelder, Official Court Reporter
for the United States District Court, Middle District of
Florida, do hereby certify that pursuant to Section 753,
Title 28, United States Code, that the foregoing is a true
and correct transcript from the stenographic notes taken by
the undersigned in the matter of *UNITED STATES vs. RICHMOND
JOSEPH MC DONALD and SHAUNA MARYANN BOSELLI*, Case No.
8:16-cr-517-T-33AEP (Pages 1 through 139), and that the
transcript page format is in conformance with the regulations
of the Judicial Conference of the United States.



    /s/ *Scott N. Gamertsfelder, RMR, FCRR*

    *Official Court Reporter*

                              Date: February 26, 2018